# United States Tax Court

T.C. Memo. 2024-55

GARY M. SCHWARZ AND MARLEE SCHWARZ,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 12347-20.                                    Filed May 13, 2024.

————

Ps have a history of conducting real estate activities in South Texas, mostly involving ranch land. Through entities they controlled, Ps bought 15,070 acres of land in Zapata County in 2005 with the intent to improve and sell it. Ps later decided to conduct ecotourism operations consisting of hunting, fishing, and events on a portion of the land.

In the years at issue, 2015–17, ecotourism in Zapata County was conducted by TI, a partnership owned by Ps. TI leased the Zapata County land from entities controlled by Ps. TI also conducted farming and construction operations on the Zapata County land and other properties owned by Ps, related entities, and third parties.

TI filed Schedule F, Profit or Loss From Farming, with its return for each year 2005–20. TI reported income and expenses for both ecotourism and farming/construction operations on Schedule F. TI reported Schedule F gross income totaling over $14 million for years 2005–20. However, large expenses resulted in TI's reporting a Schedule F net loss for each year. These net losses total over $15 million for years 2005–20. TI's Schedule F losses flowed through to Ps, who used them to offset significant taxable income.

[*2]     R issued Ps a notice of deficiency for years 2015–17. R determined that TI's Schedule F activity was not engaged in for profit pursuant to I.R.C. § 183. Multiple adjustments flowed from this determination, including the disallowance of deductions for TI's Schedule F losses. R also determined that a 20% accuracy-related penalty applies for each year at issue.

Ps filed a Petition challenging R's determinations. Ps contend that TI's Schedule F activity was engaged in for profit and that it and the real estate activities that Ps and related entities conducted are a single activity. Ps also contend they have a reasonable cause defense to penalties.

*Held*: TI's Schedule F activity and the real estate activities are separate activities.

*Held, further*, TI's Schedule F activity was not engaged in with the intent to make a profit.

*Held, further*, accuracy-related penalties are not applicable.

————————

*Margarita L. Stone*, *Adam P. Sweet*, *Benjamin J. Peeler*, and *Kacie N.C. Dillon*, for petitioners.

*Matthew R. Delgado*, *Audrey Marie Morris*, and *Roberta L. Shumway*, for respondent.

## TABLE OF CONTENTS

FINDINGS OF FACT .................................................................... 7
I.      Petitioners' Backgrounds .............................................. 7
II.     Dr. Schwarz's System to Grow Big Deer ...................... 8
III.    Real Estate Activities in General ............................... 10
IV.     Tecomate Ranch Hunting Operation........................... 11
V.      Heart Attack (the Buck)............................................. 12
VI.     TI, GMCP, and LSLP ................................................. 12

        A.      TI ................................................................... 13
        B.      GMCP and LSLP ............................................ 13

3

[*3] VII. Creation of La Perla and Jalisco Ranches .......................... 14

    A.    2004–06: Overview of Land Transactions ...................... 14
    B.    2005 and 2006: Decision Not to Sell All the Land........... 15
    C.    Other Zapata County Transactions ................................. 16

VIII. TI's Farming Activity: Early Operations and General
Information.................................................................................. 17

    A.    Early Farming Operations ............................................. 17
    B.    Farming Activity 2015–20: General Information............ 20

IX.    TI's Farming Activity: Ecotourism ............................................ 21

    A.    Overview and Common Amenities.................................. 21
    B.    Hunting Packages.......................................................... 22
        1.    Deer Hunting ...................................................... 22
        2.    Exotics Hunting .................................................. 25
        3.    Upland Bird Hunting........................................... 25
        4.    Waterfowl Hunting .............................................. 26

    C.    Lakes, Fish, and Fishing Packages................................ 26
        1.    Construction of Lakes.......................................... 26
        2.    Management/Upkeep of Lakes............................. 28
            a.    Structure and Water .................................. 29
            b.    Predatory Animals ..................................... 30
            c.    Genetics .................................................... 30
            d.    Food........................................................... 32
            e.    Culling ...................................................... 33

        3.    Outcomes and Pricing.......................................... 33

    D.    Event Packages.............................................................. 35

X.    TI's Farming Activity: Custom Farming.................................... 36
XI.    TI's Farming Activity Income and Expenses: Overview............ 37
XII.    Ecotourism: Analysis of Income and Expenses......................... 40

    A.    Ecotourism: Gross Income.............................................. 40
    B.    Ecotourism: Lease Expenses........................................... 43
        1.    Lease Expenses Overview .................................... 43
        2.    LSLP and GMCP Leases: Terms.......................... 45
        3.    LSLP and GMCP Leases: Problems...................... 46

**[\*4]**          a.   Double Counting Twin Lakes Ranch.......... 46
                   b.   Leases for Grazing Rights........................... 47
                   c.   Starr County Properties............................. 47
                   d.   Waterfowl Hunting Leases ........................ 48
                   e.   Accounting/Payment Issues....................... 48

              4.   Lease Expenses Tax Benefits ............................... 50

         C.   Ecotourism: "Wildlife Operations" Expenses ................. 50
         D.   Ecotourism: Income and Expense Conclusions .............. 52

XIII.  Custom Farming: Financial Analysis........................................ 53
XIV.   Ranching and Other Operations: Financial and Other
       Information........................................................................ 55
XV.    How Ecotourism Drove TI's Schedule F Losses ........................ 56
XVI.   Preparation of Returns........................................................ 58
XVII.  Miscellaneous Facts ........................................................... 59

         A.   Personal Use of La Perla and Jalisco Ranches................ 59
         B.   Setbacks ................................................................ 59
         C.   Petitioners' Net Worth............................................... 60
         D.   Notice of Deficiency and Petition ................................ 60

XVIII. Expert Witness for Deer and Exotics Herds ............................. 60
XIX.   Expert Witness for Property Valuation..................................... 60
XX.    Expert Witness for Business Valuation and Analysis.............. 62

OPINION................................................................................... 62
I.     Burden of Proof................................................................. 62
II.    Evidentiary Issues.............................................................. 63
III.   Whether Any New Matters Were Raised After Trial ................ 63
IV.    The Parties' Work, Petitioners' Credibility, and Years After
       2020................................................................................ 65

         A.   The Parties' Work .................................................... 65
         B.   Petitioners' Credibility .............................................. 66
         C.   Years After 2020 ..................................................... 67

V.     Issues with Dr. Hellickson's Expert Report .............................. 68
VI.    Issues with Dr. Hakala's Expert Report .................................. 71

         A.   Comparison of Income, Losses, and Gross Gains............ 72
              1.   Step One: TI's Income/Losses .............................. 72

**[\*5]**         2.      Step Two: LSLP, GMCP, & Lone Star La Cuesta  73
                 3.      Step Three: Gross Property Gains ........................ 74

         B.      Unrealized Gains in LSLP Work .................................... 80
                 1.      Error Relating to Ownership of Jalisco Ranch ..... 80
                 2.      Error Regarding Jalisco Ranch Value Used ......... 81
                 3.      Errors Regarding TI's Assets ............................... 82

         C.      Conclusion ................................................................. 82

VII.     Section 183 Issue: Introduction ..................................... 83
VIII.    Section 183 Issue: Ascertaining the Activity at Issue .............. 84

         A.      Introduction and Case as a Whole ................................. 84
         B.      Treasury  Regulation  §  1.183-1(d)(1)  and  Caselaw
                 Considerations ........................................................... 86
                 1.      Treasury Regulation § 1.183-1(d)(1) Test ............. 87
                 2.      Treasury Regulation § 1.183-1(d)(1) and Caselaw
                         Factors ............................................................... 94
                         a.      Degree of Organizational and Economic
                                 Interrelationship of the Undertakings ....... 94
                         b.      Business Purpose Served by Carrying On
                                 the Undertakings Separately or Together . 98
                         c.      Similarity of the Undertakings ................... 98
                         d.      Caselaw Factors ......................................... 99

         C.      Conclusion Regarding Activity at Issue ........................ 100

IX.      Section  183  Issue:  Whether  TI's  Farming  Activity  Was
         Engaged In for Profit ................................................... 101

         A.      Manner in Which Taxpayer Carries On the Activity .... 101
         B.      Expertise of Taxpayer or Advisers ................................ 103
         C.      Time and Effort Expended by Taxpayer in Carrying
                 On the Activity ........................................................... 104
         D.      Expectation  That  Assets  Used  in  Activity  May
                 Appreciate in Value .................................................... 105
         E.      Success  of  Taxpayer  in  Carrying  on  Similar  or
                 Dissimilar Activities ................................................... 107
         F.      Taxpayer's History of Income or Losses with Respect
                 to the Activity ............................................................ 107
         G.      Amount of Occasional Profits, if Any ........................... 110
         H.      Financial Status of Taxpayer ....................................... 110

**[\*6]** I.       Elements of Personal Pleasure or Recreation ............... 111
        J.       Conclusion Regarding Section 183................................ 112

X.       Accuracy-Related Penalties ..................................................... 112
XI.      Conclusion ............................................................................... 116

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: Respondent determined the following deficiencies and penalties with respect to petitioners' federal income tax for years 2015–17 (years at issue):

| Year | Deficiency | Penalty § 6662(a)[1] |
|---|---|---|
| 2015 | $496,754 | $99,351 |
| 2016 | 637,924 | 127,585 |
| 2017 | 717,020 | 143,404 |

The issues for consideration are whether (1) the activity reported on Schedules F, Profit or Loss From Farming (farming activity), engaged in by petitioners' partnership, Tecomate Industries, LLC (TI),[2] was a for-profit activity in the years at issue and (2) petitioners are liable for accuracy-related penalties for the years at issue. We hold that TI's farming activity was not engaged in for profit in the years at issue but that petitioners are not liable for accuracy-related penalties.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All counties discussed are in the State of Texas. We round most monetary amounts to the nearest dollar. Some amounts are slightly adjusted to account for rounding.

The acreage of most real properties will be rounded to the nearest whole acre. Because of the numerous real property transactions and acreage measurements performed, sometimes different acreages are listed on documents for a given property. As a result, this Opinion may contain minor inaccuracies regarding acreage of properties (or price per acre when discussing property transactions).

[2] TI is not subject to the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. Before its repeal, TEFRA governed the audit and litigation procedures for many partnerships (including entities that elected to be treated as partnerships).

**[*7]** Many facts stipulated, alleged, argued, testified about, and otherwise presented to the Court in this case are, or appear to be, incorrect or misleading. The parties' work occasionally reflected an uninspired attitude toward developing, trying, and briefing this case. As a result, many potentially relevant facts and arguments were undeveloped, ignored, misrepresented, and/or missed. For example, the parties did not develop or explain TI's financial information sufficiently for us to assign profit margins to different types of farming activity work. The parties also failed to correctly represent where TI's farming activity primarily occurred from 2005 until around 2010.

We have endeavored to present a summation of the facts that is both accurate and complete. Unfortunately, it is not always possible to do both given the case presented to us. To ensure accuracy, portions of this Opinion will be vague, and we will use more passive wording than we otherwise would.

The parties also failed to specify what income and expenses shown in TI's financial records are attributable to non-Schedule F items. The parties agree that the only deficiency issue in dispute is whether TI's farming activity was a for-profit activity in the years at issue. However, TI's financial records do not clearly separate Schedule F and non-Schedule F income and expense items.[3] In certain instances, we have been unable to tell whether items shown on financial records are Schedule F items (and therefore relevant to the deficiency issue in dispute) or are non-Schedule F items (and not relevant). To be conservative, we will concentrate on gross income and expense items that we are reasonably certain are Schedule F items.

FINDINGS OF FACT

I.     *Petitioners' Backgrounds*

Petitioners resided in Texas at all relevant times. They timely filed joint returns for the years at issue.

---

[3] TI reported comparatively small non-Schedule F income and expense items on returns for many relevant years. Respondent did not propose significant adjustments to these small items for the years at issue. Respondent proposed adjustments for Schedule K, Partners' Distributive Share Items, of $79 and $52 for 2015 and 2017, respectively, which the parties did not substantively address. These adjustments may be computational; we will not discuss them further.

**[\*8]**    Petitioners were each born and raised in South Texas. One of Dr. Gary Schwarz's grandfathers was a cattle rancher. Dr. Schwarz's grandparents owned two ranches in South Texas, including one in Starr County where the brush had not been cleared. As a result, deer[4] and other native wildlife remained on this ranch, though in small numbers. In his own words, Dr. Schwarz "fell in love" with deer after observing them at his grandparents' Starr County ranch. As a young man, Dr. Schwarz dreamt of one day growing big deer in South Texas. He was encouraged by his father, Marvin, who was a farmer. Dr. Schwarz would later write: "My life long dream was to buy a South Texas ranch to protect and enjoy the habitat and wildlife for myself and my future heirs and friends." He also later said that this goal "consumed" him.

Petitioners began dating in high school in 1969 and spent a significant amount of time together watching wildlife in South Texas. They also hunted together. Dr. Schwarz has hunted since he was young, and Mrs. Marlee Schwarz began hunting in 1972.

Petitioners married in 1974, and each graduated from college in 1975. Mrs. Schwarz initially worked as a speech therapist but became a homemaker when the first of petitioners' three children was born in 1980. Dr. Schwarz graduated from dental school in 1978 and an oral surgery program in 1983. He has worked as a dentist and oral surgeon since the 1980s. In the years at issue he owned Valley Oral & Maxillofacial Surgery, P.C. (VOMS), and received wages reported on Forms W–2, Wage and Tax Statement, of $2,003,725, $2,200,681, and $2,428,260. He worked roughly 40 hours a week for VOMS. He hired a manager to run VOMS so that he could focus on dental work.

II.    *Dr. Schwarz's System to Grow Big Deer*

Despite his success in dentistry, Dr. Schwarz has never forgotten his love of deer. In the early 1980s he began to study deer and ranch management. He learned that deer were more plentiful and larger in Canada and the Midwest than in South Texas, largely because of a comingling of farms and woods that provided food and habitat for deer. Dr. Schwarz believed he could fulfill his dream to grow big deer in South Texas by mimicking what was happening in Canada and the Midwest. He hypothesized that areas of crops, which he called "food plots," could improve the nutrition available to deer, increasing both the number and the size of deer on a South Texas ranch. He studied dry-land farming

---

[4] All references to "deer" in this Opinion are to white-tailed deer.

**[*9]** and nutritious crops that would be more drought tolerant than those grown in South Texas at the time.

Dr. Schwarz mostly studied legumes, because they contain proteins that help bucks' antlers (and deer in general) grow larger. Larger antlers are important because bucks are generally judged on the size of their antlers. Under the commonly used Boone and Crockett scoring system, a gross score is assigned on the basis of how many inches of antlers a buck has. Deductions for symmetry and other items are made to reach a net score, though most hunters use the gross score.

Dr. Schwarz identified several crops that might grow well in South Texas and looked for a ranch where he could test his food plot hypothesis. In 1983 Dr. Schwarz and six other individuals bought 1,000 acres of land in Starr County. In 1986 they formed a partnership named El Tecomate Ranch[5] and transferred the 1,000 acres to it. El Tecomate Ranch purchased an additional 989 acres of contiguous land in 1986 and named the combined 1,989 acres "Tecomate South Ranch."[6]

In the 1980s Dr. Schwarz hired a dry-land farmer, Rogelio Guerra, to help grow food plots on Tecomate South Ranch. The two started with cow peas and soybeans, and later mixed in legumes from other continents. They also assessed various farming methods, including skipping rows when planting. After several years they determined that certain crops needed to grow a fair amount before deer browsed them, or the deer would kill the young plants. To solve this problem, Dr. Schwarz and Mr. Guerra invented a "reversible fence" that could be raised or lowered by rolling and fastening portions of the fencing. They thus gained control over when deer had access to food plots, allowing plants to grow a sustainable amount and allowing ranchers to let deer in at the time of year (generally the summer) when bucks need protein

---

[5] "Tecomate" was the name of a dilapidated windmill on the 1,000 acres. The word means "basket rack" in a Native American language. Dr. Schwarz chose to use "Tecomate" in the name of the partnership and other endeavors because he believed it added romance and intrigue to operations.

[6] The parties stipulated that "[i]n 1986, petitioners and six partners bought 1,989.37 acres which petitioners call 'Tecomate South Ranch.'" This is incorrect; the evidence clearly shows that the first 1,000 acres were purchased in 1983. *See Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976) (holding that stipulated facts can be superseded when they are clearly contrary to the record). Furthermore, Mrs. Schwarz was not a partner in El Tecomate Ranch in 1986.

**[\*10]** to grow large antlers.[7] This system worked; bucks shot on Tecomate South Ranch began to win hunting competitions by the early 1990s.

The food plots plus reversible fencing combination became the backbone of what Dr. Schwarz calls the "Tecomate System." This system (and to a lesser extent, petitioners' donations of conservation easements on some properties they owned) would turn Dr. Schwarz into a minor celebrity among hunters and outdoor enthusiasts in Texas. In the 1990s Dr. Schwarz and others wrote numerous magazine articles about the Tecomate System, Dr. Schwarz, and/or petitioners' family. Dr. Schwarz also received several awards relating to conservation and gave presentations regarding the Tecomate System.

Neither Dr. Schwarz nor Mr. Guerra patented the reversible fence or the Tecomate System. However, Dr. Schwarz and others formed a partnership named "Tecomate Seed Company" (Tecomate Seed) to sell seeds. The partners freely disseminated information about the Tecomate System. They hoped to promote Tecomate Seed and enlarge the seed market. For example, Dr. Schwarz co-wrote magazine articles detailing how to grow food plots and build reversible fences. The articles included contact information for Tecomate Seed.

Tecomate Seed expanded nationwide, but the partners realized that the seed business was brutally competitive, in part because companies must state their seed formula on each bag sold. At an unclear time, the partners branched out and formed Tecomate Wildlife Systems, Ltd. (Tecomate Wildlife Systems). Tecomate Wildlife Systems sold food plot equipment and consulting services and produced television shows featuring deer hunts. Tecomate Seed became a division of Tecomate Wildlife Systems.

Around 2016 Dr. Schwarz left Tecomate Wildlife Systems because it had built up high levels of debt and the seed division was losing money. Another partner continued to operate the company.

III.    *Real Estate Activities in General*

After seeing the Tecomate System begin to work by the late 1980s, Dr. Schwarz was interested in purchasing additional ranch land

---

[7] Bucks shed their antlers each year and grow new ones before deer hunting season. In counties relevant to this case, deer hunting season runs from early November to late January. *See* 31 Tex. Admin. Code § 65.42(b)(1) (2024).

**[\*11]** in South Texas. Petitioners began to purchase and sell land, mostly through entities they partially or wholly owned (Affiliated Entities). Petitioners and Affiliated Entities have bought and sold over 20,000 acres of land since 1983, almost entirely ranch land in South Texas. At the time of trial they owned over 5,000 acres of land. They also purchased two condominium units, one of which was rented out during portions of the years at issue.

Petitioners and Affiliated Entities have used a variety of methods to sell land at a profit. For most ranch acreage they would buy cheap land, improve it (often by implementing the Tecomate System), and then attempt to quickly resell it. They also often broke up ranches into smaller tracts that could be sold at a higher price per acre.

For example, Dr. Schwarz bought 1,598 acres called Novillos Ranch in 1995 for $514 per acre. In 1996, before implementing the Tecomate System, Dr. Schwarz sold tracts of 392 acres, 273 acres, and (again) 273 acres at an average price of $1,286 per acre. He then implemented the Tecomate System and sold another 169.61 acres for $2,063 per acre during 2001.[8] The final 491 acres were transferred to an Affiliated Entity (G. Morgan Capital Partners, Ltd., discussed *infra* Findings of Fact (FoF) Part VI.B) and sold in 2006 for $3,900 per acre.

For other ranches, petitioners and Affiliated Entities divided the acreage into "ranchettes" of only a few acres. One of the Affiliated Entities, Lone Star La Cuesta, sold owner-financed ranchettes, lending its own money to fund purchases by third parties and generating interest income as loans were repaid (in addition to profits from sales).

IV.   *Tecomate Ranch Hunting Operation*

By 1994 petitioners and Affiliated Entities owned around 4,000 acres of land in Starr County near Tecomate South Ranch. This included 1,266 acres owned by Dr. Schwarz named "Tecomate Ranch." Petitioners sold deer hunts on Tecomate Ranch and other acreage in Starr County that they owned and leased (Tecomate Ranch hunting operation). Petitioners and their family also used Tecomate Ranch. Both the family and paying hunters stayed at a lodge on or near the property.

---

[8] The parties stipulated that Dr. Schwarz sold "166.62 acres for $349,902" in 2001. The settlement statement showing the $349,902 figure clearly states that 169.61 acres were sold. The parties' stipulation is incorrect.

[*12] The Tecomate Ranch hunting operation was not profitable. The reason(s) it was unprofitable was not established. However, in 1997 Dr. Schwarz wrote an article in which he stated:

> I have no concept of proper budgetary restraint! Never have I even come close to breaking even in my ranch activities as my sweet and patient wife, Marlee, is quick to point out. I can tell you how to grow big deer. Although I think it can be done, I can't tell you that I have done it at the level I have and made it pay. . . .
>
> My other great weakness in life besides fiscal irresponsibility is organization. I can't stand paper work!

The Tecomate Ranch hunting operation ran until 2011. At an unclear time, Dr. Schwarz transferred Tecomate Ranch to an entity or entities. Tecomate Ranch was sold by one of the entities in 2011. These facts will be discussed further *infra* FoF Part VIII.A.

## V.     *Heart Attack (the Buck)*

In 1993 Dr. Schwarz and Marvin were on a property owned by an Affiliated Entity when they saw the biggest buck they had ever seen. They named this buck "Heart Attack." Marvin wanted to catch Heart Attack and breed him, but Dr. Schwarz believed that doing so was not legal under Texas state law. Dr. Schwarz later learned of a state program to replenish the deer population on ranches where it had declined. Using the program, Dr. Schwarz transferred Heart Attack and another buck to Novillos Ranch with 40 does for breeding.

Heart Attack lived a long life and died of natural causes. Petitioners by then had numerous of his descendants that were moved to other ranches in which petitioners owned interests.

## VI.     *TI, GMCP, and LSLP*

Petitioners created or repurposed several entities around 2005 that they used in various activities, including farming.

[*13]  A.  *TI*

Petitioners formed G. Morgan Company, LLC, in 1997 and in 2001 renamed it TI.[9] TI was a general partnership; petitioners were managing members and each owned 50% at all relevant times. TI's stated business purpose was "custom farming, hunting, fishing and ecotourism operation."

TI was not noteworthy in the years 2002–04. For years 2002–04 TI reported no receipts and small losses (mostly or entirely from small interests it held in various other entities) of less than $2,500 each year. TI's financial information for years before 2002 was not presented. In 2005 TI stepped up its operations. It began farming operations and reporting Schedule F losses that flowed through to petitioners in years 2005–20.[10] TI's Schedule F losses pertain to the primary issue in this case; they will be discussed *infra* FoF Parts XI–XV.

To clarify, when we refer to "Affiliated Entities" throughout this Opinion, we are not including TI.

B.  *GMCP and LSLP*

Petitioners formed Tecomate Capital Partners, Ltd., as a partnership in 2002 and in 2007 renamed it G. Morgan Capital Partners, Ltd. (GMCP).[11] Petitioners each owned 49.5% and TI owned 1% of GMCP at all relevant times. TI was GMCP's general partner and petitioners were limited partners.

Lone Star La Perla, LP (LSLP), was formed as a partnership in 2005. At all relevant times TI owned 0.25% of LSLP and was its tax matters partner. Dr. Schwarz's brother, Brad Schwarz, owned 20% of LSLP in 2005 and 2006, but GMCP acquired his interest in 2007. GMCP owned 79.75% of LSLP in 2005 and 2006 and 99.75% of LSLP in 2008–20.

---

[9] All references to TI include G. Morgan Company, LLC.

[10] TI's returns and most other records for years after 2020 were not introduced into evidence.

[11] All references to GMCP include Tecomate Capital Partners, Ltd.

**[\*14]** Both GMCP and LSLP bought and sold real estate, almost entirely in South Texas. They also each filed Schedules F for years 2008–12, discussed further *infra* FoF Part VIII.A.

VII. *Creation of La Perla and Jalisco Ranches*

A. *2004–06: Overview of Land Transactions*

In 2004 petitioners agreed to purchase contiguous tracts of land totaling 15,070 acres in Zapata County. A series of closings occurred in 2005; LSLP purchased 6,564 acres and GMCP purchased 8,506 acres. The average price paid per acre was $546 (about $8.2 million total). Petitioners (through GMCP and LSLP) purchased the land as investment property; they intended to improve it and sell it for a profit.

LSLP and GMCP were able to purchase the land for a low price because it was in a state of disrepair. The land had been overgrazed by cattle, and large portions had no access to water. A rundown lodge on the land "smelled like death," as Mrs. Schwarz testified.

Petitioners began to improve the land soon after each tract was purchased.[12] Petitioners cleaned and refurnished the lodge, while using controlled burns and roller chopping to improve the quality of the flora. To fix the water access issue petitioners placed a large submersible pump in a six-acre lake[13] near the lodge (named "House Lake") and laid a pipe (connected to the pump) in an enormous oval to give water access to tracts on the outside of the oval. The lodge sat on 3,030 acres of land within the oval.

Petitioners' vision for the land was attractive to buyers even before the improvements were completed. In 2005 (with one sale in 2006[14]) GMCP sold all 8,506 acres it had purchased and LSLP sold 4,828 acres of the 6,564 acres it had purchased, retaining 1,736 acres that had the lodge and House Lake on it, all inside the oval. The sale price of a 1,362-acre tract is unclear, but petitioners received an average of $783 per acre for the other 11,972 acres that were sold. Profits from the 11,972

---

[12] The parties failed to make a clear record regarding which people/entities did what work on which tracts for many years, especially before 2010. Because the record is not clear, we will simply refer to "petitioners" in most of this FoF Part VII.

[13] Witnesses used the terms "lake" and "pond" somewhat interchangeably. We will use "pond" only when referencing forage ponds (discussed *infra* FoF Part IX.C.2.d).

[14] The sale in 2006 was 181 acres of land sold by LSLP. LSLP repurchased the acreage in 2007 and sold it (again) in 2013. These 181 acres are not especially relevant.

[*15] acres sold were about $2.8 million (excluding all expenses/ improvement costs).

### B. *2005 and 2006: Decision Not to Sell All the Land*

On April 12, 2005, LSLP and GMCP closed on tracts that included all 3,030 acres within the oval. Of these 3,030 acres, GMCP purchased 1,294 acres and sold them to La Perla Negra Investment Group, Inc. (La Perla Negra), also on April 12, 2005. In addition to cash, GMCP received a 14.285% interest in La Perla Negra as part of the sale.

In April 2005 petitioners planned to have LSLP retain its 1,736 acres for about three years before selling them. In these three years petitioners planned to let third parties that had purchased tracts surrounding the 3,030-acre oval stay in the lodge while they were building their own lodges.

Around April 2005 petitioners built a fence around the oval. Dr. Schwarz was building another fence to separate LSLP's 1,736 acres from the other 1,294 acres within the oval (now owned by La Perla Negra), when he discovered three gorges that needed to be filled in. The gorges were created by flowing water. Petitioners could add concrete culverts to fill the gorges and still let water pass through the area, or they could build a lake to halt the flow of water by giving it a place to collect. They chose to build a lake.

Dr. Schwarz began to study lakes and fish, especially bass.[15] In May 2005 he met with Bob Lusk, who ran a lake management company. Mr. Lusk gave Dr. Schwarz advice about lake construction. Petitioners started construction of the lake in June 2005 and finished in 2006. They named the 23-acre lake "Waterworld."

Around the time of his meeting with Mr. Lusk, Dr. Schwarz decided not to sell LSLP's 1,736 acres within the oval.[16] Instead, he decided to perform hunting, fishing, and event operations (ecotourism) on the land, and, in his words, "have a chance to make a profit." Dr. Schwarz knew the Tecomate Ranch hunting operation was unprofitable and that he would have a "hard time" profiting from deer hunting.

---

[15] All references to "bass" in this Opinion are to largemouth bass unless otherwise indicated.

[16] Evidence shows that Dr. Schwarz made major decisions largely on his own starting with this change of mind.

**[*16]** However, he wanted to try a ranch operation with a more diverse income stream (fishing, events, and hunting of various animals). He knew that if ecotourism was not profitable, the land would very likely appreciate anyway. Ecotourism will be discussed at length *infra* FoF Part IX.

At an unclear time, Dr. Schwarz decided to conduct ecotourism on all 3,030 acres within the oval. In May 2006 LSLP purchased 502 acres from La Perla Negra which were combined with the 1,736 acres already owned by LSLP. Petitioners named this 2,238-acre property "La Perla Ranch."[17] In December 2006 GMCP purchased 792 acres from La Perla Negra, which petitioners named "Jalisco Ranch."[18] GMCP contributed Jalisco Ranch to LSLP in 2015.[19]

C. *Other Zapata County Transactions*

The final relevant property in the 15,070 acres originally purchased is Twin Lakes Ranch. This ranch is 1,362 acres, sold by GMCP to a third party in 2005. Marvin traded land he owned to acquire Twin Lakes Ranch, then sold it to Twin Lakes, LLC, in 2011 for $1,974,610. Twin Lakes, LLC, was owned by GMCP in 2011–14, then merged into LSLP in 2015. GMCP acquired Twin Lakes Ranch to obtain a pumping system and then flip the property. GMCP and LSLP tried to sell Twin Lakes Ranch for years, but it languished on the market until it was finally sold in two parcels in 2019 for a total of $2,977,950.

Both as part of and separate from land transactions, in 2005–14 LSLP amassed a sizable amount of rights to water out of the Rio Grande River to use on Zapata County properties. In 2015 LSLP purchased additional water rights for $560,450, which Dr. Schwarz funded by withdrawing funds from his section 401(k) plan at VOMS.

---

[17] The 502 acres were sometimes identified as a separate tract of land called "La Perla Negra," but we will call all 2,238 acres "La Perla Ranch."

[18] The word "Jalisco" is from the name of a song that, when translated, contains the phrase "never give up." As he did with "Tecomate," Dr. Schwarz chose to use "Jalisco" because he believed it added romance to operations.

[19] As discussed *infra* OPINION Part VI.B.1, GMCP may have reacquired Jalisco Ranch from LSLP in 2016.

**[\*17]** VIII. *TI's Farming Activity: Early Operations and General Information*

In this FoF Part VIII we will discuss TI's early farming operations and then general information about TI's farming activity in 2015–20.

A. *Early Farming Operations*

In 2005–08 TI's farming activity took place primarily in Starr County, where TI took over the Tecomate Ranch hunting operation in 2005 and ran it until Tecomate Ranch was sold in 2011. In 2005–08 LSLP conducted most of the farming operations in Zapata County. TI began to take over the Zapata County operations around 2009 and 2010, though it conducted some hunting operations in Starr County until 2011. LSLP conducted some Schedule F operations on La Perla and Jalisco Ranches as late as 2012. A sample of facts supporting these findings follows:[20]

- TI's gross income from hunting in 2005–07 was higher than hunting revenue for any other three-year period in 2005–20. This shows that TI took over an established hunting operation in 2005 and was not building one from scratch in Zapata County. Charts showing hunting income by year are presented *infra* FoF Part XII.

- TI's financial records show that it paid a total of $293,969 to rent land in Starr County in 2005–08.[21] TI continued to rent land in Starr County in 2009, 2010, and 2011, though the amounts paid in those years are unclear.

- Returns for LSLP and GMCP[22] show that TI did not rent La Perla and Jalisco Ranches in 2007 or 2008. TI paid a small amount of money to rent land from LSLP and/or GMCP in 2005 and 2006, though this was not developed, and it is unclear what land was

---

[20] The parties overlooked these facts and made numerous incorrect claims as a result. These discrepancies are discussed further *infra* OPINION Part IV.

[21] TI's profit and loss statements for 2005–08 show expenses for "Hunting Lease SR 6300 ACRES." "SR" stands for "San Roman [Ranch]." Tecomate South Ranch was once part of the San Roman Ranch in Starr County. Dr. Schwarz had a long-term lease on thousands of acres of San Roman Ranch dating back to at least the 1990s.

[22] GMCP's 2005 return is not in evidence because neither party could find it.

**[\*18]** rented. Both LSLP and GMCP owned land in Starr County in 2005 and 2006.

- TI's 2005–12 books and records show that it owned a portion of Tecomate Ranch and other land in Starr County. Ownership of the land was transferred to GMCP in 2013.[23]

- GMCP sold Tecomate Ranch to a third party in late 2011 (see discussion *supra* note 23). The contract of sale and an addendum provide that TI had a lease on thousands of acres of land around Tecomate Ranch that the buyer would sublease. The addendum provides that there were fifteen booked "management buck hunts that [were] to occur during the 2011/2012 hunting season" and that the buyer would be responsible for conducting the hunts. TI was also required to plant winter crops on Tecomate Ranch and leased acreage in late 2011.

- Though TI's invoices for years before 2010 were not introduced into evidence, invoices from 2010 show that TI sold at least two deer hunts on Tecomate Ranch in 2010. Another invoice from October 2011 is labeled "Hunts Booked at San Roman" and shows several hunts booked. Many invoices do not reference the ranch

---

[23] The accounting with respect to the land ownership and transfer(s) appears to be erroneous in two primary ways, which we will summarize.

First, TI's depreciation schedules indicate that it owned (at least a portion of) a 541.57-acre tract that was part of Tecomate Ranch. However, GMCP's financial records also reflect ownership of this tract until the tract was sold in 2011. TI's depreciation schedules (for years before 2013) show the name of the tract, followed by "541.57 Acres." GMCP's balance sheets (for years before 2011) show the name of the tract, followed by "541.57AC." GMCP's balance sheets also state that it has "100% Ownership" of the tract. Why TI ever reported an ownership interest in the tract is unclear. It is even more puzzling why TI continued to report an ownership interest in the tract after GMCP sold the tract (and the remainder of Tecomate Ranch) in 2011.

Second, TI's 2005–12 balance sheets show a total basis in land it owned of $445,961.38. Land was transferred to GMCP in 2013, and GMCP's 2013 balance sheet shows a basis in "Tecomate South 1000AC" of $545,961.38. This is up from $100,000 the year before. Confusingly, GMCP counted the entire $445,961.38 as part of its basis in Tecomate South Ranch even though other properties once owned by TI contributed to the $445,961.38. It is also unclear why GMCP's balance sheets reflect an ownership interest in Tecomate South Ranch at all. If anything, the balance sheets should show an interest in El Tecomate Ranch partnership.

We found apparent errors such as these throughout TI's (and Affiliated Entities') books and records, which often made them difficult to decipher.

[*19]  on which hunts took place, but other exhibits indicate that TI sold other hunts that took place in Starr County in 2010 and 2011.

- TI's depreciation schedules for many years included depreciation from Starr County assets. Depreciation from some Starr County assets was even reported for the years at issue, contributing to large Schedule F losses. Assets depreciated in the years at issue include one labeled "Carpet Hooterville Cabins." Hooterville was the name of the camp that contains the lodge used for the Tecomate Ranch hunting operation.

- LSLP attached Schedule F to each of its 2008–12 returns. The Schedules F report the principal farming activity was "ranching, deer and wildlife." LSLP reported Schedule F losses totaling $2,714,992 for the five years combined.[24] LSLP also reported Schedule F gross income from hunting and "continuing education" as late as 2010. TI later ran continuing education courses on La Perla and Jalisco Ranches. TI took over ecotourism on La Perla and Jalisco Ranches that was already being conducted by LSLP.

- GMCP also attached Schedule F to each of its 2008–12 returns, though it reported Schedule F losses totaling only $53,759. The Schedules F reported that the principal activity was "crop farming."

- When asked how TI's operations changed after he was hired in 2008, TI's bookkeeper testified that "[t]he only thing that changed was the once–[LSLP] was one of the entities that [TI] bought. The La Perla property, fishing was added to the hunting sales." The bookkeeper was then asked: "So when you first worked at [TI], did La Perla Ranch exist?" He responded: "That's correct. It didn't."

- For each year 2005–20 LSLP's returns report that its principal business activity is "Ranching" and that its principal product or service is "Animals." LSLP never updated its activity and product after TI took over operations on La Perla and Jalisco Ranches.

---

[24] LSLP's returns suggest that it could or should have filed Schedules F for earlier years, as its 2005–07 returns show other expenses claimed on Form 1065, line 20, including feed, chemicals, "hunt expense," "fish expense," and/or "seed." Such expenses were deducted on Schedules F for 2008–12.

[*20]  B.  *Farming Activity 2015–20: General Information*

Unless otherwise indicated, the facts stated in this FoF Part VIII.B pertain to 2015–20. For the most part, TI's work in 2015–20 can be divided into three categories: (1) ecotourism, (2) custom farming, and (3) Ranching/Other operations. These operations will be discussed further *infra* FoF Parts IX–XIV.

TI had six full-time employees and also paid independent contractors including a chef, hunting/fishing guides, and seasonal farm workers. TI properly issued tax reporting forms regarding employees and contractors.

One of TI's employees was petitioners' son, Blair Schwarz, an experienced outdoorsman. Blair Schwarz became TI's ranch manager, huntmaster, and fishmaster in 2015. In these roles he was always on La Perla and Jalisco Ranches when customers were present to tend to them. Despite his relationship to petitioners, Blair Schwarz was not overpaid.

Another of TI's employees, from 2008, was a bookkeeper and financial manager named Chris Yelland. Mr. Yelland kept books and managed the finances for TI and most Affiliated Entities, including GMCP and LSLP. Affiliated Entities did not pay TI for Mr. Yelland's work. It was not established who kept books and records before 2008.

Although its employees oversaw TI's day-to-day operations, Dr. Schwarz made all major decisions. Petitioners spent most weekends on La Perla and Jalisco Ranches, which were about a three-hour drive from petitioners' home. When petitioners were on the ranches, Mrs. Schwarz made sure that the lodge was clean and sometimes helped prepare food. She also oversaw decorating of the lodge. Dr. Schwarz often did manual labor on the ranches. In 2012 he suffered a major injury when he fell and hit his head on a bulldozer. Fortunately, he fully recovered.

TI operates a website displaying photographs and descriptions of the various activities on La Perla and Jalisco Ranches, pricing and contact information, and an online store with La Perla Ranch-branded products. The logos on some products and on the website show a silhouette of Heart Attack. TI also promotes its ecotourism using brochures, magazine articles and advertisements, hunting and fishing excursions filmed for episodes of television shows, and social media platforms. Many of the magazine articles focus on Dr. Schwarz's quest to grow large deer and bass. The television shows include those produced

**[\*21]** by Tecomate Wildlife Systems,[25] as well as two other shows that have no connection to petitioners. TI partially or fully comps hunting and fishing excursions featured on television shows.

TI paid for farm liability, property, boat, worker's compensation, vehicle, and crop insurance policies in the years at issue.

IX. *TI's Farming Activity: Ecotourism*

Unless otherwise indicated, the facts stated in this FoF Part IX pertain to 2015–20. Before the years at issue (and especially before 2010) it is often unclear what operations TI was conducting on properties in Zapata County. Because the evidence shows that Dr. Schwarz had made all major decisions for/pertaining to TI, La Perla Ranch, and Jalisco Ranch since around May 2005, we will tend to use his name when we are unsure who/what entity made a decision or took an action.

A. *Overview and Common Amenities*

TI's ecotourism includes sales of hunting packages (for deer, exotic mammals, and birds), fishing packages, and event packages. TI also generates a small amount of income from birdwatching tours, but this will not be discussed further.

TI began to sell hunting packages in 2005, when it took over the Tecomate Ranch hunting operations. By 2015 nearly all TI's ecotourism was conducted on La Perla and Jalisco Ranches, with limited ecotourism conducted on Twin Lakes Ranch until that property was sold in 2019. TI leased La Perla, Jalisco, and Twin Lakes Ranches (and other properties) from LSLP and/or GMCP in the years at issue to conduct ecotourism. These leases are discussed further *infra* FoF Part XII.B.

Whether a customer purchased a hunting, fishing, or event package, there were numerous common elements. After a date was selected, TI sent the primary customer a contract, liability release, and invoice. The customer completed the contract and liability release, then returned them to TI with a 50% deposit toward the package price to complete the booking. The remaining 50% of the package price was due 30 days before the starting date. On the starting date customers were

---

[25] These shows are titled "The Bucks of Tecomate" and "Tecomate Whitetail Nation." The shows have been successful and have each aired for more than a decade, most recently on the Outdoor Channel.

[*22] greeted by Blair Schwarz (or his predecessor) at La Perla Ranch, checked into their rooms, signed any additional liability releases, and reviewed the ranch rules. Hunters attended safety meetings and had their hunting licenses verified.

Customers stayed at the lodge on La Perla Ranch. Before 2017 the lodge had eight bedrooms and four bathrooms. The lodge was remodeled in 2017 to add ten bedrooms and give each bedroom an adjoining bathroom. The lodge had a large living room with a projector screen, an outdoor firepit, a commercial kitchen, and other accommodations. A full football field was maintained near the lodge for customers to use. The chef cooked meals for customers, which often included meat from animals shot on the ranches.

Other common amenities (some with additional fees) on La Perla and Jalisco Ranches included (1) rifle and pistol ranges, with an optional shooting expert to train customers; (2) skeet shooting; (3) a peninsula on one of the lakes with palapas, televisions, bathrooms, and a bar; (4) nighttime hunting of coyotes and pigs; (5) a golfing range with targets; (6) a butterfly garden; (7) fishing, but only for non-trophy-class bass and fish other than bass (unless the customer purchased a fishing package); (8) biking and hiking; and (9) use of off-road vehicles.

B. *Hunting Packages*

1. *Deer Hunting*

TI constantly prepared for deer hunting season by (1) growing food plots, (2) stocking deer feeders, (3) monitoring trail cameras, (4) completing an annual deer survey, (5) maintaining ranches in general, (6) breeding deer, (7) ensuring guides were available to escort customers, (8) determining how many hunts to sell, (9) booking hunts, (10) culling excess deer to avoid overpopulation, and (11) ensuring that all State licensing/regulatory requirements were met. We will elaborate on many of these items.

TI's main goal regarding deer was to grow bucks with large antlers on La Perla and Jalisco Ranches. When customers booked a deer hunt, they selected the class of buck they wanted to hunt for. There were three classes, determined using Boone and Crockett gross scores. "Management" bucks had 130 through 139 inches of antlers and cost $3,000 in the years at issue. "Classic" bucks had 140 through 149 inches of antlers and cost $3,000 plus $200 for each inch above 140 in the years at issue. "Trophy" bucks had 150 or more inches of antlers and cost

**[\*23]** $5,000 plus $250 for each inch above 150 in the years at issue. TI later raised its prices by about 20%. Prices for TI's deer hunting packages were competitive with those of nearby ranches that sell deer hunts.

Before we discuss the hunts, we will address how TI attempted to grow bucks with large antlers. This began with genetics. Dr. Schwarz brought some of Heart Attack's descendants to La Perla and Jalisco Ranches. TI built and used breeding pens on the ranches starting in 2013. Three pens were used at first, though this was later increased to six. TI caught a superior buck (or purchased a "breeder buck" from a third party) and enclosed it with 20 does in a pen. Because does often give birth to twins, this resulted in about 30 fawns per pen, per year that TI could determine the parentage of. The pens protected fawns from predation and were stocked with food, improving a fawn's odds of surviving to maturity. After about 11 months in the pens, deer were released onto La Perla and Jalisco Ranches.

TI used the Tecomate System and supplementary deer feeders to improve nutrition. TI also maintained land in a manner that ensured brush and other elements favorable to deer existed. TI kept the deer it grew on La Perla and Jalisco Ranches by maintaining a high fence around the ranches. Even though the deer were retained on land owned by LSLP/GMCP, they were owned by the State of Texas. *See* Tex. Parks & Wild. Code Ann. § 1.011(a) (West 2015). In addition, because bucks shot in high-fenced areas were not eligible for the Boone and Crockett Record Book, bucks shot on La Perla and Jalisco Ranches were ineligible. All deer-hunting customers were aware of this fact.

Before deer hunting season each year, a helicopter survey was conducted to count deer. Deer counted were divided into buck, doe, and fawn groups. The bucks were further divided by age and antler size. The number of deer in the groups were estimates, as not all deer were seen from the helicopter and some deer were misclassified. Dr. Mickey Hellickson, a wildlife biologist, used survey data to complete a harvest recommendation each year. Harvest recommendations listed how many bucks in each class and age group should be sold for hunts (or culled),[26] as well as how many does should be culled to prevent overpopulation. Because the State of Texas owned the deer, the Texas Parks and Wildlife

---

[26] Trophy and classic bucks should not be harvested until they are at least five years old because bucks' antlers reach their maximum size when bucks are five to seven years old. Bucks with smaller antlers can be harvested or culled at younger ages.

[*24] Department (TPWD) had to approve each harvest recommendation. After hunting season TI reported the number and types of deer shot to the TPWD; this included both culled deer and deer shot by customers.

Because there was no market to sell hunts for does and smaller bucks to be culled, TI's employees and their families culled deer themselves. Petitioners and their family, including their grandchildren, were allowed to hunt for deer to be culled. Every year one grandchild was also allowed to shoot a management buck. Dr. Schwarz, petitioners' three children, and two of petitioners' children-in-law have each shot a trophy buck on film for television shows.

Once a customer was on the ranch, they were assigned a guide. The guides were TI's employees or independent contractors hired by TI for about $250 per day. Each guide took their customer to a hunting blind and used a deer feeder and/or corn to attract deer. The guide examined bucks that came within range and estimated whether any buck was within the customer's booked class. The guides were quite accurate in their estimates, but occasionally made mistakes regarding the class of a buck. If a customer shot a buck that was smaller than the booked class, the customer did not get a refund for the difference in price. If a customer shot a buck that was bigger than the booked class, the customer had to pay the higher price for the larger deer. Customers were aware that the ultimate decision to pull the trigger was theirs and that they were responsible for any increase in price.

When a buck estimated to be within a customer's booked class approached, the customer could shoot it. The guide and the customer would then wait about an hour before approaching the area where the deer was shot. This was because a deer might not immediately die, and if a person approached a mortally wounded deer, it might get up and run for several miles. Once the guide and the customer approached the area, if the deer was not there, they would attempt to follow any trail of blood to find the deer. If that did not succeed, the customer had the option to pay for an independent contractor with hunting dogs to come help find the deer. Most deer were found, but a few were not.

Once the trigger was pulled the deer was considered dead unless it was seen to be alive and healthy afterward. This was because there were occasions where a guide thought a customer missed a buck, which then ran away and was found dead several weeks later. Customers were aware of this rule.

**[\*25]** After the customer shot and the deer was found, the customer would pose for photographs with the deer. TI's employees would then break down the deer. Customers usually wanted the head to go to a taxidermist, which TI could facilitate. If the customer wanted the meat, they would take it home when they left; if not, TI used what they could for meals and donated the rest to charity. Meat from culled deer was similarly used in meals and donated.

TI had a near 100% success rate in getting customers the opportunity to shoot a buck estimated to be in their booked class. On the rare occasion that a customer did not get such an opportunity, the customer did not get a refund.

Deer hunting packages included a three-night stay at the lodge. After a hunter shot a deer, they could stay on the ranch until the end of their booking and enjoy the common amenities. Hunters could also bring nonhunter guests with them for $200 per guest per day in the years at issue, which was later increased to $350 per day. For safety reasons, the maximum number of people hunting deer on La Perla and Jalisco Ranches at the same time was eight. In the years at issue TI fully booked its available deer hunts and had a waiting list.

### 2. *Exotics Hunting*

In 2017 Dr. Hellickson advised TI to stock and sell hunts for exotic antelopes (exotics), including oryx, blackbuck, and nilgai. These are primarily grazing animals, so there would not be much competition with deer for food. Dr. Hellickson believed that exotics could improve TI's income by offering customers horned mammals to hunt year round, as there was no specific season for hunting exotics. TI purchased and released several dozen exotics on La Perla and Jalisco Ranches in 2017.

TI sold hunting packages for exotics for $4,500 per animal. There is little evidence regarding the hunting and management of exotics. The exotics began to reproduce on La Perla and Jalisco Ranches, but TI's financial records reflect that only one or two exotics hunts were sold in each year 2017–20. At some point petitioners began to let one grandchild shoot one exotic each year.

### 3. *Upland Bird Hunting*

TI's upland bird hunts were for quail and dove. Both packages included cleaning and packaging of birds shot. Up to 24 people could hunt for quail or dove on La Perla and Jalisco Ranches at the same time.

**[\*26]** Dove hunts constituted most of TI's bird hunts. In South Texas, dove-hunting season is from early September to late October/early November; then it reopens for a month or so in mid-December. *See* 31 Tex. Admin. Code § 65.314 (2024). For dove hunts TI charged $850 per hunter for a two-night stay for a minimum group of ten hunters. Doves are migratory birds with a predictable flight pattern. TI knew that there would be large groups of doves stopping in fields on La Perla and Jalisco Ranches each year. TI planted corn food plots each year and scattered seeds before hunts to attract doves.

Quail-hunting season is from late October to late February. *See* 31 Tex. Admin. Code § 65.62 (2024). Quail hunts were also for two nights but cost $1,000 per hunter for a minimum group of ten. Little preparation occurred before quail hunting season. Although some quail lived on La Perla and Jalisco Ranches, quail are easily depleted by hunting. Therefore, TI usually bought pen-raised quail and released them in a field before a hunt.

### 4. *Waterfowl Hunting*

TI's waterfowl hunts were for ducks and geese, though TI conducted no waterfowl hunts in 2015–20. Little evidence was presented regarding waterfowl hunting that occurred before 2015, with that evidence pertaining almost entirely to ducks. Like doves, ducks are migratory birds. Unlike doves, ducks have a flight pattern dependent on rainfall. There were two successful duck-hunting seasons on La Perla and Jalisco Ranches before a drier year caused ducks to migrate along the coast instead of through Zapata County. Hunts are usually booked months before hunting season, but at that time one cannot predict whether ducks will migrate through Zapata County. This uncertainty led TI to cease regular waterfowl hunting around 2014.

### C. *Lakes, Fish, and Fishing Packages*

### 1. *Construction of Lakes*

Around the time Waterworld was completed in 2006 a fisheries expert named John Jones became the primary advisor to Dr. Schwarz regarding lakes and fish. Mr. Jones visited La Perla Ranch in 2006 and examined Waterworld and a new lake that was beginning to be constructed named "La Perla Lake." Mr. Jones was informed that Dr. Schwarz wanted to create a world-class bass fishing destination, which meant growing bass that could break the Texas state bass record. At the time of trial, the record of 18.18 pounds had stood since 1992.

**[\*27]** Waterworld was too small and shallow to grow huge bass, so Dr. Schwarz chose to construct La Perla Lake. Mr. Jones gave Dr. Schwarz many recommendations regarding how to construct La Perla Lake to grow huge bass, such as making the lake deeper (to withstand drought and give bass a cool refuge from high surface temperatures) and adding more shoreline to increase fishing areas and fish habitats. Dr. Schwarz followed 80% or more of Mr. Jones's recommendations over the years.

TI constructed at least part of La Perla Lake, though LSLP also worked on the project. The intent was to save money by not hiring a third party. As will be discussed further *infra* FoF Part XIII, TI charged LSLP millions of dollars for construction work on La Perla Lake and other lakes in 2010–20.

La Perla Lake was constructed in sections. Following Mr. Jones's advice, Dr. Schwarz stocked a completed section of the lake with pure Florida bass (the largest type of bass) and other fish to support the ecosystem around 2007, when the entire lake was only 20%–30% complete. When other sections were completed, a trench would be cut to connect sections. The young bass thus grew as the lake did.

Construction of La Perla Lake was completed in 2010. It had about 75 acres of surface area, plus 10 acres of forage ponds (discussed *infra* FoF Part IX.C.2.d). The maximum depth was 15 to 20 feet, and the average depth was about 8 feet.

Around 2010 a new lake was built on La Perla Ranch and named "Trophy Lake." Trophy Lake was expanded by TI in 2015 to have about 18 acres of surface area with an unspecified substantial average depth. Dr. Schwarz intended for Trophy Lake to contain only a small number of huge bass but, as Blair Schwarz testified, "we had plans to develop it into another fishing lake, and we just never did."

By the end of 2010 La Perla Ranch had four lakes: House Lake, Waterworld, La Perla Lake, and Trophy Lake. TI started selling fishing packages in 2011, but only La Perla Lake was used for fishing-package customers in the years at issue.

Jalisco Ranch had a lake named "Lake Louise" that existed before 2005. Dr. Schwarz changed the name to "Lake Marvin" after Marvin died in 2012, and later changed the name again to "Jalisco Lake."[27]

---

[27] All references to Jalisco Lake include Lake Louise and Lake Marvin.

[*28] In 2011 Dr. Schwarz decided to significantly expand Jalisco Lake because, at an unclear time, he went against Mr. Jones's recommendation and added bass with hybrid genes to La Perla Lake to improve catch rates. The hybrid bass interbred with the pure Florida bass in La Perla Lake. This was detrimental to Dr. Schwarz's efforts to create a world-class bass fishing destination because only a pure Florida bass has a realistic chance of breaking the state bass record. As stated in a 2014 article about Dr. Schwarz's fish exploits, Dr. Schwarz "believe[d] that stocking hybrid bass was an insurmountable mistake to realize his fevered passion to build the world's biggest bass. So, he decided to dig another lake . . . ." The article quoted Dr. Schwarz as saying: "What I wouldn't do to go back in time and reverse that decision [to add hybrid bass]!"

Like La Perla Lake, Jalisco Lake was built in sections. The construction was entirely, or almost entirely, completed by TI. In 2014 the lake was 15%–20% complete, at which time it was stocked with specially bred pure Florida bass (discussed *infra* FoF Part IX.C.2.c). Jalisco Lake was completed in 2017; it had about 60 acres of surface area and 25.5 acres of forage ponds. The maximum depth was 20 feet or more, with an average depth around 8 feet. TI began using Jalisco Lake for fishing-package customers in 2020 or 2021.

### 2. *Management/Upkeep of Lakes*

TI did little management/upkeep work on House Lake. This is not unexpected, as House Lake is not used to grow large bass. The work that was done includes installing pipes and fish feeders and building a pier. TI did slightly more work on Trophy Lake and Waterworld, installing a pier and fish feeders for each. On several occasions TI also paid Mr. Jones to analyze the water and to conduct bass surveys. These surveys were done by using electricity to stun fish in an area of the lake, then measuring, weighing, and (optionally) taking genetic samples from bass that floated to the surface. The bass could be returned to the lake unharmed, or, if their weight-to-length ratio was low, they could be culled (discussed *infra* FoF Part IX.C.2.e).

TI has performed far more work on La Perla and Jalisco Lakes than on other lakes. TI paid Mr. Jones to make regular visits to La Perla and Jalisco Lakes to monitor progress toward the goal of growing record-setting bass. The path to accomplish this goal included (1) having lakes with good structure and water, (2) dealing with predatory animals,

**[\*29]** (3) growing pure Florida bass, (4) having plenty of food, and (5) culling undersized bass. We will discuss each of these items.

a.   *Structure and Water*

The structure of La Perla and Jalisco Lakes has been discussed in part above. Both lakes contained deep water with plenty of shoreline and areas for bass and their prey, such as bluegill, to spawn. However, there were problems with the water. The lakes had issues with salt accumulation for years. About one-third of an inch of water evaporated off each lake every day, but salt and other substances were left behind. Over time this buildup caused harmful changes in water chemistry. The bass also expended more calories to live in salty water, which caused them to grow more slowly in later years. Even when TI replaced evaporated water with water from the Rio Grande River (using LSLP's water rights), it diluted the salt and substances only temporarily. The most effective long-term solution for salt/substance accumulation is regular flushing events, typically from rainfall causing a lake to overflow, with the overflowing water carrying salt/substances to a river or neighboring property.

TI performed salt wicking in 2016 to remove salt from La Perla and Jalisco Lakes, but it did not help nearly as much as anticipated. In a 2017 report for TI, Mr. Jones stated: "Salt content continues to be high (and is getting worse each year) . . . and will limit the potential of these fisheries long term. . . . Solutions are not easy or inexpensive but we must continue to explore new ideas and other options to reduce salt levels." Mr. Jones advised Dr. Schwarz for years to lower the spillway on the lakes so they would overflow more easily, but Dr. Schwarz refused to do so because he did not want to do anything that would cause water to pass through the properties. Dr. Schwarz later recognized that he "should have listened to" Mr. Jones.

La Perla and Jalisco Lakes eventually experienced fish kills, which occur when many or all of the fish in a lake die in a short time. Possible reasons for fish kills are a buildup of salt or chemicals from fertilizers, or toxic algae blooms (which can be sustained by high salt levels). In 2020 La Perla Lake experienced a partial fish kill. Then, in 2022, La Perla Lake experienced a complete fish kill in the same month that a partial fish kill occurred in Jalisco Lake. Trophy Lake and Waterworld also experienced fish kills at unspecified times.

[*30] House Lake never experienced a fish kill. House Lake never had a problem with salt/substance levels because its water was pumped out for use in the lodge and on properties surrounding La Perla and Jalisco Ranches, then replaced with water from the Rio Grande River. This caused the water in House Lake to be flushed regularly. After the 2022 fish kills TI took steps to flush water in other lakes by adding pumps and pipes, using the water for crop irrigation.

Although it failed to prevent the fish kills, TI took other measures to improve and maintain the water in La Perla and Jalisco Lakes. TI paid for the lakes to be chemically treated to improve water clarity. Clear waters help bass see prey and lures, improving both size and catch rates. In addition, TI does not permit customers to use boats or fishing lines that have been used in other lakes. This is to prevent the spread of harmful flora and fauna into La Perla and Jalisco Lakes. Finally, TI has paid for aeration systems to be installed in the lakes and several forage ponds to improve water quality by boosting oxygen levels.

b. *Predatory Animals*

La Perla and Jalisco Lakes were not stocked with animals that eat bass. In addition, in 2011 Dr. Schwarz began obtaining state depredation permits that allowed employees on La Perla and Jalisco Ranches to kill double-crested cormorants. These are predatory birds that eat fish and travel in large flocks. Around 2016 Texas stopped issuing the depredation permits as the result of a federal lawsuit. *See Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1 (D.D.C. 2016). This had an adverse impact on TI's fishing operations.

c. *Genetics*

As previously stated, Dr. Schwarz stocked hybrid bass in La Perla Lake, against Mr. Jones's recommendation to grow pure Florida bass. However, TI used "filter socks" to ensure water pumped into La Perla Lake from the Rio Grande River contained no fish or fish eggs that would otherwise dilute the bass genetics or introduce other unwanted species. TI also used these filters for Jalisco Lake. In a 2017 report for TI, Mr. Jones stated that "poor filter sock management practices" led to white bass being introduced into Jalisco Lake. It was not established whether white bass can breed with Florida bass, but they would compete for food regardless. Carp (and possibly tilapia) were also found in Jalisco Lake, and tilapia were found in La Perla Lake. In his 2017 report Mr. Jones

[*31] mentioned the carp and (possible) tilapia in Jalisco Lake, stating: "Today there are not enough individuals of these species in the lake to cause observable effects, however overtime [sic] it could create problems," presumably due to competition for food.

The Florida bass stocked in Jalisco Lake in 2014 were sourced from the TPWD's "ShareLunker Program." This program was designed to grow larger bass in Texas public lakes, with a long-term goal of growing a world record-sized bass.[28] An angler who caught a 13-pound bass or larger could alert the TPWD, who would pick up the fish and genetically test it to ensure it was a pure Florida bass. If it was, the TPWD might use the fish for breeding purposes before returning it to the lake in which it was caught. Half of any offspring were stocked in the lake where the bass was caught, while the remainder stayed with the TPWD and/or were used to stock public lakes.

In early 2014 Dr. Schwarz learned that the TPWD was looking for private lakes that it could stock with ShareLunker Program offspring and study them as they aged. He contacted the TPWD about participating in this study. By written agreement effective May 1, 2014, Dr. Schwarz and the TPWD agreed that Jalisco Lake would be used to conduct ShareLunker Program research.[29] The agreement was to last 15 years, in which time the TPWD would own all fish in Jalisco Lake and no fishing could take place.[30] Although not stated in the agreement, it was understood that Dr. Schwarz would incur expenses related to bass food and lake upkeep. TI ultimately incurred these expenses.

The agreement could be terminated early by either party for numerous reasons, including if "either party determines, in that party's sole discretion, that termination is in that party's best interest." If the agreement was terminated early, the TPWD was permitted to access Jalisco Lake and remove any fish that it wanted to. After the

---

[28] As of 2014 the world record was over 22 pounds.

[29] The agreement states that Dr. Schwarz is a party to the agreement. LSLP, GMCP, and TI are not mentioned. Dr. Schwarz signed the agreement and listed his title as "Owner – La Perla Ranch Jalisco Lake." Despite this, the parties stipulated that LSLP and the TPWD are the parties to the agreement.

[30] The TPWD wanted the bass to be undisturbed (except by TPWD employees) while they grew. TI may not have complied with the "no fishing" requirement; a 2017 report by Mr. Jones regarding bass in Jalisco Lake states: "Numerous hook marks were observed . . . ; fishing pressure should be reduced considerably (ideally eliminated completely)." The parties did not address this.

[*32] TPWD removed such fish, Dr. Schwarz would own all the remaining fish.

About 7,000 ShareLunker Program offspring were stocked in Jalisco Lake in 2014. From 2014 through 2016 or 2017 the TPWD conducted yearly surveys of Jalisco Lake to monitor the growth of the bass, which was faster than average. At the time, Jalisco Lake was one of only three private lakes in Texas that the TPWD used for ShareLunker Program research. Private lake owners could not otherwise obtain ShareLunker Program bass from the TPWD (unless a qualifying bass was donated and they received half of the offspring), meaning that Jalisco Lake contained specially bred bass that were rare.

The TPWD ceased the yearly surveys at some point after the 2016 or 2017 survey. The ShareLunker Program study in Jalisco Lake was terminated early by the TPWD in 2020 or 2021. The reasons for these decisions are unclear. The TPWD removed some bass from Jalisco Lake, though most remained in Jalisco Lake and became the property of Dr. Schwarz/LSLP.

### d. *Food*

Food is almost always the limiting factor when growing large bass because (1) large quantities of food are expensive; (2) bass reproduce heavily, with large female bass capable of laying tens of thousands of eggs; (3) bass need 10 pounds of food to gain 1 pound of weight; and (4) bass continue to grow until they die and will not reach their maximum potential weight if they go through a period with little food.

Dr. Schwarz stocked La Perla and Jalisco Lakes with fathead minnows, bluegill, threadfin shad, and other fish that are good prey for bass. He also stocked fish feeders on the lakes and forage ponds to help grow fish. Dr. Schwarz used forage ponds to grow additional food for bass, such as freshwater crawfish. The forage ponds were periodically drained into La Perla and Jalisco Lakes.

Growing prey in La Perla Lake, Jalisco Lake, and the forage ponds was far more cost effective than purchasing prey from a retailer. At the time of trial Mr. Jones charged $15 per pound of prey fish. It cost about $0.75 per pound for Dr. Schwarz to grow his own. Still, this adds up considering the "10 pounds of food for 1 pound of weight" rule and the fact that there were over 6,000 bass in La Perla Lake in early 2016. There were also thousands of bass in Jalisco Lake.

**[\*33]**     e. *Culling*

Routine culling of undersized bass in a lake is extremely important to grow large bass. If not culled, genetically smaller bass will compete for food with larger bass. Because bass reproduce heavily, it quickly becomes financially burdensome to provide adequate food if culling is not regularly completed. While culling will greatly assist in growing huge bass, it can reduce catch rates because there are fewer bass in a lake and the bass that remain have more food and may not be hungry enough to bite a lure.

Mr. Jones constantly urged Dr. Schwarz to cull more bass but received pushback due to low catch rates. In a February 2016 report Mr. Jones estimated that 95%–98% of prawns added to La Perla Lake were eaten by bass that should be culled. Mr. Jones recommended culling "6000 or more bass" from La Perla Lake as a result; it was not established what number were actually culled. In an August 2017 report Mr. Jones again recommended more culling in La Perla Lake.

A round of culling was carried out in Jalisco Lake in January 2016.[31] In an August 2017 report, Mr. Jones noted "signs of overpopulation and consequently decline in the intermediate bass" in Jalisco Lake. Mr. Jones stated that culling "will be the most impactful management strategy to . . . get back to positive growth trends." Whether culling was sufficient after August 2017 was not established.

3. *Outcomes and Pricing*

It takes years to grow bass large enough that fishermen will pay to fish on a lake. The average growth rate for bass in Texas is about one pound per year, with exceptional growth rates being two to three and one-half pounds per year. After being stocked around 2007, the bass in La Perla Lake experienced exceptional growth rates, which allowed TI to start offering fishing packages in 2011.

In 2013 bass above 12 pounds were found in La Perla Lake. On February 19, 2015, Blair Schwarz caught a bass weighing 14.3 pounds, which was still the largest bass caught in La Perla Lake as of

---

[31] It was not established whether the TPWD approved any culling before the ShareLunker Program agreement with Dr. Schwarz was terminated.

[*34] August 2022.[32] However, growth rates then significantly slowed. As Mr. Jones stated in his August 2017 report:

> [T]he younger bass in the lake are growing at the proper rate. After four years of age growth rates become non-linear and reach an asymptote (taper off). This obviously is a negative relationship and suggests some factor (water quality/competition) becomes so great as bass age, positive growth trends essentially stop. . . .

> The essentially year-round growing season and physiologically demanding environment (high water temperatures/high salt levels) is clearly taking a toll on the bass population.[33]

Shortly before the 2022 fish kill that killed all bass in La Perla Lake, an electrofishing survey found a bass weighing 16 to 16.5 pounds.

Less information was provided about the bass in Jalisco Lake. They were growing exceptionally well as of January 2016, though there was a "slight decline in relative weight" measured in a May 2017 survey. The largest bass in the May 2017 survey weighed about 7.5 pounds.

In the years at issue, TI's weekend fishing packages (two nights) cost $3,500 to $4,000 per person depending on group size and the days of the week. Packages included use of TI's boats and a guide who could identify the best areas to fish. As with hunters, fishing customers enjoyed the common amenities and could bring nonfishing guests for the same price as guests of hunters.

TI's bass fishing was catch and release. All customers were aware of this. If a customer caught a large bass, they could weigh it and take photographs and detailed measurements. A taxidermist could use measurements and photographs to recreate a likeness of the bass, though this was not included in the fishing package price.

TI hoped that a state record bass would be grown and caught in Jalisco or La Perla Lake, which TI could then capitalize on by raising fishing package prices and/or seeing an increase in demand. There was

---

[32] Blair Schwarz caught this bass while teaching his predecessor how to guide fishing customers. It was not a personal activity.

[33] Potential temperature issues in La Perla Lake were not elaborated on in the report or addressed in depth by the parties.

**[\*35]** also the opportunity for sponsorship deals with fishing equipment manufacturers, or TI might have been able to sell the record bass' offspring or sell the bass itself to a company for display.[34] Mr. Lusk believed that offspring from a state record bass could sell for as much as $20 each, a significant amount considering such a bass could lay tens of thousands of eggs.[35]

TI was not the only entity/person attempting to grow a state record bass in a private lake in Texas. As Mr. Lusk testified: "It's a competitive thing, you know, among guys." Despite the efforts of TI and others, no state record bass had been caught in a private lake in Texas at the time of trial. Part of the reason for this (aside from high expenses) is the multitude of things that can go wrong before bass could grow that large. As Mr. Jones testified:

> [O]ur edict as a manager is try to, where possible, to manage the risk of [adverse] events, but to grow a truly large fish, you're trying to not have a catastrophe for 10 or 12 years, not a single one. And you know, take any type of work that you might do and not have this–with live animals and not have any setback for that period of time is very, very hard to do. It almost never happens really.

In addition, even if a bass grows to a state record size it needs to be caught on a fishing line to set the record.

Petitioners' family members are allowed to fish at House Lake and Waterworld because these lakes do not have large bass. They are also allowed to catch other types of fish, such as bluegill, from the piers on La Perla and Jalisco Lakes.

D.    *Event Packages*

A number of events took place on La Perla and Jalisco Ranches, including company retreats, continuing education courses, and a football camp. One of the continuing education courses was run by Dr. Schwarz for dentists. This course occurred each year 2010–19, with VOMS paying

---

[34] Dr. Schwarz testified that at some point the TPWD began to interpret an existing regulation to prohibit selling bass but that Mr. Jones "feels certain that's going to change back in the near future." It is not clear which regulation Dr. Schwarz was referring to, nor whether it applies to the sale of young bass offspring.

[35] Only female bass grow to a state record size. Male bass are much smaller.

**[\*36]** TI an average fee of about $24,500 per year. VOMS also paid TI $18,750 to host a two-night Christmas party at the ranches in 2012.

Pricing for events depended on several factors, including whether persons in the group hunted. For example, a two-day football camp with no noted hunting resulted in a payment of $4,000 to TI. When an event guest hunted, sometimes TI counted the hunting portion charge as hunting and/or other wildlife gross income, while other times the hunting portion charge was counted as event gross income.[36]

X. *TI's Farming Activity: Custom Farming*

TI's custom farming was essentially general farming and construction work. This included clearing land, disking, plowing, planting, constructing fencing, building roads, constructing lakes, etc. TI owned equipment and vehicles that it used to complete this work, including trucks, tractors, commercial mowers, etc. Most work was completed by TI's employees, though TI occasionally hired outside experts to do specific jobs, such as digging underneath gas lines. Most of TI's custom farming work in and after 2010 was completed for LSLP and GMCP, such as building lakes and other improvements on La Perla and Jalisco Ranches. Affiliated Entities also paid TI for custom farming work completed on other properties those entities owned. Several third parties also hired TI for custom farming work. More information about custom farming and an overview of payments TI received for custom farming work in the years at issue are included *infra* FoF Part XIII.

---

[36] For example, in 2015 a third party paid TI $30,681 for an event that included dove hunting. In TI's accounting records, $20,075 (for bird hunting and an early arrival fee) was attributed to bird hunting gross income, $4,166 (for ammo, menu upgrade, gas, and motivational books) was attributed to "Other" hunting gross income, $440 (for shirts) was attributed to nonhunting wildlife gross income, and $6,000 (for range shooting sports) was attributed to "Wildlife Revenue - Other" gross income.

Gross income allocation for similar events in 2019 changed. TI's 2019 profit and loss statement shows bird hunting gross income of $16,700. Invoices show that two dove hunts of $5,500 and $11,200 (paid by two third parties) make up the $16,700. However, three other third parties paid $17,250, $10,500, and $30,000, respectively, for dove hunting that took place during events. It appears all $57,750 was attributed to event package gross income (though a small portion may have been attributed to another category such as "Other" ecotourism gross income; detailed accounting records were introduced regarding only the years at issue).

[*37] XI.    *TI's Farming Activity Income and Expenses: Overview*

TI's Schedule F losses for years 2005–20 total $15,449,685, as shown in the following table:

| Year | Schedule F Income | Schedule F Expenses | Schedule F Net Loss |
|---|---|---|---|
| 2005 | $585,805 | $885,945 | ($300,140) |
| 2006 | 844,616 | 1,537,315 | (692,699) |
| 2007 | 713,068 | 1,737,993 | (1,024,925) |
| 2008 | 528,166 | 1,841,740 | (1,313,574) |
| 2009 | 1,174,098 | 1,784,932 | (610,834) |
| 2010 | 980,428 | 1,912,028 | (931,600) |
| 2011 | 731,765 | 1,403,037 | (671,272) |
| 2012 | 1,642,047 | 1,828,800 | (186,753) |
| 2013 | 1,179,021 | 2,266,321 | (1,087,300) |
| 2014 | 1,520,652 | 2,532,491 | (1,011,839) |
| 2015 | 506,262 | 1,635,595 | (1,129,333) |
| 2016 | 708,958 | 2,185,470 | (1,476,512) |
| 2017 | 367,794 | 2,055,949 | (1,688,155) |
| 2018 | 790,741 | 2,020,889 | (1,230,148) |
| 2019 | 1,028,623 | 1,851,629 | (823,006) |
| 2020 | 1,036,524 | 2,308,119 | (1,271,595) |
| **Total** | **$14,338,568** | **$29,788,253** | **($15,449,685)** |

[*38] TI's Schedule F gross income breaks down as follows:[37]

| Year | Ecotourism | Custom Farming | Ranching[38] | Other | Total |
|---|---|---|---|---|---|
| 2005 | $182,300 | Unspecified[39] | $177,510 | $225,995 | $585,805 |
| 2006 | 184,800 | $585,175 | 32,195 | 42,446 | 844,616 |
| 2007 | 180,121 | 203,750 | Unspecified | 329,197 | 713,068 |
| 2008 | 135,213 | 209,503 | 28,494 | 154,956 | 528,166 |
| 2009 | 113,850 | 902,945 | 19,172 | 138,131 | 1,174,098 |
| 2010 | 174,850 | 513,650 | 18,679 | 273,249 | 980,428 |
| 2011 | 143,745 | 462,860 | 11,991 | 113,169 | 731,765 |
| 2012 | 165,340 | 1,362,127 | 83,963 | 30,617 | 1,642,047 |
| 2013 | 207,329 | 750,356 | 178,367 | 42,969 | 1,179,021 |
| 2014 | 217,015 | 767,753 | 464,453 | 71,431 | 1,520,652 |
| 2015 | 274,974 | 156,450 | 42,527 | 32,311 | 506,262 |
| 2016 | 250,838 | 382,226 | 13,637 | 62,257 | 708,958 |
| 2017 | 224,528 | 77,664 | 13,050 | 52,552 | 367,794 |
| 2018 | 265,585 | 351,851 | 20,581 | 152,724 | 790,741 |
| 2019 | 319,650 | 494,369 | 119,936 | 94,668 | 1,028,623 |
| 2020 | 259,622 | 563,424 | 112,455 | 101,023 | 1,036,524 |
| **Total** | **$3,299,760** | **$7,784,103** | **$1,337,010** | **$1,917,695** | **$14,338,568** |

[37] Most figures in the table are from TI's profit and loss statements. For numerous years we were unable to reconcile profit and loss statement figures to those on Schedule F for the same year. In such instances, we used ecotourism, custom farming, and ranching figures from profit and loss statements, then included remaining Schedule F gross income in the "Other" category. The Other category (discussed further *infra* FoF Part XIV) comprises mostly cattle sales income, crop insurance proceeds, and dividend income.

[38] The ranching category (discussed further *infra* FoF Part XIV) comprises mostly gross income from consulting, fuel reimbursements, and sales of water.

[39] Custom farming income was included in ranching and/or "Other Revenue" on TI's 2005 profit and loss statement. TI's 2005 Schedule F indicates that the amount of custom farming income was $147,500.

[*39] We are unable to break down TI's expenses into the same categories. Most expense categories shown on TI's profit and loss statements and returns (such as vehicles/machinery, wages/benefits, and general/administrative) cannot be assigned solely to one income category or properly divided among them, at least not with the information in the record. A table showing the largest expense categories from TI's profit and loss statements follows:[40]

| Year | General & Admin. | Ranching Operations | Wildlife Operations | Wages & Benefits | Vehicles & Machinery | Depreciation & Amort. |
|---|---|---|---|---|---|---|
| 2005 | $43,297 | $85,214 | $149,079 | $161,212 | $175,645 | $169,886 |
| 2006 | 65,657 | 205,537 | 134,120 | 267,624 | 291,121 | 361,980 |
| 2007 | 65,631 | 205,894 | 187,301 | 294,258 | 260,942 | 454,593 |
| 2008 | 59,717 | 262,354 | 242,514 | 294,749 | 346,624 | 448,795 |
| 2009 | 36,430 | 356,278 | 132,429 | 287,767 | 399,008 | 430,835 |
| 2010 | 62,920 | 410,770 | 85,825 | 262,451 | 400,988 | 439,606 |
| 2011 | 65,445 | 238,946 | 112,470 | 228,441 | 365,967 | 279,548 |
| 2012 | 61,189 | 360,212 | 143,668 | 320,161 | 462,158 | 360,282 |
| 2013 | 82,307 | 535,121 | 199,747 | 355,689 | 471,526 | 220,825 |
| 2014 | 63,791 | 1,229,251 | 219,945 | 361,868 | 371,648 | 197,423 |
| 2015 | 57,644 | 641,271 | 223,006 | 289,315 | 182,098 | 194,824 |
| 2016 | 81,593 | 838,966 | 403,474 | 356,903 | 240,654 | 199,586 |
| 2017 | 69,057 | 732,909 | 290,192 | 339,728 | 236,652 | 324,235 |
| 2018 | 97,109 | 673,424 | 284,210 | 324,104 | 294,198 | 243,126 |
| 2019 | 119,427 | 383,082 | 315,197 | 450,860 | 269,769 | 245,682 |
| 2020 | 131,947 | 523,670 | 393,672 | 431,716 | 242,567 | 486,625 |
| Total | $1,163,161 | $7,682,899 | $3,516,849 | $5,026,846 | $5,011,565 | $5,057,851 |

These expenses total $27,459,171. We will discuss some of TI's expenses further *infra* FoF Parts XII–XV.

---

[40] A small percentage of these expenses may not be attributable to TI's farming activity.

[*40] XII.    *Ecotourism: Analysis of Income and Expenses*

A.    *Ecotourism: Gross Income*

TI's ecotourism gross income is from hunting packages, fishing packages, event packages, and other items, as follows:

| Year | Hunting Packages | Fishing Packages | Event Packages | Other[41] | Total |
|------|------|------|------|------|------|
| 2005 | $161,450 | N/A | N/A | $20,850 | $182,300 |
| 2006 | 155,800 | N/A | N/A | 29,000 | 184,800 |
| 2007 | 188,971 | N/A | N/A | (8,850) | 180,121 |
| 2008 | 135,213 | N/A | N/A | N/A | 135,213 |
| 2009 | 113,850 | N/A | N/A | N/A | 113,850 |
| 2010 | 130,700 | N/A | $30,000 | 14,150 | 174,850 |
| 2011 | 113,050 | $3,495 | 20,000 | 7,200 | 143,745 |
| 2012 | 102,114 | 5,371 | 56,750 | 1,105 | 165,340 |
| 2013 | 145,714 | 8,400 | 47,215 | 6,000 | 207,329 |
| 2014 | 131,747 | N/A | 70,002 | 15,266 | 217,015 |
| 2015 | 153,149 | 59,872 | 46,400 | 15,553 | 274,974 |
| 2016 | 147,916 | 32,604 | 51,300 | 19,018 | 250,838 |
| 2017 | 142,325 | 38,003 | 42,000 | 2,200 | 224,528 |
| 2018 | 137,663 | 14,550 | 109,873 | 3,500 | 265,585 |
| 2019 | 130,471 | 31,750 | 143,124 | 14,304 | 319,650 |
| 2020 | 186,179 | 27,800 | 44,201 | 1,442 | 259,622 |
| **Total** | **$2,276,312** | **$221,845** | **$660,865** | **$140,738** | **$3,299,760** |

There has been an upward trend in event package gross income; the dip in 2020 was likely due to the COVID-19 pandemic. At least a portion of this trend is due to a shift in accounting to assign more income

---

[41] Other ecotourism income includes hunting rights lease income, various fees, and other small items. These items are not particularly significant. The negative amount for 2007 is entirely attributable to "Tips."

[*41] to events that might instead be assigned to hunting packages (especially for birds), discussed *supra* note 36.

TI broke down its hunting package income among deer, bird, exotic, and "other" hunting package income, as follows:

| Year | Deer | Bird | Exotic | Other[42] | Total |
|---|---|---|---|---|---|
| 2005 | $125,300 | Not specified | N/A | $36,150 | $161,450 |
| 2006 | 33,250 | Not specified | N/A | 122,550 | 155,800 |
| 2007 | 25,500 | $7,000 | N/A | 156,471 | 188,971 |
| 2008 | Not specified | Not specified | N/A | Not specified | 135,213 |
| 2009 | 69,846 | Not specified | N/A | 44,004 | 113,850 |
| 2010 | 70,768 | 36,000 | N/A | 23,932 | 130,700 |
| 2011 | 48,667 | 61,500 | N/A | 2,883 | 113,050 |
| 2012 | 52,612 | 48,747 | N/A | 755 | 102,114 |
| 2013 | 88,209 | 41,700 | N/A | 15,805 | 145,714 |
| 2014 | 76,418 | 52,497 | N/A | 2,832 | 131,747 |
| 2015 | 93,568 | 48,092 | N/A | 11,489 | 153,149 |
| 2016 | 94,642 | 46,236 | N/A | 7,038 | 147,916 |
| 2017 | 64,811 | 64,190 | $4,531 | 8,793 | 142,325 |
| 2018 | 109,189 | 18,150 | 6,269 | 4,054 | 137,662 |
| 2019 | 105,454 | 16,700 | 8,500 | (183) | 130,471 |
| 2020 | 143,366 | 29,314 | 6,600 | 6,900 | 186,180 |
| **Total** | **$1,201,600** | **$470,126** | **$25,900** | **$443,473** | **$2,276,312** |

---

[42] Other hunting package income in the years at issue included some non-hunting guest fees, ammunition, other food and supplies, motivational books, and other miscellaneous items. Most hunting package income in 2006 and 2007 was included in other hunting package income for an unclear reason.

**[\*42]** TI further broke down the deer hunting packages among management, classic, and trophy buck hunts, as follows:

| Year | Management | Classic | Trophy | Total |
|---|---|---|---|---|
| 2005 | $71,250 | $40,400 | $13,650 | $125,300 |
| 2006 | 17,700 | 300 | 15,250 | 33,250 |
| 2007 | 16,200 | 9,300 | N/A | 25,500 |
| 2008 | Not specified | Not specified | Not specified | Not specified |
| 2009 | 39,102 | N/A | 30,743 | 69,846 |
| 2010 | 42,571 | N/A | 28,197 | 70,768 |
| 2011 | 31,767 | N/A | 16,900 | 48,667 |
| 2012 | 18,165 | 3,068 | 31,379 | 52,612 |
| 2013 | 52,259 | 14,531 | 21,419 | 88,209 |
| 2014 | 50,715 | 16,519 | 9,184 | 76,418 |
| 2015 | 21,639 | 37,172 | 34,757 | 93,568 |
| 2016 | 37,605 | 16,527 | 40,510 | 94,642 |
| 2017 | 39,430 | 17,524 | 7,857 | 64,811 |
| 2018 | 57,196 | 22,693 | 29,300 | 109,189 |
| 2019 | 23,616 | 12,087 | 69,750 | 105,454 |
| 2020 | 19,272 | 29,000 | 95,093 | 143,366 |
| **Total** | **$538,487** | **$219,121** | **$443,989** | **$1,201,600** |

Several things stand out in the two prior tables. First, total hunting gross income for years 2005–07 was higher than for any other three-year period, likely because TI took over the established Tecomate Ranch hunting operation in 2005. Second, hunting income has increased since 2010. Third, bird hunting income fell after 2017,[43] though deer hunting income rose after 2017. Fourth, increased income from trophy

---

[43] This may be explained by some bird hunting income being classified as event income in later years, as discussed *supra* note 36.

**[*43]** buck hunts in 2019 and 2020 indicates that the breeding pens TI began using in 2013 were working. Finally, few exotic hunts were sold.

### B.  *Ecotourism: Lease Expenses*

Turning to TI's ecotourism expenses, we will first discuss lease expenses, as they alone are larger than gross income from ecotourism.

### 1.  *Lease Expenses Overview*

TI rented the land on which it conducted ecotourism from Affiliated Entities.[44] Expenses to rent land in Starr County constitute most or all of the ecotourism lease expenses in 2005–08. TI also rented La Perla and Jalisco Ranches from LSLP and GMCP beginning in 2009.[45] In 2012–20 almost all of TI's ecotourism lease expenses were for rents paid to LSLP and GMCP. Specific properties that TI rented from LSLP and GMCP during the years at issue will be discussed later in this FoF Part XII.B.

In many years between 2006 and 2020 TI paid a small amount of rent (usually $5,000) to Mr. Guerra for hunting rights.[46] The rents paid to Mr. Guerra were not explained.

---

[44] TI's profit and loss statements reflect two types of ecotourism-related lease expenses, "Lease - Land" expenses and "Hunting Lease" expenses. There appear to be no significant differences between the two, so we will combine them in the table on the next page. A third type of lease expense pertained to Mr. Yelland's home office. This lease expense was not strictly an ecotourism expense, so we will not discuss it in this FoF Part XII.B.

[45] As discussed *supra* FoF Part VIII.A, TI paid a small amount to rent land from LSLP and GMCP in 2005 and 2006, though it is unclear what land was rented.

[46] After he helped develop the Tecomate System, Mr. Guerra worked for or with petitioners for many years. He was an employee of TI in the years at issue.

**[*44]** The amounts of lease expenses (subtracting home office rents paid to Mr. Yelland) are as follows:[47]

| Year | Ecotourism Lease Expenses |
|---|---|
| 2005 | $67,409 |
| 2006 | 85,460 |
| 2007 | 73,300 |
| 2008 | 112,200 |
| 2009 | 234,800 |
| 2010 | 273,174 |
| 2011 | 100,758 |
| 2012 | 85,550 |
| 2013 | 488,438 |
| 2014 | 908,612 |
| 2015 | 425,370 |
| 2016 | 497,981 |
| 2017 | 441,410 |
| 2018 | 309,886 |
| 2019 | 5,000 |
| 2020 | 105,326 |
| **Total** | **$4,214,674** |

Total ecotourism lease expenses of $4,214,674 for years 2005–20 are greater than all gross income from ecotourism in that time ($3,299,760). If we limit the years to 2010–20, the difference between the numbers increases, with ecotourism lease expenses of $3,641,505 over $1 million higher than ecotourism gross income of $2,503,476.

---

[47] For most years, lease expenses shown in TI's profit and loss statements match lease expense deductions on Schedule F. However, there were discrepancies for 2013 and 2017. It is unclear why the discrepancies exist. For 2013 we find that the Schedule F is correct. For 2017 we find that the profit and loss statement is correct. Returns for LSLP and GMCP and TI's 2017 general ledger support these findings.

**[\*45]**      2.      *LSLP and GMCP Leases: Terms*

As previously stated, almost all of TI's ecotourism lease expenses for years 2012–20 were for rents paid to LSLP and GMCP. TI entered into written leases with LSLP and GMCP running from January 1, 2014, to December 31, 2023, which were introduced into evidence.[48] Dr. Schwarz signed each lease for both the tenant (TI) and the landlord (LSLP or GMCP). A brief description of each lease follows:

- GMCP Lease #1: Deer hunting lease covering 2,153 acres in Zapata County and 955 acres in Starr County[49] at $12.50 per acre per year ($38,850 total per year).

- GMCP Lease #2: Upland bird hunting lease covering 2,153 acres in Zapata County and 955 acres in Starr County at $7.50 per acre per year ($23,310 total per year).

- GMCP Lease #3: Waterfowl hunting lease covering 1,362 acres in Zapata County at $6 per acre per year ($8,172 total per year).

- GMCP Lease #4: Fishing lease covering 1,362 acres in Zapata County at $10 per acre per year ($13,620 total per year).

- GMCP Lease #5: Livestock grazing lease covering 2,153 acres in Zapata County and 955 acres in Starr County at $9.50 per acre per year ($29,526 total per year).

- LSLP Lease #1: Deer hunting lease covering 3,575.40 acres in Zapata County and 140 acres in Starr County at $12.50 per acre per year ($46,443 total per year).

- LSLP Lease #2: Upland bird hunting lease covering 3,575.40 acres in Zapata County at $7.50 per acre per year ($26,816 total per year).

- LSLP Lease #3: Waterfowl hunting lease covering 3,005 acres in Zapata County at $10 per acre per year ($30,050 total per year).

---

[48] Written leases for years before 2014 were not introduced and may not exist, even though TI paid rents to LSLP and GMCP before 2014.

[49] The leases used only this "acreage and county" identification and did not specify ranches by name. The ranches included are discussed *infra* FoF Part XII.B.3.

**[*46]** • LSLP Lease #4: Fishing lease covering 3,005 acres in Zapata County at $25 per acre per year ($75,125 total per year).

- LSLP Lease #5: Livestock grazing lease covering 3,575.40 acres in Zapata County and 140 acres in Starr County at $12.50 per acre per year ($46,443 total per year).

- LSLP Lease #6: Headquarters event use lease covering 1,711 acres in Zapata County at $17.50 per acre per year ($29,943 total per year).

The differences between the GMCP and LSLP leases are insignificant. Each lease (except LSLP Lease #6 covering event use) provides that TI would supply 100% of the labor and materials "for purposes of farming or agricultural operations." TI was liable for all expenses relating to hunting and fishing activities. TI was also required to "care for and maintain the premises," which included specific obligations.

### 3. *LSLP and GMCP Leases: Problems*

Numerous problems with TI's leases with LSLP/GMCP resulted in TI's substantially overpaying LSLP and GMCP.

### a. *Double Counting Twin Lakes Ranch*

Twin Lakes Ranch is included in GMCP Leases #1, #2, and #5 regarding deer hunting, upland bird hunting, and livestock grazing rights, as well as LSLP Leases #1, #2, and #5 regarding the same rights.[50] TI thus paid twice for the same rights on Twin Lakes Ranch.

---

[50] An explanation of the math follows:

LSLP and GMCP purchased 15,070 acres of land in Zapata County in 2005. They initially sold all but 1,736 acres owned by LSLP. Most of this tract is identified in LSLP Lease #6 as 1,711 acres. There is a 25-acre discrepancy because 25 acres consist of a water line boundary and an access road that were not leased to TI.

After LSLP and GMCP repurchased land from La Perla Negra in 2006, La Perla Ranch was 2,238.68 acres and Jalisco Ranch was 791.6 acres (3,030.28 acres total). Zapata County acreage is stated to be 3,005 acres in some leases, which is 3,030.28 acres, rounded to 3,030 acres, minus the 25 acres not leased.

Twin Lakes Ranch is 1,361.8 acres, rounded in some leases to 1,362 acres.

**[\*47]** The parties agree that Twin Lakes Ranch was incorrectly included in the LSLP deer hunting, upland bird hunting, and livestock grazing leases. Petitioners agree that TI overpaid LSLP $44,265 per year as a result.[51]

### b. *Leases for Grazing Rights*

TI owed LSLP and GMCP a total of $75,969 per year for grazing rights pursuant to GMCP Lease #5 and LSLP Lease #5. TI at one time owned a large number of cattle, discussed further *infra* FoF Part XIV. However, TI sold nearly all its cattle by early 2011. While the exotics are primarily grazing animals, the exotics were not purchased until 2017 and thus do not explain why TI entered into livestock grazing leases beginning January 1, 2014.

### c. *Starr County Properties*

Tecomate Industries owed LSLP and GMCP $31,673 per year pursuant to leases pertaining to three properties in Starr County: (1) 140 acres known as the "Sullivan Tract"[52] is included in LSLP Leases #1 and #5 and (2) 955 acres included in GMCP Leases #1, #2, and #5 comprises two properties known as "Tecomate West Ranch"[53] and

---

The GMCP deer hunting, upland bird hunting, and cattle grazing leases each cover 2,153 acres in Zapata County. This is the 791.6 acres of Jalisco Ranch plus the 1,361.8 acres of Twin Lakes Ranch, rounded to the nearest acre.

The LSLP deer hunting, upland bird hunting, and cattle grazing leases each cover 3,575.40 acres in Zapata County. This is the 2,238.68 acres of La Perla Ranch (rounded down to reach 2,238.60 acres), minus the 25 acres not leased, plus the 1,361.8 acres of Twin Lakes Ranch.

[51] On brief, petitioners agree that overpayments regarding Twin Lakes Ranch in the three LSLP leases were $17,025, $10,215, and $17,025. Petitioners then incorrectly added these figures, stating that "a total of $37,965 per year . . . was overcharged." Petitioners inverted two numbers and added $10,725 for one figure instead of $17,025. We have fixed petitioners' error.

[52] LSLP purchased 3,204 acres of land in Starr County during 2005 and named it "Sullivan Ranch." LSLP then sold tracts of Sullivan Ranch to various buyers. The remaining 141 acres still owned by LSLP is the Sullivan Tract. It was not established why LSLP Leases #1 and #5 identified the property as only 140 acres.

[53] GMCP purchased 498 acres of land in Starr County during 2006 and named it "Tecomate West Ranch." GMCP sold the property during 2021.

[*48] "Tecomate 457 Ranch."[54] A portion of the amount owed on these leases is due to livestock grazing rights already discussed.

While TI conducted hunting operations in Starr County beginning in 2005, TI's Starr County operations ended around the time Tecomate Ranch was sold in 2011. There is no indication that TI conducted ecotourism on the three leased Starr County properties in or after 2014. This is true even though TI continued to show assets relating to Starr County properties on its depreciation schedules for the years at issue (as discussed *supra* FoF Part VIII.A).[55] In short, TI was paying for rights in Starr County that it was not using.

### d. *Waterfowl Hunting Leases*

TI owed LSLP and GMCP $38,222 per year for waterfowl hunting rights pursuant to GMCP Lease #3 and LSLP Lease #3. As previously stated, TI ceased regular waterfowl hunting before the years at issue. The last TI invoice pertaining to waterfowl hunting is for a hunt that occurred in January 2014, at least a portion of which did not even take place in Zapata County.[56] Before the January 2014 hunt, the next-most-recent waterfowl hunt was for the same customer in January 2013. Considering the general lack of waterfowl hunting, TI should have either (1) not entered into the waterfowl hunting leases or (2) sought to modify or terminate these leases considering the lack of waterfowl hunting in Zapata County.

### e. *Accounting/Payment Issues*

In addition to problems with the leases themselves, TI's accounting for the leases is erroneous. In TI's general ledgers for the years at issue, the leases are misnamed and mispriced. For example, the 2015 general ledger contains an entry for a GMCP "2015 Hunting and Grazing Lease 457, Tecomate [West]" lease in the amount of $27,240. This is twice the amount ($13,620) of GMCP Lease #4 pertaining to fishing rights on Twin Lakes Ranch. In the 2016 general ledger, there is

---

[54] Petitioners purchased 457 acres of land in Starr County during 2003 and named it "Tecomate 457 Ranch." Petitioners transferred the property to GMCP during 2005 and GMCP sold the property during January 2016.

[55] The depreciation issue is likely an accounting error or miscellaneous unsold asset rather than an indication of where TI operated in and after 2014.

[56] The invoice states that an "Extra leg – 1 day coastal duck hunt" would take place in Arroyo City, Texas. We take judicial notice that Arroyo City is in Cameron County, several counties southeast of Zapata County.

[*49] an entry for a "2015 Waterfowl Hunting Lease" of $60,100, which is twice the amount ($30,050) of LSLP Lease #3 relating to waterfowl hunting. There are numerous other such examples. In short, general ledger entries do not match the actual leases.

TI owed LSLP/GMCP $368,296 per year pursuant to the written leases.[57] However, TI's books and records from 2014–20 show that it actually paid the following rents:

| Year | LSLP/GMCP Rents Paid |
|---|---|
| 2014 | $903,612 |
| 2015 | 420,370 |
| 2016 | 492,981 |
| 2017 | 436,410[58] |
| 2018 | 309,886 |
| 2019 | – |
| 2020 | 100,326 |
| **Total** | **$2,663,585** |

Forms 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation, for LSLP and GMCP roughly support these figures, though those forms reflect slightly higher gross rents received each year. The difference was not explained. It was not established why lease payments to LSLP and GMCP decreased in 2018, were zero in 2019, and remained low in 2020.[59]

---

[57] Per the written leases, this amount should have been reduced over the years because Tecomate 457 Ranch was sold in January 2016 and Twin Lakes Ranch was sold in December 2019. It is unclear whether any adjustments were actually made as a result of these property sales. While Tecomate West Ranch was apparently sold in 2021, we will not address this property further because no returns for years after 2020 were introduced into evidence.

[58] TI's 2017 profit and loss statement indicates that it paid $441,410 in rents to GMCP and LSLP. However, TI's 2017 general ledger shows that $5,000 of the $441,410 was actually rent paid to Mr. Guerra. TI's 2017 profit and loss statement erroneously shows zero paid to Mr. Guerra.

[59] On brief, petitioners state that they "believe" prepayment of leases resulted in the fluctuation of amounts paid. General ledgers contain some support for this

**[*50]**  4.  *Lease Expenses Tax Benefits*

TI entered into overpriced and/or erroneous leases with LSLP and GMCP. TI then paid even more than the total amounts provided for in the leases. Unsurprisingly, petitioners were gaining a tax benefit from this. GMCP and LSLP incurred rental real estate losses in many years that flowed through to petitioners. These rental real estate losses were passive losses for petitioners that were not fully deductible for the years incurred and would be carried forward. When TI paid rent to GMCP and LSLP, it reduced GMCP's and LSLP's rental real estate losses. This effectively reduced petitioners' passive losses. When TI paid rents to LSLP and GMCP, TI incurred offsetting rental expenses. These rental expenses were included in TI's Schedule F losses, which flowed through to petitioners as immediately deductible nonpassive losses.

In short, TI's overpaying GMCP and LSLP effectively turned passive rental real estate losses that would have been deferred into immediately deductible losses on petitioners' returns.

C.  *Ecotourism: "Wildlife Operations" Expenses*

On TI's profit and loss statements a group of expenses titled "Wildlife Operations" pertains to ecotourism (almost entirely to hunting and fishing operations).[60] It includes items such as food for animals, helicopter surveys, guide fees, and hunting supplies. It also includes many fishing expenses not related to the construction of lakes, such as chow, tackle, forage, survey, and other expenses.

---

assertion for 2016 and 2017, but not 2015. In addition, the math as a whole does not add up.

[60] While wildlife operations expenses pertain to ecotourism, they are not the only ecotourism expenses. For example, "Wages & Benefits" expenses are not part of the wildlife operations expenses. A portion of the "Wages & Benefits" expenses is attributable to ecotourism, though a portion is also attributable to custom farming/ranching/Other operations. The parties did not provide us with sufficient information to allocate "Wages & Benefits" (and most other expense categories) among the various operations.

**[\*51]** Wildlife operations expenses for 2005–20 are summarized in the table below. We have separated fishing and nonfishing expenses and subtracted certain ecotourism lease expenses already discussed.

| Year | Fishing Expenses | Nonfishing Expenses | Total Wildlife Operations Expenses |
|---|---|---|---|
| 2005 | $4,637 | $94,833 | $99,470 |
| 2006 | 2,369 | 66,291 | 68,660 |
| 2007 | 1,156 | 112,845 | 114,001 |
| 2008 | 10,076 | 120,238 | 130,314 |
| 2009 | 7,988 | 119,441 | 127,429 |
| 2010 | 7,663 | 73,162 | 80,825 |
| 2011 | 10,431 | 102,039 | 112,470 |
| 2012 | 38,647 | 100,021 | 138,668 |
| 2013 | 71,596 | 123,151 | 194,747 |
| 2014 | 74,361 | 140,584 | 214,945 |
| 2015 | 82,231 | 135,775 | 218,006 |
| 2016 | 231,656 | 166,818 | 398,474 |
| 2017 | 108,026 | 182,166 | 290,192 |
| 2018 | 36,136 | 248,074 | 284,210 |
| 2019 | 80,809 | 229,388 | 310,197 |
| 2020 | 84,345 | 304,327 | 388,672 |
| **Total** | **$852,127** | **$2,319,153** | **$3,171,280** |

Several things stand out in this data. First, total fishing expenses for 2010–20 are substantially higher than total fishing package gross income of $221,845. *See* table *supra* page 40. Second, total nonfishing wildlife operations expenses for 2005–20 are higher than total hunting package gross income of $2,276,312. *See* table *supra* page 40. Limiting the years to 2010–20, the difference between the numbers increases, with nonfishing wildlife operations expenses of $1,805,505 and hunting package gross income of $1,521,028. In addition, from 2010 to 2020 nonfishing wildlife operations expenses increased significantly faster than hunting package gross income increased. Hunting package gross

**[\*52]** income increased from $130,700 in 2010 to $186,180 in 2020, a 42% jump. However, nonfishing wildlife operations expenses increased from $73,162 in 2010 to $304,327 in 2020, a 316% jump.

### D.    *Ecotourism: Income and Expense Conclusions*

Summing things up regarding ecotourism gross income and expenses, we note several facts pertaining to years 2015–17:

- TI's ecotourism gross incomes were $274,974, $250,838, and $224,528.

- Expenses for the leases with GMCP and LSLP were $420,370, $492,981, and $436,410.

- Fishing wildlife operations expenses of $82,231, $231,656, and $108,026 dwarfed fishing package gross income of $59,872, $32,604, and $38,003.

- Nonfishing wildlife operations expenses of $135,775, $166,818, and $182,166 increased, while hunting package gross incomes of $153,149, $147,916, and $142,325 declined.

- Event package gross income of $46,400, $51,300, and $42,000 was about flat.

Considering these notes and years 2010–20, we draw several factual conclusions regarding TI's ecotourism:

- Considering only lease and wildlife operations expenses, ecotourism had a profit margin of less than negative 100% for 2015 and less than negative 200% for 2016 and 2017.

- Though hunting package gross income rose from 2010 to 2020 (up 42%), nonfishing wildlife operations expenses rose much faster (up 316%). While gross income from trophy buck hunts increased (especially in 2019 and 2020), increases in wildlife operations expenses more than offset this gain.

- Fishing was a significant drain on TI's finances.

- While growth in event package gross income was strong in 2018 and 2019, we have not attempted to extrapolate all expenses related to event packages from the financial records.

**[\*53]**    The reason is that, unlike the clearly delineated wildlife operations expenses, no such section exists regarding event operations.[61]

- Rents paid to LSLP and GMCP essentially guaranteed that ecotourism could not be profitable.

TI is not a young company and Dr. Schwarz has had decades of experience with hunting and ranches. However, even after significant work on La Perla and Jalisco Ranches, there is no sign that TI's ecotourism will ever be profitable, even if lease problems are corrected.

## XIII. *Custom Farming: Financial Analysis*

Considering the evidence presented, we are unable to complete an in-depth financial analysis of TI's custom farming. We will give a brief, vague overview of custom farming gross income in this FoF Part XIII. It is difficult to speak with certainty about certain points because some of TI's invoices are missing and general ledgers for years other than the years at issue were not introduced into evidence. Unless otherwise indicated, the facts stated in the remainder of this FoF Part XIII pertain to years 2010–20.

A portion of TI's custom farming work was smaller tasks such as general farming work and maintaining ranches. TI seldom charged LSLP or GMCP for these smaller tasks carried out on La Perla and Jalisco Ranches.[62] TI also completed smaller custom farming tasks on ranches owned by Affiliated Entities or third parties where it did not conduct ecotourism. TI usually or always charged Affiliated Entities or third parties for such work.

The other portion of TI's custom farming work pertained to larger projects, such as building lakes, the football field, and roads. Even when these projects occurred on La Perla and Jalisco Ranches, TI usually or always charged the relevant entity/party for this work.

---

[61] There is an entry on profit and loss statements titled "Groceries for Ranch Event," but it appears this is all grocery expenses for hunting, fishing, and event packages. For the years at issue, these expenses were $29,766, $23,311, and $39,967.

[62] It is unclear exactly where ecotourism ended and custom farming began on La Perla and Jalisco Ranches. Per the leases with GMCP and LSLP, TI was obligated to care for and maintain leased properties.

**[\*54]** In order for TI to bill the correct entity/party for custom farming work, TI's employees completed timesheets listing where they worked, the hours worked, and the equipment used. The employees then sent those timesheets to Mr. Yelland, who issued an appropriate invoice.

Lakes on La Perla and Jalisco Ranches were the largest custom farming projects that TI worked on. TI's invoices show that it charged LSLP about $2.6 million for work on lakes in 2010–20. A portion of these charges was for project administration fees and fuel expenses, which TI often included in ranching income on its profit and loss statements (discussed further *infra* FoF Part XIV). The project administration fees are a means of providing some gain for TI on custom farming work. A $384,773 custom farming invoice TI issued to LSLP in 2012 included a $96,900 charge labeled "Project Administration Fees – profit 30%." Numerous other custom farming invoices contained 30% project administration fees without the "profit" specification.

Several unrelated third parties hired TI to perform custom farming work, though the amount of gross income TI earned from this work was comparatively small in the years at issue.

A summary of the custom farming invoices that TI issued in the years at issue follows:

- Invoices for work on lakes and irrigation systems on La Perla Ranch issued to LSLP total $304,500.

- Invoices for various projects on Tecomate West Ranch issued to GMCP total $148,018.

- Invoices for farming and maintenance issued to "Tecomate South" total $82,821.[63]

- Invoices for equipment use, cleaning, and supplies issued to Rovan Texas (a company owned by Brad Schwarz) total $31,870.

- Invoices for sales of "Black Buck Does" issued to two unrelated third parties total $2,564.

---

[63] There were additional, non-custom-farming charges on several of these invoices; general ledgers support the $82,821 figure.

**[*55]** • Invoices for unspecified work in Rio Grande City issued to Hawk Oilfield (an unrelated third party) total $32,000.

- A 2016 invoice for a 40-acre farm lease on the "Rio Hondo Property"[64] to an unrelated third party for $3,200.[65]

- A 2016 invoice for a "Polaris EV" sale to an unrelated third party for $3,000 (with only $2,000 actually paid).[66]

These invoices total $607,973, which is lower than TI's total custom farming gross income for the years at issue of $616,340. This discrepancy exists because not all invoices were paid in the year they were issued, and some invoices are missing.[67]

XIV. *Ranching and Other Operations: Financial and Other Information*

As shown in the table *supra* page 38, TI had gross income from ranching operations of $1,337,010 for years 2005–20. For the same years TI had gross income from Other operations of $1,917,695.

As with custom farming, the parties did not provide us with sufficient information to perform a comprehensive financial analysis of the ranching and Other operations. These operations were barely discussed at all. A brief synopsis of some of the income attributable to these operations follows.

The ranching income comprised largely consulting income, fuel reimbursement income, and water sales. The consulting income was mostly project administration fees that TI charged on top of many

---

[64] A summary exhibit mentions the "Rio Hondo Tract" but does not cite any admitted evidence in support of its purchase and sale information. LSLP's returns and balance sheets show that it somehow acquired the property in 2015 and sold it in 2020.

[65] It is unclear why this was included in TI's custom farming gross income or what authority TI had to agree to a lease regarding this property.

[66] It is unclear why TI classified this sale as part of its custom farming work. On brief, petitioners state that the invoice "is not a custom [farming] invoice" without addressing why the $2,000 paid was included in TI's custom farming gross income.

[67] For example, TI's 2015 general ledger shows that LSLP made numerous payments for custom farming work to TI in 2015, but there are no 2015 invoices issued to LSLP in evidence. Only a portion of the 2015 payments is explained by earlier invoices, including some payments to TI in December 2015 being attributable to an invoice issued to LSLP in August 2013.

**[*56]** custom farming jobs. The fuel reimbursement income was charges that TI added to custom farming jobs to recoup the cost of fuel used. The water sales were charges to the ranches surrounding the oval on which La Perla and Jalisco Ranch sit, for use of water from House Lake.

Schedule F income attributable to Other operations comprised largely cattle sales income,[68] crop insurance proceeds, and dividend income. The cattle were transferred to TI in 2005, were mostly or entirely kept on Starr County properties, and were nearly all sold by early 2011. General ledgers for the years at issue show crop insurance proceeds paid by the company that issued TI's crop insurance policies. Those general ledgers also show dividend income mostly from "Texas Farm Credit," but this was not explained.

XV.     *How Ecotourism Drove TI's Schedule F Losses*

As discussed *supra* FoF Parts XII and XIII, TI lost money on ecotourism, but it is unclear whether TI lost any on custom farming or how much. TI considered these operations to be part of the same farming activity. In its books and records, TI separated gross income attributable to ecotourism and custom farming but did not separate most expenses.

Witnesses at trial did not provide comprehensive explanations for TI's history of Schedule F losses.[69] However, financial records and other

---

[68] Some cattle sales income was reported on Forms 4797, Sales of Business Property, and some was reported on Schedules F.

[69] Petitioners' accountant testified that

the years that we're questioning now [there] was a drop in revenue, and you know I asked Mr. Yelland about that, and I asked Dr. Schwarz about that also, and they really couldn't explain why we had that drop in revenue in that period from [20]15 to [20]17, because our revenue from [20]12 to [20]14 was pretty good, 1.1 million to about 1.6 million, and then we had a drop off. We dropped off significantly . . ..

When asked why TI's Schedule F income was lower in the years at issue, Dr. Schwarz answered:

Because we–our biggest customer quit paying [TI]. Our biggest customer was [GMCP or LSLP] whichever at–whoever owns those–those entities drive me crazy. But I think the entity that owns La Perla, the land, what used to be Tecomate Capital Partners, wasn't paying [TI], but that eventually led to markedly reduce[d] expenses that we enjoyed this past couple of years.

**[*57]** evidence show that TI's Schedule F losses were largely attributable to ecotourism. The fact that ecotourism gross income for years 2010–20 ($2,503,476) is significantly smaller than custom farming gross income ($5,882,730) plus consulting and fuel reimbursement portions of the ranching income ($474,716 and $475,668, respectively) might suggest that most losses were attributable to custom farming. We believe not, for several reasons.[70]

First, profit margins for ecotourism were abysmal. Both for 2010–20 (combined) and for the years at issue ecotourism had a profit margin of less than negative 100% only considering wildlife operations and ecotourism-related lease expenses. Specifically, this profit margin was negative 151% for 2010–20 and negative 207% for the years at issue. Sizable portions or most of the expenses in the following categories were also attributable to ecotourism: (1) advertising & promotions, (2) groceries, (3) cable/satellite TV, (4) chemicals and fertilizers, (5) ranch repairs and maintenance, (6) seeds, (7) wages and benefits, (8) other payroll expenses, (9) vehicles and machinery, (10) depreciation and amortization, (11) electricity and gas, (12) liability/crop insurance, and (13) miscellaneous other expenses (such as "La Perla Supplies"). For 2010–20 the expenses in these categories total over $13 million. Safe to say, ecotourism actually had a profit margin *far* less than negative 151% for years 2010–20.

Second, evidence indicates that profit margins for custom farming were significantly better. TI charged 30% project administration fees on many custom farming projects that represented (or were intended to represent) profit for TI. TI also included fuel reimbursement charges on many custom farming projects. Such practices helped to limit any losses associated with custom farming.

---

Dr. Schwarz later clarified that the payments ceased because work on Jalisco Lake was completed. However, Jalisco Lake was not completed until 2017. While Dr. Schwarz's answers might explain lower revenue and net income in 2017, they do not explain TI's history of losses.

[70] The consulting and fuel reimbursement portions of the ranching income were largely related to custom farming work, so we believe they should be included in this analysis. We will leave out gross income attributable to Other operations and Ranching operations other than consulting and fuel reimbursement, as they comprised mostly sales of cattle, sales of water, crop insurance proceeds, and dividend income. These gross income items are based on financial products and/or capital assets and appear to have had comparatively low ongoing expenses associated with them.

[*58] Third, most of the custom farming plus consulting plus fuel reimbursement income was attributable to custom farming work in support of ecotourism, such as building lakes, deer breeding pens, and other improvements for La Perla and Jalisco Ranches. Invoices for years 2010–20 show that TI billed LSLP about $3.7 million for custom farming work (and related consulting and fuel reimbursement charges) completed on La Perla Ranch, Jalisco Ranch, and a nearby airstrip that TI's customers could use. This was over half of TI's total custom farming/consulting/fuel reimbursement gross income for 2010–20 of about $6.8 million. In addition, the $3.7 million amount is almost certainly understated because of missing and unclear invoices.

We also note that multiple times during his testimony, Dr. Schwarz mentioned how expensive building the lakes was. For example, when asked why he "keep[s] with [TI]," Dr. Schwarz replied, in part: "I'm through digging, that's the main thing. Those–those lakes cost millions of dollars." Such testimony indicated that TI's construction of the lakes (used for ecotourism) resulted in large losses. Considering this, other facts discussed in this FoF Part XV, and TI's books and records, we find that the large majority of TI's Schedule F losses were attributable to ecotourism and custom farming work in support of ecotourism.

XVI. *Preparation of Returns*

Petitioners' returns for the years at issue were prepared by Russell Guthrie. Mr. Guthrie was a certified public accountant (CPA) with decades of experience, and he often did accounting work for agriculture businesses. He had prepared returns for petitioners, TI, LSLP, and GMCP since the mid-2000s. He did not prepare returns for other Affiliated Entities.

Mr. Guthrie discussed TI's profitability with petitioners and Mr. Yelland on numerous occasions. His opinion was that TI's farming activity was engaged in for profit, which he communicated to petitioners regarding each year at issue. As he testified at trial, Mr. Guthrie's opinion was based in part on his belief that TI "develop[ed] the value in the real estate." On Mr. Guthrie's advice, petitioners filed a section 469 grouping election with their 2017 return, covering TI and GMCP (which collectively owned 100% of LSLP). *See* Treas. Reg. § 1.469-4.

To prepare returns for petitioners, TI, LSLP, and GMCP, Mr. Guthrie obtained general ledgers, balance sheets, profit and loss statements, and other documents. Mr. Guthrie also asked various

**[\*59]** questions of petitioners and Mr. Yelland. Mr. Guthrie was always provided with all information that he asked for.

Mr. Guthrie knew that leases between TI and LSLP/GMCP existed. However, he was not aware of a clause in each lease stating: "Any and all buildings, fences, improvements, or other alterations constructed or established upon the premises during the term of the lease by the tenant shall constitute additional rent and shall become the property of the landlord on expiration or termination of this lease." The leases were not provided to Mr. Guthrie, though he never asked for them. This will be discussed further *infra* OPINION Part X.

XVII. *Miscellaneous Facts*

A.    *Personal Use of La Perla and Jalisco Ranches*

Dr. Schwarz and many members of petitioners' family hunted and fished on La Perla and Jalisco Ranches. Articles about Dr. Schwarz and members of petitioners' family show they greatly enjoyed hunting. At least two of petitioners' children had hunted since they were young; in 1997 one of petitioners' daughters shot a buck in a statewide hunting contest that broke a youth division record previously held by her brother, Blair Schwarz. Dr. Schwarz also enjoyed fishing; an April 2014 article about his quest to grow large bass described him as "an avid angler [who] liked the idea of having a private lake where he and guests could have fun catching bass."

Petitioners designated the week between Christmas and New Year's Day a "family week" for them, their children, and their grandchildren to stay at the lodge on La Perla Ranch. This week was originally reserved for just family members, though at some point customers began to come as well. The customers were informed when making reservations that petitioners' family would be there. Petitioners' family also spent time at the ranches around other holidays, and one of the grandchildren had a birthday party there around 2012.

B.    *Setbacks*

Petitioners claim various setbacks affected TI's ability to make a profit. Alleged setbacks included a barn under construction burning down in 2012, droughts, Dr. Schwarz's 2012 bulldozer accident, increasing illegal immigration, the fish kills, and the lawsuit that resulted in no state permits being issued to kill double-crested cormorants. They also included federal Medicaid fraud charges against

**[\*60]** Dr. Schwarz, pertaining to his dental work. Dr. Schwarz was acquitted after a trial in 2011. These matters will be discussed further *infra* OPINION Part IX.F.

### C.    *Petitioners' Net Worth*

In 2017 Dr. Schwarz applied for a loan and attached a balance sheet showing that petitioners had assets of about $56 million, liabilities of about $7 million, and a net worth of about $49 million. Most of the assets pertained to ownership of TI (about $2.5 million), Affiliated Entities (about $26 million), life insurance (about $16 million), and VOMS ($6 million).

### D.    *Notice of Deficiency and Petition*

On July 14, 2020, respondent issued a notice of deficiency to petitioners regarding the years at issue. Petitioners timely filed a Petition contesting respondent's determinations.

## XVIII. *Expert Witness for Deer and Exotics Herds*

In addition to working with Dr. Schwarz and TI during the years at issue, Dr. Hellickson acted as an expert witness for petitioners regarding the deer and exotics on La Perla and Jalisco Ranches. Dr. Hellickson concluded that (1) sales of exotics packages could greatly increase in future years, (2) the deer herd on La Perla and Jalisco Ranches was exceptionally well managed, and (3) the value of the deer herd on La Perla and Jalisco Ranches was $628,000. We will discuss issues with Dr. Hellickson's report *infra* OPINION Part V.

## XIX.    *Expert Witness for Property Valuation*

Merrill Swanson acted as a property valuation expert for petitioners. Five of Mr. Swanson's reports were accepted into evidence. Each report pertains to one or more properties/tracts owned by an Affiliated Entity at the time of trial. Mr. Swanson valued each property as of October 31, 2022.

Mr. Swanson's valuations were provided in support of petitioners' legal argument that appreciation in value of properties should be considered in determining whether TI's farming activity was engaged in for profit in the years at issue. As discussed *infra* OPINION Part VIII, we rule that TI's farming activity and petitioners'/Affiliated Entities' real estate activities (real estate activities) are separate activities. We

**[\*61]** therefore need not determine whether Mr. Swanson's valuations are accurate. However, we will briefly describe two of Mr. Swanson's reports that cover La Perla and Jalisco Ranches to illustrate petitioners' arguments and provide additional relevant facts.

Mr. Swanson chose to break up La Perla Ranch for valuation purposes. In one report he valued a 703-acre "La Perla Headquarters Tract," plus a contiguous 500-acre "Tract 4," plus 25 acres comprising the water line boundary and the access road discussed *supra* note 50. This is 1,228 total acres (collectively, La Perla HQ Tract). In another report he separately valued the 802-acre Jalisco Ranch[71] and two other 500-acre tracts (these two, collectively, Lone-Star Tract).

In the first report, Mr. Swanson determined that the value of the La Perla HQ Tract was $9,347,000 ($7,614 per acre), comprising (1) land worth $3,392,000, (2) Waterworld and La Perla Lakes worth $3,392,000 (by making the land twice as valuable),[72] (3) irrigation systems and "above standard improvements" worth $1,947,000, and (4) associated water rights worth $616,000.

In the second report, Mr. Swanson valued Jalisco Ranch and the Lone-Star Tract separately. Mr. Swanson determined that the value of Jalisco Ranch was $4,765,000 ($5,941 per acre), comprising (1) land worth $2,199,000, (2) Jalisco Lake worth $2,200,000 (by making the land about twice as valuable), (3) irrigation systems worth $126,000, and (4) associated water rights worth $240,000.

Mr. Swanson determined that the value of the Lone-Star Tract was $2,650,000 ($2,650 per acre), comprising land worth $2,602,000 and associated water rights worth $48,000. Although Trophy Lake sits on the Lone-Star Tract, Mr. Swanson did not deem Trophy Lake large enough to add a multiplier to the value of the land.

Mr. Swanson determined that the highest and best use of each of the La Perla HQ Tract, Jalisco Ranch, and the Lone-Star Tract was "recreational ranching" focused on game and fish. He believed the most likely buyer for each property to be "a high wealth individual or corporate investor desiring a South Texas ranch with ready to go"

---

[71] After the years at issue 10 acres from the La Perla Ranch acreage were added to Jalisco Ranch to build an access road. This brought Jalisco Ranch up to 802 acres.

[72] House Lake also sits on the La Perla HQ Tract, though Mr. Swanson did not consider it large enough to factor into the 2.0 multiplier.

[*62] hunting and current or potential fishing. For each property he noted the quality of the deer genetics and "good exotic game herd." He described the management of Waterworld, Jalisco, Trophy, and La Perla Lakes as fisheries and noted other improvements such as fencing, breeding pens, and food plots. He found that each property had "Exceptional recreational appeal" and made small positive adjustments to property valuations in his comparable sales analysis due to the recreational appeal. These adjustments increased property values by about 2.2% on average. He noted maintenance costs for "extensive ranch infrastructure" as a negative marketing feature for each property.

In each of Mr. Swanson's five reports, he "Referenced the Trends in Rural Land Market Data published by the Real Estate Center at Texas A&M University." Using the "Annual Compound 5-Year Growth Rate" for 2021 from this data, Mr. Swanson applied time adjustments of 6.55% per year to transactions to account for the upward trending South Texas market.

XX.    *Expert Witness for Business Valuation and Analysis*

Dr. Scott Hakala acted as a business valuation and analysis expert for petitioners. His report is titled "Financial and Valuation Analysis of [TI] and Affiliated Companies for the Tax Years 2015, 2016, and 2017." Dr. Hakala's primary conclusion was that operating losses in TI were more than entirely offset by realized and unrealized gains in real property. We will discuss issues with Dr. Hakala's report *infra* OPINION Part VI.

OPINION

I.    *Burden of Proof*

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the Commissioner's determinations are incorrect. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In certain circumstances, the burden of proof with respect to any factual issue may be shifted to the Commissioner. § 7491(a). The parties disagree whether petitioners have met the statutory requirements to shift the burden of proof to respondent. However, because we decide all issues on the basis of the preponderance of the evidence, we need not decide which party bears the burden of proof. *See Gaughf Props., L.P. v. Commissioner*, 139 T.C. 219, 232 (2012) (citing *Knudsen v. Commissioner*, 131 T.C. 185 (2008), *supplementing* T.C. Memo. 2007-340), *aff'd*, 738 F.3d 415 (D.C. Cir. 2013).

[*63] II.    *Evidentiary Issues*

We held a trial of this case in Houston, Texas, from January 30 through February 3, 2023. The parties were able to resolve many evidentiary issues during the trial, but some remain outstanding.

Respondent reserved relevancy objections to numerous Exhibits. We find those Exhibits to be relevant and overrule the relevancy objections.

There are additional issues regarding Exhibit 635-P, of which several pages constitute a summary of real estate transactions involving petitioners and Affiliated Entities. The Exhibit also contains over 200 pages of supporting documents, which are mostly deeds and closing statements. Respondent objects to the admission of Exhibit 635-P because it contains inaccuracies. We overrule this objection. We agree that the summary exhibit contains a few (mostly minor) inaccuracies, but we are capable of identifying them.

On the first day of trial respondent also objected to a prior version of Exhibit 635-P on grounds that it is a summary exhibit that contains information not otherwise in evidence. The Court instructed petitioners that the summary portion of the Exhibit must contain citations of the record to support the transactions reflected in the Exhibit. Petitioners added citations and additional supporting documents, then submitted the current version of Exhibit 635-P. However, some of the transactions in the current version do not have citations of the record. For many of these transactions we have not found support in the record. While we will not exclude the entirety of Exhibit 635-P, we sustain respondent's objection with respect to the few transactions shown in Exhibit 635-P that are not supported by the record.

III.    *Whether Any New Matters Were Raised After Trial*

After opening and answering briefs were filed, we ordered the parties to file supplemental briefs: (1) addressing issues with the leases between TI and LSLP/GMCP, (2) addressing TI's custom farming gross income and expenses, and (3) addressing certain related points. We ordered the parties to "address how the[se] matters . . . impact the section 183 and section 6662 issues in this case." At the parties' request, we also held a conference call with the parties on October 6, 2023, during which we reiterated that we wanted the parties to address only the existing section 183 and section 6662 issues.

**[\*64]** Petitioners contend in their supplemental briefs that new matters were raised and are not properly before the Court. Petitioners' arguments include claims such as "[w]hether petitioners overcharged for the leases involves a new matter regarding the deductibility of the lease payments under I.R.C. § 162." Petitioners cite our previous statement that "[w]e've often held that we won't consider issues that haven't been properly raised in the pleadings or by an amendment to the pleadings" in support of their position. *See Niemann v. Commissioner*, T.C. Memo. 2016-11, at \*14 (first citing *Foil v. Commissioner*, 92 T.C. 376, 418 (1989), *aff'd per curiam*, 920 F.2d 1196 (5th Cir. 1990); and then citing *Markwardt v. Commissioner*, 64 T.C. 989, 997 (1975)). Petitioners admit that "A 'new matter' is one that reasonably would change the evidence required in the case. Alternatively, a 'new theory' is a new argument about the existing evidence." (Citations omitted.)

We disagree with petitioners' position. No new matter exists. We asked the parties to address how existing evidence affects the existing section 183 and section 6662 issues. No section 162 issue exists.

The parties introduced leases between TI and LSLP/GMCP that show that TI overpaid LSLP/GMCP. Respondent failed to notice obvious flaws in the leases, and petitioners failed to notice them or chose not to explain them. Like the flaws, tax benefits petitioners gained by TI's overpaying LSLP/GMCP are clear according to returns in evidence. Though the parties did not address the flaws or consequences in their opening and answering briefs, we had sufficient evidence to, and would have, made findings regarding the flaws and consequences even if we had not ordered supplemental briefing.

The parties made little effort to complete financial analyses of TI's operations. We were able to analyze TI's ecotourism gross income and some ecotourism expenses largely on our own but were unable to do the same for custom farming. We ordered the parties to address custom farming gross income and expenses in part to ensure that we were not overlooking anything. The parties' supplemental briefs confirm that no detailed financial analysis of custom farming is possible on basis of the evidence presented.[73]

---

[73] Without our asking them to, petitioners attempted to use information from outside the record to complete tables in their supplemental opening brief regarding custom farming financial information. Because petitioners' tables are based on information not in the record, we disregard them.

**[\*65]** At no time did we request that the parties introduce new evidence regarding the issues discussed in the supplemental briefs. We simply asked the parties to respond to evidence already in the record. No new matters were raised; this was only an opportunity for the parties to clarify their existing positions.

IV.    *The Parties' Work, Petitioners' Credibility, and Years After 2020*

    A.    *The Parties' Work*

The parties often provided misleading, incorrect, or undeveloped factual claims to the Court.[74] Glaringly, the parties were mistaken about where TI operated in 2005–08. The narrative presented by the parties is roughly that "GMCP and LSLP bought land in Zapata County in 2005, and TI conducted its farming activity on that land since 2005." However, as discussed *supra* FoF Part VIII.A, the evidence shows that TI operated primarily in Starr County from 2005 to (at least) 2008 and did not operate primarily in Zapata County until 2009 or 2010.

Incredibly, the facts discussed *supra* FoF Part VIII.A were not developed or addressed by the parties. This failure is likely attributable in part to TI's and Affiliated Entities' often unclear books and records, as well as to the multiplicity of similarly named properties and entities relevant to this case. However, the greater part is attributable to the parties' failing to pay enough attention to the evidence and seeming to have little concern for accuracy. Many witnesses and the parties' counsels were often confused or operating under faulty assumptions during the trial. This often led to incorrect, confusing, and/or vague testimony that counsel failed to correct, clarify, or develop through their questioning. The parties then filed briefs that contained a multitude of

---

[74] For example, the parties stipulated that "Petitioners' son, Blair Schwarz, has been [TI's] ranch manager, huntmaster and fishmaster since 2005. He travels from McAllen to La Perla Ranch on a weekly basis and returns home on his days off." However, Blair Schwarz testified that he started law school in 2006, worked for a law firm for years after law school, and did not start to work full time for TI until after he quit working for the law firm. Other evidence clearly shows that Blair Schwarz did not become TI's ranch manager, huntmaster and fishmaster until 2015. This did not stop the parties from asking us to make findings of fact in accordance with the obviously incorrect stipulation.

The parties also stipulated that two employees started working for TI in 1985 and 1991. This was in the same Stipulation of Facts in which the parties stipulated that TI was not formed until 1997.

**[\*66]** inaccurate, apparently inaccurate, and otherwise misleading statements.

The unaddressed, undeveloped, misrepresented, and missing facts pertain mostly to TI's operations in Starr County and its 2005–13 ownership interest in real properties. *See supra* FoF Part VIII.A. We will not concentrate on these and related facts. In OPINION Parts VIII and IX, *infra*, we will focus on years 2010–20 and address only facts that the parties failed to argue or develop as necessary.

B.    *Petitioners' Credibility*

We believe the parties' failure to present accurate facts largely falls on petitioners (specifically, on Dr. Schwarz). Surely Dr. Schwarz was aware that TI took over the Tecomate Ranch hunting operation in 2005 and ran it until 2011. However, petitioners completely avoided this topic in their briefs, as did Dr. Schwarz in his lengthy testimony.

Petitioners' briefs demonstrate their cavalier approach to accuracy: They routinely asserted demonstrably false/not credible statements. For example, petitioners repeatedly claimed on brief that in 2005 they "separated" their business activities into TI as the "operating entity" and numerous "real estate [holding] entities," including LSLP. Many of petitioners' legal arguments rest on this claim that is simply incorrect; LSLP's 2008–12 Schedules F (and prior returns) show that it conducted extensive operations.[75] Furthermore, Dr. Hakala based

---

[75] Dr. Schwarz also gave misleading/incorrect testimony on this topic. He testified that a tax attorney and Mr. Guthrie advised him to "have an operating entity that became [TI], lease the property from the owner of the asset, which became Tecomate Capital Partners, and Capital Partners doesn't do anything but own, and that reduces the risk of liability." The implication was that TI leased La Perla and Jalisco Ranches at all times. We note that GMCP (formerly Tecomate Capital Partners) owned most of LSLP.

Other parts of Dr. Schwarz's testimony lacked credibility. For example, he testified that the written leases between TI and LSLP/GMCP were drafted by other people, that he never read the leases, and that he "didn't even know about the leases on some of the" properties. He also testified that in the years at issue he had multiple discussions with Mr. Yelland and Blair Schwarz about how to reduce TI's expenses. He testified that he cracked down on TI's electricity use, food waste/grocery bills, and vehicle repairs. However, these three items combined were substantially less than the written lease totals, to say nothing of the higher rents TI actually paid in the years at issue. Lease expenses alone averaged about $200,000 more per year than TI's total ecotourism gross income for the years at issue. Dr. Schwarz's claim that he focused on smaller expenses while not even reviewing lease agreements that he signed (twice) is not credible.

**[\*67]** analysis in his expert report (discussed further *infra* OPINION Part VI) on similar incorrect claims and might have assigned fewer real estate gains to TI's work had accurate information been provided to him.

As another example, in their opening brief petitioners asked us to find that TI "realized they were losing money trying to prepare for duck hunts and they stopped offering them before the years at issue." In their answering brief petitioners twice asserted that duck/waterfowl hunting was "abandoned." Petitioners argued that these facts, which are supported by evidence, show that they made changes to TI's farming activity in an attempt to make a profit. However, after we ordered supplemental briefs addressing the LSLP/GMCP lease problems, petitioners reversed their prior claims. In their supplemental opening brief, petitioners instead asserted that TI "continues to offer waterfowl hunts to its customers still today."[76]

As a third example, in their supplemental opening brief, petitioners alleged that TI "maintained grazing leases to provide for additional land for the nilgai it replaced the cows [that were sold in and before 2011] with." However, Dr. Hellickson did not suggest that TI purchase nilgai or other exotics until 2017. Nilgai were not purchased before 2017. Petitioners' allegation that the grazing leases beginning in January 2014 existed to provide for animals not purchased until 2017 is not at all credible.

Most of the evidence in this case was presented or created by petitioners (and/or affiliated persons/entities). However, petitioners put forth an incomplete and often inaccurate set of facts. This was ultimately to their detriment, as many of their arguments rest on inaccurate claims.

C.    *Years After 2020*

Petitioners included a graph in their opening brief purportedly showing TI's gross income for years 2021 and 2022. At trial Dr. Schwarz testified that TI's financials are improving and it "would have reached profitability" in 2022 but for an alleged $400,000 expense related to the fish kills. Dr. Schwarz further testified that he believed TI would be profitable in 2023. These allegations are not supported by financial

---

[76] Petitioners cited printouts from the La Perla Ranch website, which show waterfowl hunts available in 2019, though this may have just been the result of lack of updates to the website. Petitioners do not allege that any waterfowl hunts actually took place in or after the years at issue.

[*68] records in evidence. The only financial records in evidence for years after 2020 are invoices pertaining to 2021. These invoices are inadequate to estimate TI's profits or losses for 2021.

We do not find Dr. Schwarz's/petitioners' unsupported testimony/graphs to be credible. TI's expenses and gross income are, to a significant extent, determined by Affiliated Entities (for example, how much LSLP/GMCP charge for the leases and how much they pay for custom farming work). Even if TI is moving toward profitability, we would need financial records to analyze whether this is manufactured on the backs of Affiliated Entities. If petitioners wanted to rely on financial information for years after 2020, they should have introduced adequate financial records pertaining to those years.

Dr. Schwarz also testified that (1) he decided "two or three years" ago that LSLP will sell Jalisco Ranch to reduce TI's expenses and (2) if "I'm not profitable within two years, I'm selling the whole thing." Regarding the first point, Jalisco Ranch is allegedly still being prepared for sale, and we do not find Dr. Schwarz's unsupported statement of intent, after many years of losses, to be credible. Regarding the second point, this may be an admission that petitioners are not making an overall profit from TI even when property appreciation is included, though we will not treat it as one.

V.    *Issues with Dr. Hellickson's Expert Report*

As previously stated, in his expert report Dr. Hellickson concluded that (1) sales of exotics packages could greatly increase in future years, (2) the deer herd on La Perla and Jalisco Ranches was exceptionally well managed, and (3) the value of the deer herd on La Perla and Jalisco Ranches was $628,000. As discussed below, there are numerous issues with Dr. Hellickson's conclusions.

First, Dr. Hellickson briefly discussed the exotics on La Perla and Jalisco Ranches. He concluded: "Based on the rapid growth in the exotic wildlife industry in Texas during recent years, future income generated from exotics on La Perla Ranch could rival revenues generated form [sic] the white-tailed deer herd." No information presented in Dr. Hellickson's report (or otherwise in this case) substantially supports the position that there is rapid growth in the exotic wildlife industry in Texas. Indeed, TI's low sales for exotic hunts suggest otherwise. We disregard Dr. Hellickson's conclusions pertaining to the exotics.

**[\*69]** Second, Dr. Hellickson opined that the "wildlife management program on the La Perla Ranch has resulted in the best managed white-tailed deer herd that I am aware of in North America." Dr. Hellickson noted the following contributory factors: (1) nearly 300 acres of fenced food plots, (2) year-round supplemental feeding, (3) use of breeding pens, (4) culling of excess deer, and (5) management of the habitat. Even if petitioners had not submitted Dr. Hellickson's report, we would still have found that the deer herd on La Perla and Jalisco Ranches is well managed. But this superior deer herd has come at a cost. As previously discussed, from 2010 to 2020 nonfishing wildlife operations expenses increased by 316% but hunting package gross income increased only by 42%. While deer hunting package revenue increased by 103%, this was far less than the increase in nonfishing expenses. There has been no showing that the superior deer herd on La Perla and Jalisco Ranches will result in profitable hunting, ecotourism, or overall operations for TI.

Third, Dr. Hellickson determined the value of the deer herd on La Perla and Jalisco Ranches to be $628,000. Respondent argues that Dr. Hellickson is not qualified to appraise the deer herd. We need not address respondent's argument because we find Dr. Hellickson's appraisal is flawed.

Dr. Hellickson began by using data from annual helicopter surveys to estimate a deer population of 594, comprising 160 bucks, 218 does, and 216 fawns. He determined that the fawns were about half male and half female, then "aged up" all deer by one year to get 268 bucks and 326 does. For the bucks, he used survey data to estimate that there were 108 bucks 1 year old, 60 bucks 2 years old, 51 bucks 3 or 4 years old, and 49 bucks 5 years or older (mature bucks). For the 49 mature bucks, he used survey data to estimate that there were 26 trophy class bucks and 23 "cull & management bucks." These 23 cull and management class mature bucks include the classic deer class with 140 to 149 inches of antlers.

To determine the value of the deer Dr. Hellickson used TI's deer hunting package prices during the 2020 to 2021 hunting season (equal to the prices in the years at issue). Dr. Hellickson found the 23 cull and management class bucks to be worth $3,000 each ($69,000 total). Using

[*70] an estimate of antler sizes for the 26 trophy class bucks, he found them to be worth a total of $260,000.[77]

Dr. Hellickson then turned to the younger bucks and does. He stated that if these deer were killed "through hunter harvest," the "close-out" values were $1,500 for each "yearling buck[]," $2,500 for each "middle-aged buck[]," and $250 for each doe. Curiously, after aging up the deer by a year to account for the 216 fawns, Dr. Hellickson showed his math as follows:

60 yearling bucks @ $1,500 per buck = $90,000

51 middle-aged bucks @ $2,500 per buck = $127,500

326 adult does @ $250 per doe = $81,500

The 108 male fawns were mistakenly omitted, though the 108 female fawns remain in the calculation. There should have been 111 middle-aged bucks and 108 yearling bucks.

Adding the five group totals above ($69,000, $260,000, $90,000, $127,500, and $81,500) equals $628,000. Dr. Hellickson determined that this was the value of the deer herd on La Perla and Jalisco Ranches. We do not believe this conclusion is reliable, for a number of reasons.

First, petitioners did not show that hunters will pay to hunt does.[78] Second, Dr. Hellickson did not explain how he arrived at the $1,500 and $2,500 values for yearling and middle-aged bucks, respectively. Third, the "mature cull & management bucks" category should have been broken down into cull, management, and classic class bucks because cull class bucks have no marketable hunting value. Fourth, there was no acknowledgment that TI's deer hunting packages include not only the deer; they also include three nights of lodging, food, and amenities on La Perla and Jalisco Ranches. There are expenses associated with both the hunts (such as guide fees) and the common

---

[77] Dr. Hellickson's math was not correct for groups of trophy bucks (grouped on the basis of antler size). For example, he determined that two bucks with an average of 190 inches of antlers were worth $27,500, when this should have been $30,000. However, Dr. Hellickson separately calculated the total values for all trophy bucks plus cull/management bucks and reached a $329,000 figure that is in accordance with his stated methodology.

[78] While does from a superior deer herd may have value to be used in breeding, Dr. Hellickson's conclusions are based on "hunter harvest" values.

**[\*71]** amenities. Fifth, Dr. Hellickson's math errors do not give us confidence in his work generally.

Finally, Dr. Hellickson's report does not address the fact that the State of Texas owns the deer on La Perla and Jalisco Ranches. We believe the "close-out harvest" method that Dr. Hellickson used to value the herd is not appropriate, considering that the number of deer that can be harvested must be approved by the state. On the basis of other evidence in the record, it appears to be extremely unlikely that the state would approve the harvesting of all deer on La Perla and Jalisco Ranches. Dr. Hellickson's report did not account for this or other factors related to the state's ownership of the deer.

We disagree with the $628,000 deer herd valuation reached by Dr. Hellickson. Though the superior deer herd on La Perla and Jalisco Ranches likely has some value,[79] there are too many variables for us to estimate the value of the herd to TI. Consider that (1) the State of Texas owns the deer, (2) the state must approve TI's yearly deer hunting proposals, (3) the deer live on land owned by LSLP that TI leases, (4) whether TI can legally sell deer off the land is unclear as is the price such deer might sell for, (5) no discount rate to value cashflows from hunting over time was established, and (6) ecotourism is losing so much money that it is unclear how much TI benefits from maintaining the superior deer herd.[80]

VI.    *Issues with Dr. Hakala's Expert Report*

As previously stated, Dr. Hakala concluded that TI's operating losses were more than entirely offset by realized and unrealized gains in real property. Dr. Hakala's analysis was premised on petitioners' argument that appreciation of real properties should be considered in determining whether TI was a for-profit activity in the years at issue.[81]

---

[79] As stated *supra* FoF Part XIX, Mr. Swanson made small positive adjustments to property valuations in his comparable sales analysis considering the quality of animals on La Perla and Jalisco Ranches.

[80] Even if we did value the deer herd as of 2022, that value alone would be of little relevance. One factor in determining whether an activity is conducted for profit is whether there is an expectation that assets used in the activity may appreciate in value. However, petitioners never established a baseline estimate of the value of the deer herd for us to estimate how much the herd has appreciated in value.

[81] This is a legal issue to be decided by the Court. To the extent it opines on the legal issue, we disregard Dr. Hakala's opinion that "companies operating with the use

[*72] As discussed *infra* OPINION Part VIII, we reject petitioners' argument. However, we will discuss the two major parts of Dr. Hakala's analysis[82] to give a more complete picture of petitioners' argument. As discussed below, there are numerous issues with Dr. Hakala's conclusion.

### A. *Comparison of Income, Losses, and Gross Gains*

Most of Dr. Hakala's work was an attempted comparison of losses incurred by TI with selected income and losses of Affiliated Entities. As part of this work, Dr. Hakala attempted to determine gains from sales of properties and properties still owned by petitioners/Affiliated Entities, then isolate the portions of the gains made in certain years that TI existed/operated.

### 1. *Step One: TI's Income/Losses*

Dr. Hakala began by attempting to calculate TI's net income/losses and cash operating income/losses for years 2005–17. He restated TI's profit and loss statements for years 2011–17 and provided abbreviated restatements for 2005–10. These calculations and restatements were often needlessly complex, not well explained, and full of apparent errors.[83]

Dr. Hakala chose to end his income analysis with the 2017 year. This choice was not well explained, though at one point Dr. Hakala mentioned "the relevant period from 2002 to 2017." Regarding years after 2017, Dr. Hakala stated that

> Dr. Schwarz indicated in my interview that he had
> some losses after 2017 due to fish kills and having to drain

---

of real estate in affiliated entities should be analyzed together with such entities and not analyzed separately for valuation and income allocation or attribution purposes."

[82] Dr. Hakala's analysis was lengthy and there are many minor points that we find to be irrelevant or of questionable accuracy. We will not summarize such points.

[83] For example, Dr. Hakala noted that TI "reported an operating profit in 2006 but that was due in part to the financial records not reserving for depreciation." Dr. Hakala's abbreviated restatement for TI's 2006 year lists no amount for depreciation. Confusingly though, both TI's 2006 profit and loss statement and its 2006 Schedule F reflect depreciation of $361,980 and large operating losses. We see no indication that TI treated depreciation for 2006 differently from that for other years such that depreciation expenses should not be considered when calculating 2006 operating income. There are numerous other instances in which figures in Dr. Hakala's report do not match TI's financial records, for unexplained and unclear reasons.

**[\*73]** and revise the lakes and ponds and how watershed runoff flowed through the lakes and ponds. However, he expects [TI] to be profitable going forward as properties are sold and the amount of "custom" work increases again for sold or managed properties.

This statement is inaccurate and misleading. TI incurred $3,324,749 in Schedule F losses in 2018–20. These were not losses "due to fish kills;" they were a continuation of losses from TI's normal operations. In addition, the measures to flush water from lakes other than House Lake were not implemented until after the 2022 fish kills. Dr. Hakala should have scrutinized Dr. Schwarz's statement and considered extending his analysis to years after 2017.

Dr. Hakala determined that TI had a net loss of $11,742,060 for years 2005–17, slightly smaller than its total Schedule F losses of $12,124,936 for 2005–17. Dr. Hakala also determined that TI's cash operating losses for 2005–17 were about $7.5 million. To complete the cash operating losses calculation, Dr. Hakala excluded depreciation, financing, and several other expenses. Dr. Hakala did not add any cash spent on capital assets, so the calculation does not accurately estimate cashflows. However, as discussed *infra* OPINION Part VI.A.3, Dr. Hakala later estimated "net investments in depreciable property and equipment . . . in excess of $8.0 million" for 2005–17 for TI and LSLP combined. This resolves the apparent discrepancy.

### 2. *Step Two: LSLP, GMCP, & Lone Star La Cuesta*

Dr. Hakala next attempted to determine net income and adjusted cash net income/losses for LSLP, GMCP, and Lone Star La Cuesta.

Dr. Hakala determined that LSLP had "cumulative net cash operating income minus interest expenses [of] negative $1.19 million from 2005 through 2017." This figure omits depreciation expenses (which were substantial), dividends, partnership income, and some sales of assets. Dr. Hakala attempted to account for the excluded assets sales in the third part of his analysis (discussed *infra* OPINION Part VI.A.3).

Dr. Hakala's analysis of GMCP's income was nearly useless. He did not complete any analysis for years 2005–10, possibly because of some missing GMCP records. His written analysis for years 2011–17 for GMCP was brief, consisting mostly of the following sentences:

[*74] GMCP held substantial equity in [LSLP] and other property companies with deferred and unrealized gross gains. As a result of there [sic] were significant additional net losses recognized in GMCP between 2011 and 2017. However, GMCP and other entities produced income to the Schwarz's in dividend income, realized capital gains on asset sales, and interest income that more than offset those losses such that the cumulative net income from 2011 through 2017 was $0.22 million and GMCP had substantial unrealized gains, primarily from its 99.75% equity interest in [LSLP].

Dr. Hakala acknowledged at trial that analysis of GMCP's cash operating income/losses was "too difficult to do" because "GMCP is really a roll-up of all [petitioners'] entities."

For Lone Star La Cuesta, Dr. Hakala provided a brief analysis for years 2015–17 showing net income of $791,177. Most of the net income was attributable to interest that Lone Star La Cuesta earned on loans it made to finance the purchase of properties by third parties.

### 3.　*Step Three: Gross Property Gains*

Dr. Hakala presented complex but well-explained spreadsheets showing transactions (and theoretical sales) involving properties owned by petitioners or Affiliated Entities at any time since 2002. TI did at least some custom farming and/or ecotourism work on most of the properties, but there are many properties (such as Brooks County Ranch,[84] tracts from the 15,070 acres purchased in Zapata County and sold in 2005–06, Delta Ranches, and Dolphin Cove condo[85]) which it was not established that TI did any work on. Mr. Yelland testified that he kept books and records for Brooks County Ranch and Dolphin Cove condo, though these properties were sold in 2007 and Mr. Yelland was not hired by TI until 2008.

For properties that had been sold, Dr. Hakala determined what the gross gain was. All property sales resulted in gross gains. If a portion of a property (or owning Affiliated Entity) was owned by someone other

---

[84] Brooks County Ranch was acquired by LSLP in an exchange of property in 2006 and sold by LSLP in 2007.

[85] Dolphin Cove condo was bought (apparently by LSLP) in 2005 and sold by LSLP in 2007.

**[*75]** than petitioners, Dr. Hakala usually assigned only a pro rata share of the gross gains to petitioners.[86] Dr. Hakala then estimated what portion of the gross gains occurred from January 1, 2002, to December 31, 2017, and January 1 to December 15, 2022. Dr. Hakala recognized that these numbers were "approximation[s]."[87]

For properties still owned by petitioners or Affiliated Entities as of December 15, 2022, Dr. Hakala used property valuations determined by Mr. Swanson in his expert reports (and some valuations not based on admitted expert reports) as theoretical sale prices. He then estimated what each property would have been worth on December 31, 2017, using real estate appreciation figures stated in Mr. Swanson's reports and working backwards.

A table reflecting Dr. Hakala's gross gain calculations and estimates follows. We omit properties that were sold before 2002.

| Property | Sale Year | Sale Price or Valuation | Ps' Gross Gain 2002 to 12-31-17 | Ps' Gross Gain 2002 to 12-15-22 |
|---|---|---|---|---|
| Tecomate South Ranch | Still Owned | $5,968,110 | $208,790 | $365,253 |
| Tecomate North Ranch | 2011 | 1,050,140 | 44,556 | 44,556 |
| Tecomate Ranch | 2011 | 2,280,582 | 752,694 | 752,694 |
| Novillos Ranch | Various | 3,469,096 | 679,696 | 679,696 |
| Tecomate 457 Ranch | 2016 | 1,143,365 | 795,005 | 795,005 |
| Sullivan Ranch | Various & Some Still Owned | 7,239,140 | 5,153,888 | 5,273,194 |
| Dolphin Cove Condo | 2007 | 430,000 | 135,000 | 135,000 |
| Tecomate West Ranch | 2021 | 1,979,583 | 1,339,180 | 1,673,223 |
| Brooks County Ranch | 2007 | 1,110,811 | 154,279 | 154,279 |

---

[86] An exception involving Brad Schwarz is discussed below.

[87] The calculations Dr. Hakala made to reach these "approximation[s]" were opaque. He assigned "a greater portion of the gains to" 2017 and earlier years (on account of capital improvements that he believed occurred mostly in 2005–17) without specifying adjustments he made. Especially considering other concerns we have with his report (discussed below), we would have preferred that Dr. Hakala show his work.

| | | | | |
|---|---|---|---|---|
| [*76] Las Brisas Ranchettes | 2012 | 2,752,985 | 1,152,720 | 1,152,720 |
| Las Esquinas Ranchettes | 2012 | 690,300 | 387,259 | 387,259 |
| Medio Sullivan Ranch | Various | 1,625,000 | 58,243 | 58,243 |
| Laguna Bay Condo[88] | Still Owned | 700,000 | 172,742 | 255,000 |
| Delta Ranches | Various | 2,450,000 | 831,781 | 831,781 |
| Tecomate East Ranch | Still Owned | 550,000 | 36,194 | 69,819 |
| Isla Monte Ranch | 2013 | 2,594,496 | 23,156 | 23,156 |
| Las Brisas del Rio Ranchettes | 2012 | 970,470 | 36,452 | 36,452 |
| Rio Hondo Tract[89] | 2020 | 288,000 | 281,023 | 288,000 |
| Bear Creek Ranch | Still Owned | 2,250,000 | 0.00[90] | 455,000 |
| Mercedes North Tract | Still Owned | 1,900,000 | 0.00[90] | 610,495 |
| Twin Lakes Ranch | 2019 | 2,977,950 | 1,004,132[91] | 1,003,340 |
| Zapata County Land Sold (Other than 2019 Twin Lakes Ranch Sale) | Various | 10,765,311 | 2,872,407 | 2,872,407 |
| Lone-Star Tract | Still Owned | 2,650,000 | 1,963,439 | 2,250,900 |
| La Perla HQ Tract | Still Owned | 9,347,000 | 7,151,555 | 8,389,354 |
| Jalisco Ranch | Still Owned | 4,765,000 | 3,486,976 | 3,959,360 |
| **Total** | | **$71,947,339** | **$28,721,167** | **$32,516,186** |

---

[88] TI worked to rent out the Laguna Bay condo, though what authority it had from the owning entity, GMCP, to do this is unclear. TI's profit and loss statements for 2015 and later years show no income or expenses related to the Laguna Bay condo.

[89] Dr. Hakala listed a zero purchase price for this property. No admitted evidence supports this.

[90] This property was purchased in 2021 and thus has no gain attributable to years 2002–17.

[91] A dip in real estate prices in 2018 caused this figure to be higher than the figure in the column to the right of it.

**[\*77]** Considering the gross gains reflected in the table above, Dr. Hakala concluded that "the operating losses in [TI] are more than entirely offset by realized and unrealized gains" in property.

While we appreciate Dr. Hakala's efforts with respect to the properties, we do not agree with his conclusion. As a legal matter, we rule that TI's farming activity and the real estate activities are separate activities. This is discussed *infra* OPINION Part VIII. We have several other concerns with Dr. Hakala's analysis.

First, Dr. Hakala's choice to begin with 2002, rather than 2005, is odd. As discussed *supra* FoF Part VI.A, TI's operations in 2002–04 were limited; it reported no receipts and small losses from ownership interests in other entities. Dr. Hakala may have been influenced by the parties' stipulations that "Beginning in 2002, petitioners began reporting most of their farming activity on [TI's] Forms 1065" and "[TI] has reported Schedule F losses since 2002." However, these stipulations are incorrect. TI's returns do not include Schedule F until 2005, a fact which Dr. Hakala was surely aware of considering his analysis of TI's financial information. Dr. Hakala also erroneously asserted that TI "was formed on January 1, 2002," which influenced his decision. We do not agree with Dr. Hakala's decision to include pre-2005 property gains in his analysis. Furthermore, had Dr. Hakala been provided with accurate information about TI's operations primarily in Starr County during years 2005–08, and LSLP's farming operations in Zapata County lasting until 2012, he might have made additional adjustments to the periods he considered for certain properties.

Second, Dr. Hakala used both December 31, 2017, and December 15, 2022, as endpoints. This conveniently avoided any analysis ending on December 31, 2020.[92] According to real estate appreciation figures used by Dr. Hakala, property values increased only 2.48% from December 31, 2017, to December 31, 2020, while there was a nearly 20% jump in 2021. Had Dr. Hakala continued his analysis to the end of 2020 (the most logical endpoint according to the case the parties presented)[93] he would have noted that TI's losses had begun to significantly outpace

---

[92] We previously made a similar observation regarding Dr. Hakala's choice to end the income analysis for TI with the 2017 year, noting that TI incurred $3,324,749 in Schedule F losses in 2018–20.

[93] Aside from certain invoices from 2021 and a few missing records, the parties introduced financial records and returns primarily covering years 2005–20. Other facts, and the parties' arguments, largely pertained to years up to the end of 2020.

[*78] appreciation in properties. Furthermore, LSLP had net losses of about $1.7 million in 2018–20, driven in part by the drop in rental income paid by TI after 2017. These losses narrowed when following Dr. Hakala's pattern of omitting depreciation, dividends, partnership income, and asset sales, but were still substantial.

Third, as previously stated, Dr. Hakala used real estate appreciation figures stated in Mr. Swanson's reports. He used those figures and Mr. Swanson's property valuations as of October 31, 2022, and worked backwards to reach his valuations as of the end of 2017. When stating the appreciation figures he relied upon, Dr. Hakala listed the amount for 2022 as "0.00%." This is not correct; Mr. Swanson did not provide an appreciation figure for 2022 in his report. Because Dr. Hakala used 0.0% for 2022, he failed to account for any change in price for the first ten months of 2022 (as Mr. Swanson's valuations were as of October 31, 2022). Dr. Hakala's method for accounting for changes in real estate values over time also differs from Mr. Swanson's method. Mr. Swanson used a 6.55% annual rate that is based on a five-year average. Dr. Hakala instead used data for individual years (and incorrectly asserted that appreciation for 2022 was 0.0%). Dr. Hakala's method ended up being substantially more advantageous for petitioners when calculating property values as of the end of 2017. Considering the area of expertise that this point pertains to, and Dr. Hakala's incorrect assertion regarding 2022 appreciation, we are inclined to believe that Mr. Swanson's use of a five-year average rate is more reliable.

Fourth, Dr. Hakala failed to account for Brad Schwarz's ownership interest in LSLP in 2005, 2006, and part of 2007. LSLP's returns indicate that Brad Schwarz received several hundred thousand dollars in net gains before he sold his interest in LSLP that did not go to petitioners/Affiliated Entities. While this oversight is comparatively small, it does not give us confidence in Dr. Hakala's analysis as a whole, especially in conjunction with other issues and errors.

Fifth, and most significantly, Dr. Hakala noted that the gains he used "are gross gains and do not take into account the accrual of value due to net capital expenditures associated with the properties and do not include any commissions or other selling expenses."[94] These items can have a large effect on net gains. For example, Dr. Hakala calculated

---

[94] Nor did Dr. Hakala adjust for water rights that Mr. Swanson included in his property valuations. Mr. Swanson determined that the value of water rights associated with the La Perla HQ Tract, Jalisco Ranch, and the Lone-Star Tract was over $900,000.

**[\*79]** a gross gain of $1,003,340 on the Twin Lakes Ranch sale in 2019, but LSLP's 2019 return shows a taxable gain of only $401,888. There are numerous other properties with large disparities between gross and taxable gains. Although it was not possible to use net/taxable gains for all properties given the evidence presented,[95] Dr. Hakala could easily have used taxable gains for sales that appear on returns.

Dr. Hakala included an extremely general conclusion regarding properties owned at any time by LSLP, stating:

> In total, properties originally included in [LSLP] contributed $26.69 million of gross gains from the beginning of 2004 to December 15, 2022, and $24.11 million of gross gains from the beginning of 2002 to the end of 2017.[96]
>
> Most of those gains are offset by net investments in depreciable property and equipment over time estimated to be in excess of $8.0 million in total and the ongoing cash operating losses of $7.5 million from 2005 through 2017 in [TI] and operating losses in other entities estimated to be around $0.5 million (mostly from [LSLP]). Additional net interest expenses resulted in further reported net losses but were partially offset by interest paid to Dr. Schwarz and Ms. Schwarz and affiliated entities during the period up to 2017. Despite these substantial net capital expenditures, operating losses, and net interest expenses, in total, from 2002 to 2017, the combined operations and property development produced gross gains well in excess of net capital expenditures, selling expenses, and operating losses.

Dr. Hakala could have been more specific by (1) stating the amount of interest he referred to, (2) estimating selling expenses, and (3) separating properties rather than grouping everything together.

---

[95] For example, financial information for El Tecomate Ranch sufficient to determine capital expenditures related to Tecomate Ranch South was not presented.

[96] The 2004 and 2002 beginning years in this sentence appear to be erroneous. They differ for an unexplained reason, and LSLP was not even formed until 2005.

[*80] B.    *Unrealized Gains in LSLP Work*

Related to his work discussed above, Dr. Hakala estimated LSLP's unrealized gains as of December 31, 2017. Dr. Hakala restated LSLP's 2017 balance sheet using his estimated fair market values (FMVs) of LSLP's properties as of December 31, 2017, as well as adjustments to LSLP's depreciation. By doing so, he estimated that LSLP "had at least $10.9 million in unrealized gains as of December 31, 2017." Though other properties are included in this $10.9 million, it appears that $9 to $10 million is attributable to La Perla and Jalisco Ranches.[97] However, we believe Dr. Hakala's original $10.9 million estimate is erroneous because (1) there is an error regarding ownership/basis of/in Jalisco Ranch, (2) there is an error regarding an estimated fair market value Dr. Hakala used for Jalisco Ranch, and (3) there are errors regarding assets included on TI's 2017 balance sheet.

### 1.    *Error Relating to Ownership of Jalisco Ranch*

GMCP contributed Jalisco Ranch to LSLP in 2015. At the time, GMCP had a basis in the land of Jalisco Ranch of $801,644, as reported on its 2014 balance sheet and return (on Schedule L, Balance Sheets per Books). LSLP inherited this $801,644 basis after the contribution in 2015, and it is reflected on LSLP's 2015 balance sheet and return. The Jalisco Ranch land (and the $801,644 basis) then disappears from LSLP's balance sheets and returns in 2016 and reappears on GMCP's balance sheets and returns for 2016–20.

The depreciation schedule attached to GMCP's 2017 return shows that it reacquired Jalisco Ranch on June 30, 2016. How GMCP (apparently) reacquired Jalisco Ranch from LSLP is not clear, nor was it explained by the parties, who stipulated only that "GMCP contributed Jalisco Ranch to LSLP on April 10, 2015." In their briefs the parties represented that LSLP owned Jalisco Ranch after 2015.[98] TI also paid all rents due under the written leases to LSLP in 2017, even though GMCP apparently owned Jalisco Ranch in 2017.

---

[97] The other properties are the Sullivan Tract, Twin Lakes Ranch, and the Rio Hondo Tract.

[98] Jalisco Lake improvements/expansion remained an asset on LSLP's balance sheets for years 2016–20. For an unclear reason, assets related to Jalisco Lake were also listed on LSLP's balance sheet even before 2015 (the year GMCP contributed Jalisco Ranch to LSLP). The reason for this accounting was not explained by the parties, and it may be erroneous.

**[*81]** Dr. Hakala made one of two mistakes. Either he incorrectly considered LSLP to be the owner of Jalisco Ranch at the end of 2017, or he failed to account for the $801,644 basis in Jalisco Ranch land (that was on GMCP's 2017 balance sheet) when he restated LSLP's 2017 balance sheet.[99] Whatever the case may be, a significant error occurred.

## 2. *Error Regarding Jalisco Ranch Value Used*

As stated *supra* note 99, Dr. Hakala added estimated FMVs of LSLP's properties as of December 31, 2017, to fixed assets when restating LSLP's 2017 balance sheet. Dr. Hakala added estimated FMVs of the Lone-Star Tract ($2,163,489), the La Perla HQ Tract ($7,630,992), and most other properties in accordance with his stated methodology. However, the value Dr. Hakala added for Jalisco Ranch was not in accordance with his stated methodology.

Tables in Dr. Hakala's report show his estimated FMV for Jalisco Ranch as of December 31, 2017, as $3,890,197. However, when restating LSLP's 2017 balance sheet, Dr. Hakala added a value for Jalisco Ranch of only $3,486,976. This is Dr. Hakala's estimated gross gain for Jalisco Ranch from 2002 through the end of 2017, not his estimated FMV as of December 31, 2017. Correcting this error adds $403,221 to Dr. Hakala's unrealized gains estimate.

---

[99] If the second potential error is the one that occurred, an explanation is called for. When Dr. Hakala restated LSLP's 2017 balance sheet, he added his estimated FMVs of LSLP's properties, including Jalisco Ranch, as of December 31, 2017, to fixed assets. In turn, he removed other assets related to those same properties from the balance sheet, including basis in land. He also removed accumulated depreciation that he found to be attributable to removed assets. Because accumulated depreciation was substantial and assets had appreciated in value overall, the estimated FMVs added were much more valuable than net items removed. LSLP's original 2017 balance sheet lists total assets of $6,707,916 (after certain small adjustments made by Dr. Hakala), while LSLP's restated 2017 balance sheet lists total assets of $17,613,978. Dr. Hakala labeled the $10,906,062 difference between these figures "Adjust to FMV," and it constitutes his $10.9 million unrealized gains estimate for LSLP.

The issue is that because Dr. Hakala used only LSLP's 2017 balance sheet, he failed to account for the $801,644 basis in Jalisco Ranch land that was on GMCP's 2017 balance sheet. Dr. Hakala's $6,707,916 figure was thus $801,644 too low–it should have been $7,509,560. This means that the $10,906,062 "Adjust to FMV" figure was too high (also by $801,644) and should have been only $10,104,418.

**[\*82]**         3.     *Errors Regarding TI's Assets*

Dr. Hakala failed to consider assets shown on TI's 2017 balance sheet when he restated LSLP's 2017 balance sheet. Mr. Swanson considered many assets shown on TI's 2017 balance sheet to be part of La Perla and Jalisco Ranches in his property valuation reports. This means Dr. Hakala should have adjusted his LSLP unrealized gain estimate to account for relevant assets on TI's 2017 balance sheet.

For example, TI purchased numerous exotic animals and breeder bucks in 2017 and earlier years to be used on La Perla and Jalisco Ranches. These animals were listed as assets on TI's depreciation schedule attached to its 2017 return. TI's depreciation schedule shows that numerous such animals were not fully depreciated at the end of 2017. Mr. Swanson included the deer and exotic herds when valuing La Perla and Jalisco Ranches. As a result, Dr. Hakala should have adjusted his calculations to account for the animal assets on TI's balance sheets that were not fully depreciated. As is, Dr. Hakala's restated balance sheet gives LSLP the benefit of estimated FMVs for the properties without considering all (not fully depreciated) assets on the properties that would reduce unrealized gains.

Because of a lack of specificity regarding assets shown on TI's 2017 depreciation schedule, we cannot place a dollar amount on this error. There are many assets (aside from animals) on TI's 2017 depreciation schedule that we strongly suspect (1) are located on La Perla and/or Jalisco Ranches and (2) contributed to Mr. Swanson's property valuations. Such assets include fencing, fish feeders, a La Perla Lake aeration system, deer feeders, a dock system, "furniture and fixtures," etc. These assets were not fully depreciated at the end of 2017.

C.     *Conclusion*

We have concerns with (1) Dr. Hakala's methodology (including property gains for years 2002–04, not including years 2018–20, use of gross gains, etc.); (2) errors in Dr. Hakala's work; and (3) Dr. Hakala's apparent lack of scrutiny of some financial records and Dr. Schwarz's claims regarding years after 2017. Especially when dealing with intricate and opaque mathematical calculations, our confidence in an expert witness's analysis is important. Unfortunately, we do not have confidence in Dr. Hakala's work in this particular case.

**[\*83]** Dr. Hakala's report highlights how complex the financial records of TI and Affiliated Entities are. It is noteworthy that these complexities tripped up petitioners' own expert witness.

VII.    *Section 183 Issue: Introduction*

Taxpayers are generally allowed deductions for business-related expenses. *See* § 162. Section 183(a) provides that taxpayers are not allowed a deduction "if such activity is not engaged in for profit."[100] *See also Westbrook v. Commissioner*, 68 F.3d 868, 875 (5th Cir. 1995) (stating that in order to claim a deduction under section 162, the primary purpose for engaging in the activity must be to earn a profit), *aff'g per curiam* T.C. Memo. 1993-634. "[I]f such activity is not engaged in for profit, no deduction attributable to such activity [is] allowed" except to the extent provided by section 183(b). § 183(a). Section 183(b) allows deductions that would have been allowable had the activity been engaged in for profit but only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit).

An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective in engaging in the activity. *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), *aff'd*, 702 F.2d 1205 (D.C. Cir. 1983) (unpublished table decision); Treas. Reg. § 1.183-2(a). The taxpayer's expectation of profit must be in good faith. *Allen v. Commissioner*, 72 T.C. 28, 33 (1979) (citing Treas. Reg. § 1.183-2(a)). Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. *Keanini v. Commissioner*,

---

[100] Absent stipulation to the contrary, this case is appealable to the U.S. Court of Appeals for the Fifth Circuit. *See* § 7482(b)(1)(A). The Tax Court will follow a court of appeals decision which is squarely on point where appeal from our decision lies to that court of appeals alone. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

In a case involving interest under section 6621(c), the Fifth Circuit stated that, for partnerships, deductions are "*not* actually disallowed *under* I.R.C. § 183, but under I.R.C. §§ 162 and 174." *Copeland v. Commissioner*, 290 F.3d 326, 336 (5th Cir. 2002), *aff'g in part, rev'g and remanding in part* T.C. Memo. 2000-181. The court noted that it is "accepted that in the partnership context, the profit motive inquiry focuses on the partnership, not the individual partners, and that the factors in the Treasury Regulations to I.R.C. § 183 (for determining whether an 'activity is . . . engaged in for profit') may be employed to determine the profit motive required by section[] 162 . . . exists." *Id.* at 335 (footnote omitted). Neither party has argued that *Copeland* affects the section 183 analysis in this case, and we find that it does not.

**[\*84]** 94 T.C. 41, 46 (1990); Treas. Reg. § 1.183-2(b). Greater weight is given to objective facts than to a taxpayer's mere statement of intent. *Thomas v. Commissioner*, 84 T.C. 1244, 1269 (1985), *aff'd*, 792 F.2d 1256 (4th Cir. 1986); Treas. Reg. § 1.183-2(a).

VIII. *Section 183 Issue: Ascertaining the Activity at Issue*

    A. *Introduction and Case as a Whole*

To determine whether an intent to make a profit exists, the activity at issue must first be ascertained. Treas. Reg. § 1.183-1(d)(1). Where a taxpayer is engaged in several undertakings, each may be a separate activity. *Id.* However, a taxpayer's multiple activities may be treated as one activity if the activities are sufficiently interconnected. *Welch v. Commissioner*, T.C. Memo. 2017-229, at *22 (citing Treas. Reg. § 1.183-1(d)).

Generally, the Commissioner will accept the taxpayer's characterization of multiple activities as either a single activity or separate activities. Treas. Reg. § 1.183-1(d)(1). The taxpayer's characterization will not be accepted, however, when it appears that it is artificial and cannot be reasonably supported by the facts and circumstances of the case. *Id.*

Before providing more specific considerations (which will be discussed *infra* OPINION Part VIII.B), Treasury Regulation § 1.183-1(d)(1) states: "In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account." We will begin our analysis by discussing this case as a whole.

Respondent effectively disallowed TI's Schedule F net loss deductions. Because TI commingled ecotourism and custom work expenses in its books, we cannot discern exactly what percentages of the Schedule F losses were attributable to ecotourism and what were attributable to custom farming. However, we have found that the large majority of TI's Schedule F losses were attributable to ecotourism (and work in support of ecotourism) which had little to no relationship to the real estate activities. *See supra* FoF Part XV. Petitioners have not demonstrated that any significant percentage of the farming activity losses pertained to work on properties sold or intended to be sold.

Petitioners chose to structure entities they partially or wholly owned in such a way that TI's farming activity was separate from the real estate activities. Petitioners proceeded to argue that TI's farming

[*85] activity and the real estate activities should be considered together for purposes of section 183. But TI's Schedule F expenses as a whole do not substantially relate to the real estate activities. Most properties at issue had little or no connection to TI's farming activity. For the few properties that did have a significant connection (like La Perla and Jalisco Ranches), TI's farming activity was focused on ecotourism rather than developing real estate.

Ecotourism and real estate activities had distinct objectives. The goal of TI's ecotourism was to sell hunting, fishing, and event packages almost exclusively on La Perla and Jalisco Ranches in the years at issue, while the goal of the real estate activities was to buy, develop, and sell other properties. Appreciation of La Perla and Jalisco Ranches resulting from TI's ecotourism was incidental to the goal of selling hunting, fishing, and event packages.

A small portion of TI's custom farming work was completed in support of petitioners'/Affiliated Entities' real estate activities, though TI was paid for such work. In this respect TI acted more like a third-party contractor than like part of an integrated business operation. TI completed similar custom farming work for unrelated parties, to whom it actually was a third-party contractor.

It is noteworthy that petitioners did not specify exactly what real estate gains are attributable to TI's farming activity. Instead, petitioners made the extremely broad claim that all real estate gains since January 1, 2002, should be considered in this case.[101] To hear petitioners tell it, if TI was paid $1,000 by LSLP to install a gate on a property and the property later (or even previously) increased in value by $1 million, we should count the $1 million increase against TI's Schedule F losses. Petitioners even asked us to consider gains on properties like Brooks County Ranch and Dolphin Cove condo for which there is no evidence that TI did *any* work whatsoever. Petitioners are attempting to use a strong real estate market[102] and their price-enhancing sales techniques (such as purchasing large tracts and

---

[101] TI did not even file Schedule F until 2005.

[102] The evidence in this case shows that ranch land in South Texas had appreciated at a healthy rate (6% or more per year, on average) since the early 2000s. Mr. Swanson also included water rights in the valuations of certain properties. Evidence shows that the value of water rights has increased over time.

**[*86]** selling smaller pieces)[103] to justify TI's extremely unprofitable ecotourism.

Petitioners began the Tecomate Ranch hunting operation in the 1990s. That operation was not profitable. TI took over the Tecomate Ranch hunting operation around 2005, and it continued to lose money. TI later began to operate in Zapata County, added fishing, event, and other hunting packages, and kept losing money, even though LSLP and GMCP were paying it to complete large projects such as the lakes.

Petitioners are intelligent people. Certainly they know that they will never profit from TI's ecotourism or TI's farming activity as a whole. They thus seek to tie the farming activity to the profitable real estate activities. But these ties are weak,[104] and petitioners' position is contrary to the language and intent of Treasury Regulation § 1.183-1(d)(1). Considering the facts and the law, we rule that petitioners' characterization of farming and real estate activities as one activity is artificial and unreasonable.

B. *Treasury Regulation § 1.183-1(d)(1) and Caselaw Considerations*

Treasury Regulation § 1.183-1(d)(1) and our caselaw provide specific factors to consider when ascertaining the activity at issue. These items reinforce our analysis *supra* OPINION Part VIII.A.

"Generally, the most significant facts and circumstances" to consider when ascertaining the activity at issue are (1) the degree of organizational and economic interrelationship of the undertakings, (2) the business purpose served by carrying on the undertakings separately or together, and (3) the similarity of the undertakings. Treas. Reg. § 1.183-1(d)(1). Treasury Regulation § 1.183-1(d)(1) also prescribes

---

[103] It is well established that smaller parcels (other things being equal) generally sell for higher per-acre prices than larger parcels. *See Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013-27, at *96–97; *Estate of Kolczynski v. Commissioner*, T.C. Memo. 2005-217, 2005 Tax Ct. Memo LEXIS 219, at *17 (noting premium paid for smaller parcels).

[104] For example, petitioners extoll brand and animal benefits to the real estate activities from ecotourism. As discussed further *infra* OPINION Part VIII.B.2, such benefits are minimal. There are far more efficient ways to profit from real estate than by sinking millions upon millions of dollars into a deer and fish project. No competent real estate activity would have conducted staggeringly unprofitable ecotourism for such nominal benefits.

[*87] a test for treating farming and the holding of land on which farming occurs as one activity, which we will discuss *infra* OPINION Part VIII.B.1. The term "farming" in Treasury Regulation § 1.183-1(d)(1) includes ranching. *See Hoelscher v. Commissioner*, T.C. Memo. 2013-236, at *5–6.

We also consider the following caselaw factors: (1) whether the undertakings were conducted at the same place, (2) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from their land, (3) whether the undertakings were formed separately, (4) whether one undertaking benefited from the other, (5) whether the taxpayer used one undertaking to advertise the other, (6) the degree to which the undertakings shared management, (7) the degree to which one caretaker oversaw the assets of both undertakings, (8) whether the same accountant was used for the undertakings, and (9) the degree to which the undertakings shared books and records. *See Topping v. Commissioner*, T.C. Memo. 2007-92, 2007 Tax Ct. Memo LEXIS 88, at *17–18 (citing *Mitchell v. Commissioner*, T.C. Memo. 2006-145, 2006 Tax Ct. Memo LEXIS 145, at *11–12).

### 1. *Treasury Regulation § 1.183-1(d)(1) Test*

We will first address the test in Treasury Regulation § 1.183-1(d)(1) for treating a farming activity and the holding of land[105] on which the farming occurs as one activity. We note that the parties' arguments with respect to this issue were particularly poor. Neither party came even remotely close to adequately addressing the issue.

The relevant portion of Treasury Regulation § 1.183-1(d)(1) provides:

> Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single

---

[105] The term "land" is not defined in regulations pertaining to section 183. Black's Law Dictionary defines "land" as "[a]n immovable and indestructible three-dimensional area consisting of a portion of the earth's surface, the space above and below the surface, and everything growing on or permanently affixed to it." *Land*, *Black's Law Dictionary* (11th ed. 2019). Treasury Regulation § 1.856-10(c) (pertaining to definitions applicable to sections of the Internal Revenue Code dealing with real estate investment trusts) provides that "[l]and includes water and air space superjacent to land and natural products and deposits that are unsevered from the land." Either definition includes the lakes on La Perla and Jalisco Ranches.

**[\*88]** activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

In their opening brief petitioners briefly described the text quoted in the prior paragraph (test). After several off-topic paragraphs, petitioners stated that TI's maintenance and wildlife "expenses contribute to the value of the land and reduce the net cost of carrying the land. The expenses associated with the appreciation of the land are a significant portion of TI's expenses and are far in excess of depreciation." In their Pretrial Memorandum petitioners made the same argument in the paragraph directly following their description of the test. Petitioners are suggesting that TI satisfied a version of the test that they made up.

In their answering brief petitioners tried a different argument. They asserted that the test is inappropriate in this case, stating:

> Respondent attempts to fit a square peg in a round hole using Treasury Regulation section 1.183-1(d)(1), which sets the parameters for aligning farming on land held primarily for profit from increase in value if the farming activity reduces the net carrying cost of the land. The facts in this case do not fit that situation as the hunting and fishing activities are intertwined with the land with mutual development expenses and maintenance that generate appreciation directly, through actual improvements as well as in brand and marketing benefits.

Petitioners later elaborated on this argument, stating:

> Both the Treasury Regulation and the cases cited by respondent consider different facts where the business conducted on the land is tangential to the land itself. Here, petitioners have a reputation of buying, improving using

[*89]  the Tecomate System, and selling land with large deer on the property. The added lakes and genetically superior fish on La Perla and Jalisco ranches further add to the value.

Petitioners did not sufficiently explain their argument, nor did they substantially address the actual test. We take petitioners' position to be that the test is inappropriate because TI's farming activity improves the value of properties by developing the ranch attributes, as well as brand/marketing benefits. Petitioners cited no precedent in support of their position, and we have found none.

We reject petitioners' argument that the test is inappropriate in this case. Adoption of petitioners' position would give taxpayers a way to avoid the test whenever farming expenses contribute to appreciation of real property. Treasury Regulation § 1.183-1(d)(1) provides for no such exception.

We have previously rejected a less drastic reinterpretation of the test where a taxpayer argued that real estate tax savings from a farming activity should be considered in the test computation. *See Hambleton v. Commissioner*, T.C. Memo. 1982-234, 1982 Tax Ct. Memo LEXIS 504, at *38–43. We stated that "the language of the regulation is clear and we must reject" the taxpayer's position. *Id.* at *42. We reiterate in this case that the text of Treasury Regulation § 1.183-1(d)(1) is clear, and it does not comport with petitioners' position.

Our opinion in *La Musga v. Commissioner*, T.C. Memo. 1982-742, 1982 Tax Ct. Memo LEXIS 4, also supports the position that the test is still appropriate when farming expenses also increase the value of land. *La Musga* involves facts somewhat similar to those in this case. The taxpayer purchased a farm "whose soil and buildings were in a state of neglect" with the intent to profit from appreciation of the land. *Id.* at *3–4. The taxpayer conducted an unprofitable farming activity on the land, in part to "rehabilitate the neglected soil." *Id.* at *3, *16–17. We applied the test and ruled that it was not satisfied. *Id.* at *17–19.

Furthermore, Treasury Regulation § 1.183-1(d)(1) describes the test with particularity, while petitioners' position is vague. Adoption of petitioners' position would lead to uncertainty regarding when farming and real estate activities can be considered a single activity.

We admit that the test is somewhat awkward as considered in this case. This is mostly because petitioners seek to combine TI's farming activity with real estate activities of entities that owned

**[\*90]** numerous properties, while the test contemplates combining a farming activity with the holding of a single property. Neither party addressed this, and we have found no precedent on point. We believe that considering the test with respect to individual properties in this case is most in line with Treasury Regulation § 1.183-1(d)(1). Refusal to consider the test because of the complicated ownership structure that petitioners created would likely create a loophole that others could use to avoid the test.

We rule that the test is appropriate in this case. We will consider the actual test.

Like petitioners, respondent failed to adequately address the test. In his opening brief respondent stated that

> [TI's] returns indicate that the expenses (apart from depreciation) directly attributable to its activity substantially exceed its income. As such, petitioners do not satisfy the test set forth in Treas. Reg. § 1.183-1(d)(1) for combining [TI's] activity and petitioners' real estate investment activities into a single profit motivated activity.

Respondent made similar statements multiple other times in his briefs without substantially addressing the entire test.

The test provides that it applies "[w]here land is purchased or held primarily with the intent to profit from increase in its value." Treas. Reg. § 1.183-1(d)(1). If a taxpayer's primary intent in purchasing or holding land was not to benefit from appreciation, but to operate a farm, the test does not apply. *Id.*; *see also Hoyle v. Commissioner*, T.C. Memo. 1994-592, 1994 Tax Ct. Memo LEXIS 600, at \*20 (citing *Engdahl v. Commissioner*, 72 T.C. 659, 668 n.4 (1979)).

Respondent briefly argued that La Perla and Jalisco Ranches were purchased as investments.[106] Petitioners argued that La Perla and Jalisco Ranches were purchased primarily "to provide for commercial

---

[106] Respondent also stated that "LSLP[] held La Perla Ranch and Jalisco Ranch primarily to profit from an increase in the properties' value." Though some facts support this position (i.e., petitioners describe the purpose of LSLP and GMCP to be "Holding Real Property"), it is clear that LSLP and GMCP held the land after 2006 primarily to conduct ecotourism on the land. Agreeing with respondent on this point would presumably cause the test to apply any time that a holding company is used to shield real estate from potential liabilities. We do not believe such an outcome to be consistent with the intent of the test.

**[*91]** hunting and fishing operations." We will discuss only La Perla and Jalisco Ranches at length, as they are the main properties at issue and received the most factual development.[107]

Petitioners agreed to purchase 15,070 acres of land in Zapata County in 2004 for investment purposes. GMCP and LSLP purchased the acreage in 2005. Petitioners intended to improve and sell all the land over the next three years. GMCP and LSLP sold all but 1,736 acres in 2005 and 2006. Of the land sold by GMCP, 1,294 acres was land within the oval sold to La Perla Negra, which granted GMCP a 14.285% ownership interest in La Perla Negra. GMCP and LSLP bought back the 1,294 acres from La Perla Negra in 2006 so that ecotourism could be conducted on all 3,030 acres within the oval. *See supra* FoF Part VII.B.

The test clearly applies to the 1,736 acres within the oval that LSLP purchased as an investment and never sold. Whether the test applies to the repurchased 1,294 acres is a more interesting question that the parties did not specifically address. We have not found any precedent pertaining to such a situation. We decline to rule on this question for two reasons. First, the outcome makes no difference in the result: TI's farming activity and the real estate activities are separate activities regardless of whether the test applies to the 1,294 acres. Second, we are loath to set precedent on this issue because the parties failed to develop or argue facts regarding GMCP's interest in La Perla Negra. For example, almost no evidence was presented regarding the course of dealings between petitioners/GMCP and La Perla Negra or its owner.[108] In addition, deeds in evidence indicate that GMCP's 14.285% interest in La Perla Negra may have been due to GMCP's ownership of a specific 184.83-acre tract[109] rather than 14.285% of the 1,294 acres as a whole. If GMCP retained 100% ownership of a 184.83-acre tract at all times, with La Perla Negra owning 100% of the other 1,109 acres during portions of 2005 and 2006, that would be highly relevant.

---

[107] The parties failed to develop sufficient facts with respect to other properties that would enable us to determine whether the test applies and/or whether the test is satisfied. The parties' inadequate factual development may explain why they made only cursory arguments regarding the test.

[108] Dr. Schwarz gave vague testimony about the owner of La Perla Negra buying other land from petitioners and "requir[ing]" petitioners to be partners with him. Specifics of the relationship were not discussed.

[109] The exact number of acres that GMCP sold to La Perla Negra in 2005 was 1,293.84 acres. We note that 1,293.84 acres times 14.285% equals 184.83 acres.

**[\*92]** We rule that the test applies to the 1,736 acres that were purchased by LSLP for investment in 2005 and never sold. We next consider whether the test was satisfied with respect to these 1,736 acres.

La Perla Ranch comprised the 1,736 acres combined with 502 acres that LSLP purchased from La Perla Negra in 2006. The 1,736 acres included the lodge, Waterworld, House Lake, and La Perla Lake. The evidence shows it is a near certainty that TI's Schedule F income attributable to La Perla Ranch did not exceed deductions other than those directly attributable to holding of the land in the years at issue or any other relevant period. We have considered that (1) TI's Schedule F expenses were over 200% of Schedule F income for years 2010–20 and over 350% of Schedule F income in the years at issue, (2) TI's very unprofitable ecotourism has been primarily conducted on La Perla and Jalisco Ranches since 2010, (3) most custom farming income (and related ranching income for consulting and fuel reimbursements) is attributable to work on La Perla and Jalisco Ranches in support of ecotourism for years 2010–20, *see supra* FoF Part XV, and (4) TI based its operations on La Perla and Jalisco Ranches in the years at issue and later years. Given the evidence presented, there is no way to determine TI's Schedule F income and expenses specifically attributable to the 1,736 acres. However, considering the centrality of these 1,736 acres to TI's farming activity, and TI's financial information as a whole, it is a near certainty that TI's Schedule F income attributable to the 1,736 acres does not exceed deductions other than those directly attributable to the holding of the land.[110]

The parties did not address whether TI's Schedule F expenses incurred to build improvements on land are directly attributable to the holding of the land. We believe they are not. That TI constructed improvements on the 1,736 acres has nothing to do with the holding of the land, as TI did not own the land.[111] We think the better way to look

---

[110] Petitioners' claim (discussed *supra* in this OPINION Part VIII.B.1) that TI's "hunting and fishing activities are intertwined with the land" could be taken as an argument that all of TI's Schedule F expenses are directly attributable to the holding of land. Aside from this extremely overbroad claim, petitioners do not argue that TI satisfies the test with respect to any tract of land. If petitioners believed that TI's Schedule F income exceeds expenses other than those directly attributable to the holding of any piece of land, they would have argued as much. That petitioners made no such argument speaks volumes.

[111] In addition, omitting custom farming expenses while still counting custom farming gross income would give TI a double benefit, which we do not believe to be intended by the test.

**[*93]** at this is that LSLP incurred expenses by paying TI to complete custom farming work on the 1,736 acres. TI's resulting work was not attributable to the holding of the land; TI was simply completing work that was part of its farming activity, just as if it had been paid by an unrelated third party for custom farming work. In addition, the test specifies property taxes and depreciation attributable to improvements as expenses directly attributable to the holding of the land. When LSLP paid TI to build improvements on land, LSLP paid property taxes and claimed depreciation on those improvements, not TI.[112]

Considering the facts and law, we rule that the test is not satisfied with respect to the 1,736 acres.

We and other courts, including the Fifth Circuit, have interpreted Treasury Regulation § 1.183-1(d)(1) to preclude the combining of farming and land-holding activities where the test is not satisfied. *Westbrook v. Commissioner*, 68 F.3d at 877 (stating that "Treasury Regulation § 1.183-1(d)(1) provides that farming and the holding of land for speculation constitute a single activity only if the" test is satisfied (citing *Estate of Power v. Commissioner*, 736 F.2d 826, 829 (1st Cir. 1984), *aff'g* T.C. Memo. 1983-552)); *Burrus v. Commissioner*, T.C. Memo. 2003-285, 2003 Tax Ct. Memo LEXIS 287, at *25 (stating that farming "must be treated as a separate activity from the holding of land" when the test is not satisfied); *Butler v. Commissioner*, T.C. Memo. 1997-408, 1997 Tax Ct. Memo LEXIS 491, at *23 (stating that a "farming activity and the holding of the land cannot be construed to be a single activity" when the test is not satisfied). Accordingly, we rule that TI's farming activity and LSLP's holding of the 1,736 acres are separate activities.

---

[112] A small portion of TI's depreciation expenses is attributable to improvements to La Perla Ranch that TI was not paid to complete. Omission of these expenses has a negligible effect.

We have also considered the possibility that lease payments TI made to LSLP to rent the 1,736 acres should be omitted (as a proxy for mortgage interest and property taxes paid by LSLP). However, the test does not prescribe such an adjustment, and we have found no precedent supporting one. Furthermore, even if lease payments were omitted, it is still a near certainty that TI's Schedule F income attributable to the 1,736 acres would not exceed deductions other than those directly attributable to the holding of the land.

**[\*94]**     2.     *Treasury Regulation § 1.183-1(d)(1) and Caselaw Factors*

We have ruled that TI's farming activity and LSLP's holding of 1,736 acres are separate activities. *See supra* OPINION Part VIII.B.1. However, we must address the remaining properties/real estate activities. We will address the Treasury Regulation § 1.183-1(d) and caselaw factors to be considered when ascertaining the activity or activities of a taxpayer. Like the test discussed *supra* OPINION Part VIII.B.1, many of these factors are clunky as considered in this complex case. We believe the analysis of the case as a whole *supra* OPINION Part VIII.A is more useful.

a.     *Degree of Organizational and Economic Interrelationship of the Undertakings*

Respondent claimed that there "is no organizational and economic interrelationship between [TI's farming activity] and petitioners' real estate holdings." Respondent argued that TI was paid for custom farming work performed on various properties, leased land from LSLP and GMCP, and did not own land itself. This last point is incorrect, as TI owned an interest in land from 2005 until it transferred the ownership to GMCP in 2013.

Petitioners claimed that TI is an operating entity for petitioners and Affiliated Entities. To support this, petitioners claimed that

> [TI] is the general partner of GMCP and a partner of LSLP. GMCP owns the remaining interest of LSLP. Petitioners own 100% of [TI] and 99% of GMCP. Petitioners own 100% of Lone Star La Cuesta.[113] Therefore, the ownership structure of the entities is interconnected. The organizational relationship is evident in other entities as well because Dr. Schwarz is either a partner or member in all the related entities.

> While the businesses are organized as separate LLC entities, they function through extensive intercompany transactions and their operations are significantly interrelated. [TI's] business from 2002 onward was involved in the activity of identifying properties for

---

[113] Dr. Schwarz actually owned 99% of Lone Star La Cuesta. Two third parties owned the remaining 1%.

**[*95]** purchase and assembly, developing such properties for resale (including subdividing properties), and operating and managing the properties as ranches for wildlife development, hunting and fishing for revenue, leasing, and farming so as to increase the value of such properties for prospective purchasers and investors.

> After acquiring real property, [TI] would install food plots, reversable fences and implantation of superior deer genetics on the property (i.e. the Tecomate System) with the goal of reselling the property at premium rates. Along with the Tecomate System, the properties were marketed with the Tecomate brand and Dr. Schwarz's reputation of growing big deer on his properties.

> With the purchase of La Perla and Jalisco ranches and the construction of the lakes the business strategy for the collection of entities changed. Dr. Schwarz saw an opportunity to make additional profits through a large commercial deer hunting and fishing operation[] while increasing the value of his land holdings through the continued build-up of the Tecomate brand. [TI], as the management company, rented La Perla and Jalisco ranches from LSLP and started selling guided hunts and eventually guided fishing.

(Citations omitted.) This quoted text contains numerous incorrect and/or misleading assertions that build on each other. It is somewhat difficult to address these incorrect and imprecise claims as a result.

Petitioners discussed TI's "business from 2002 onward." They claimed that during this time TI was involved in real estate and farming activities. However, TI did not file Schedule F until 2005. The facts of this case do not support petitioners' claims that TI engaged in farming activities before 2005. To the extent TI was acting as an (alleged) operating entity before 2005 with respect to the real estate activities, this supports the position that the farming activity is separate from the real estate activities.[114]

---

[114] Petitioners often fail to note the difference between TI's farming activity and TI as a whole.

**[\*96]** Petitioners went on to claim that "[w]ith the purchase of La Perla and Jalisco ranches [in 2005 and 2006] and the construction of the lakes the business strategy for the collection of entities changed." What it changed from is unclear; the prior paragraphs incorrectly represent that TI conducted ranching activities before 2005. Again, TI did not file Schedule F until 2005 (which is the same year that LSLP was formed).

Petitioners' briefs (like respondent's) are inaccurate in that they omit TI's work in Starr County in 2005 and several years thereafter. *See supra* FoF Part VIII.A. Petitioners heavily implied that TI began operating on La Perla and Jalisco Ranches soon after the properties were purchased, but the evidence shows otherwise. Petitioners also failed to explain why LSLP and GMCP filed Schedules F for years 2008–12 if TI was the operating entity at all times. LSLP reported over $2.7 million in Schedule F losses for years 2008–12 and deducted expenses attributable to hunting and fishing for years before 2008.

Petitioners' assertion that TI operated and managed properties as ranches "so as to increase the value of such properties for prospective purchasers and investors" is not supported by the facts. TI did not operate and manage *most* properties as ranches; it only performed custom farming work on most properties and was paid to do so.[115] It operated La Perla and Jalisco Ranches beginning around 2010, but any appreciation of those ranches resulting from TI's work was incidental to TI's primary goal of developing and running ecotourism. TI conducted limited ecotourism on Twin Lakes Ranch during and after the years at issue. However, Twin Lakes Ranch was never intended to be a long-term holding and was eventually sold in 2019 after years on the market.

---

[115] Mr. Yelland's testimony supports our view that TI's management work on most ranches was actually just custom farming work. After being asked if "employees would go out and manage these . . . properties" other than La Perla and Jalisco Ranches, Mr. Yelland responded:

> If there was custom work being done on those other properties, then yes. They would go out there and do that. And the properties that we did have–we had–sometimes we do custom work to third-party entities that aren't related to the Tecomate entities. And so they would also travel to those properties if work was being performed.

To the extent petitioners equate custom farming work with operation and management of properties, we disagree. Operation and management of a property implies something more general and continuous (such as TI's activities on La Perla and Jalisco Ranches) than custom farming work.

**[\*97]** Petitioners cited the leases between TI and LSLP/GMCP as evidence of economic relationships between entities. However, we have previously discussed the numerous problems with the leases and the tax benefits that petitioners gained as a result. At best, the leases slightly support petitioners' position with respect to LSLP and GMCP.

Petitioners claimed that TI's ecotourism provides brand and marketing benefits to the real estate activities. They cited "Dr. Schwarz's reputation of growing big deer on his properties" as a positive marketing feature. Petitioners also alleged that larger bucks increase the value of properties. Mr. Swanson's reports somewhat supported these claims. Mr. Swanson made small positive adjustments to some property valuations considering the quality of the game (though other features, such as fencing, factored into this adjustment). Mr. Swanson also noted the "management of wildlife by well-known owner of Tecomate" as a positive marketing feature for the La Perla HQ Tract, Jalisco Ranch, and the Lone-Star Tract, but did not make specific adjustments as a result. Notably, Mr. Swanson did not make this note in his appraisals of Tecomate South Ranch, Tecomate East Ranch, and the Sullivan Tract. Considering the small adjustments Mr. Swanson made, we conclude that brand/marketing and game-related benefits that TI's ecotourism provides to the real estate activities are minimal.

Petitioners accurately stated that TI performed custom farming work on many properties and that such work increased property values. Petitioners claimed this work (including the labor of TI's employees and the use of TI's equipment) is evidence of intercompany relationships and transactions. However, TI issued invoices and was paid for such work, often with "project administration fees" that represented, or were intended to represent, profit for TI. Custom farming work resembles the relationship between a property owner and a third-party contractor more closely than it does a property owner and an alleged operating entity. Indeed, some custom farming work is done for unrelated parties, to whom Tecomate Industries actually is a third-party contractor.

Petitioners accurately stated that Mr. Yelland kept books regarding numerous entities/properties and that his wages were reported as expenses on TI's Schedules F. Whether this was proper or represented a significant relationship between farming and real estate activities is questionable.

Petitioners accurately stated that a section 469 grouping election was made in 2017, covering TI and GMCP (which collectively own 100%

[*98] of LSLP). *See* Treas. Reg. § 1.469-4. Treasury Regulation § 1.469-4 "sets forth the rules for grouping a taxpayer's trade or business activities and rental activities *for purposes of applying the passive activity loss and credit limitation rules of section 469." Id.* para. (a) (emphasis added). Whether this election was proper or represented a significant relationship between farming and real estate activities in this section 183 case is highly questionable.

This factor is neutral with respect to LSLP and GMCP but favors respondent with respect to the remaining entities.

b.       *Business Purpose Served by Carrying On the Undertakings Separately or Together*

Petitioners restated their argument that TI is an operating entity for other Affiliated Entities. Petitioners also alleged that they created numerous entities because "[s]eparating business operations to isolate insurance and property specific liability is a common practice."

Respondent argued that TI and LSLP/GMCP were separately formed, with different objectives, books and records, and bank accounts.

If TI's farming activity was losing money primarily to develop properties for sale, this factor would likely favor petitioners. However, TI's farming activity (at least since 2010) was largely focused on developing and running ecotourism on La Perla and Jalisco Ranches. TI's farming activity was conducted separately less to isolate risks and more because it had objectives distinct from those of the real estate activities. While the objective of the real estate activities was to increase the value of properties and sell them, TI's farming objectives were to develop and run its ecotourism on La Perla and Jalisco Ranches first and complete custom farming jobs on other properties second. When TI conducted custom farming work on properties that were later put up for sale, it was paid as if it were a third-party contractor.

This factor favors respondent.

c.       *Similarity of the Undertakings*

Petitioners combined their arguments regarding this factor with their arguments regarding the "business purpose served by carrying on the undertakings separately or together" factor.

**[*99]** Respondent argued that "[o]ffering a farming, hunting, fishing and ecotourism activity to the public is a distinct undertaking from holding land and developing it for investment purposes."

Respondent is correct that TI's ecotourism had little similarity to real estate activities. The real estate activities were designed to maximize profits from property sales, typically over a shorter period and using sophisticated sales techniques. For example, after LSLP and GMCP purchased the 15,070 acres of land in Zapata County in 2005, those entities sold most of the land in under a year for large profits.

On the other hand, TI's ecotourism was not designed to maximize property values for prospective purchasers. Instead, TI's ecotourism was driven by long-term, sometimes quixotic, quests to grow big deer and bass, which petitioners claimed would one day help TI's farming activity reach profitability. Dr. Schwarz even testified that he started conducting ecotourism in Zapata County because "[g]reat real estate markets come and go, and I didn't want to be married to that."

Custom farming was similar to real estate activities when TI worked on properties to be sold. However, most of TI's custom farming income for years 2010–20 was attributable to work completed in support of ecotourism.

This factor favors respondent.

### d. *Caselaw Factors*

In addition to the factors provided in the regulations, we also consider the following factors: (1) whether the undertakings were conducted at the same place, (2) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from their land, (3) whether the undertakings were formed separately, (4) whether one undertaking benefited from the other, (5) whether the taxpayer used one undertaking to advertise the other, (6) the degree to which the undertakings shared management, (7) the degree to which one caretaker oversaw the assets of both undertakings, (8) whether the same accountant was used for the undertakings, and (9) the degree to which the undertakings shared books and records. *See Topping*, 2007 Tax Ct. Memo LEXIS 88, at *17–18 (citing *Mitchell*, 2006 Tax Ct. Memo LEXIS 145, at *11–12). We will quickly address these. There is significant overlap between many of these factors and those previously discussed. All facts have been considered.

[*100] TI conducted continuous farming activities on La Perla and Jalisco Ranches from 2010 or thereabouts. The frequency of its operations on other properties was more sporadic.

From 2010 TI's ecotourism helped generate revenue from La Perla Ranch, Jalisco Ranch, and (to a small extent) Twin Lakes Ranch. Expenses associated with this revenue resulted in massive losses. TI rented land from LSLP and GMCP, though there were numerous issues with the leases.

TI was formed separately from GMCP and LSLP. TI did not focus its operations on La Perla and Jalisco Ranches until around 2010.

From 2010 TI's ecotourism work helped to maintain and improve La Perla Ranch, Jalisco Ranch, and (to a small extent) Twin Lakes Ranch. Ecotourism benefits to other properties were minimal. Custom farming work benefited other properties, though TI was paid for such work.

Marketing and brand benefits TI's farming activity provided to the real estate activities were minimal.

Petitioners controlled and/or owned (in whole or in part) TI, LSLP, GMCP, and other Affiliated Entities.

There was a full-time ranch manager, huntmaster, and fishmaster on La Perla and Jalisco Ranches, and employees constantly worked there. The employees performed significantly less work and oversight on other properties in years after 2010.

Mr. Guthrie prepared returns for petitioners, TI, LSLP, and GMCP, but not other Affiliated Entities. Mr. Yelland kept books and managed the finances for TI and most Affiliated Entities, including GMCP and LSLP.

TI maintained books and records separate from those of the Affiliated Entities.

C.    *Conclusion Regarding Activity at Issue*

Considering all the facts and law, we rule that petitioners' characterization of TI's farming activity and the real estate activities as a single activity is unreasonable. We hold that these are separate activities.

**[*101]** IX.  *Section 183 Issue: Whether TI's Farming Activity Was Engaged In for Profit*

We next consider whether TI's farming activity was engaged in with the intent to make a profit. The regulations provide a nonexhaustive list of nine factors that should be considered: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Treas. Reg. § 1.183-2(b). "No one factor is determinative," and it is not intended that "a determination . . . be made on the basis that the number of factors . . . indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa." *Id.*

A.  *Manner in Which Taxpayer Carries On the Activity*

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that an activity is engaged in for profit. Treas. Reg. § 1.183-2(b)(1). This may be indicated where a taxpayer changes operating methods, adopts new techniques, or abandons unprofitable methods in a manner consistent with an intent to improve profitability. *Id.*

Petitioners pointed out that TI hired an experienced bookkeeper and other appropriate employees, consulted experts, maintained books and records, followed state hunting requirements, followed employment tax requirements, hired an experienced accountant, purchased insurance, promoted its ecotourism in several ways, and took other steps to protect itself, Affiliated Entities, and petitioners from liability claims. TI also ran safe hunting operations that included numerous animal management techniques. While TI had no written business plan, petitioners argued that there was an unwritten plan evidenced by actions and that Dr. Schwarz regularly discussed TI's finances with Mr. Yelland and Blair Schwarz.

Respondent pointed out that TI had no written business plan, had no budget or income projections, and sometimes had records missing and incorrect books. Respondent argued that TI failed to keep "the type of

[*102] records that they could have used to evaluate the operation of the activity and to enable them to analyze the financial aspects of the activity" and did not use "records that were maintained to improve the operations or to stem [TI's] recurring and significant losses." Respondent also cited the leases with LSLP and GMCP as evidence that TI was not carried on in a businesslike manner.

The parties argued about changes that TI made to ecotourism. Petitioners pointed to the introduction of exotics at Dr. Hellickson's suggestion, introduction of breeding pens in 2013, and various changes to the fishing program (including the agreement with the TPWD). Petitioners also originally argued that TI "stopped offering duck hunting because it was too expensive and not generating enough income," though they reversed themselves in their supplemental briefs. Respondent highlighted the fact that TI lost large amounts of money over numerous years, failed to make changes necessary to profit, and failed to research the effect that changes would have on profitability.

Each party made good arguments regarding this factor. There are a few points that we believe are most significant.

First, TI's farming activity was not illusory or low revenue. Although its expenses were high, TI earned over $10 million of total Schedule F gross income in years 2010–20. TI conducted upscale ecotourism, especially with respect to deer hunting. TI also conducted custom farming and built (or assisted in building) multiple large lakes and other significant projects on La Perla and Jalisco Ranches. TI hired, and consulted with, knowledgeable people.

Second, TI maintained books and records that have both positive and negative facts associated with them. On the positive side, the books and records appear to have survived an IRS audit with no specific expense deductions being disallowed or unreported income found. On the negative side, there are records missing and various errors in the books and records, including errors regarding the leases with GMCP and LSLP. We have spent a great deal of time reviewing the books and records and agree with respondent that they do a poor job of showing why TI's farming activity lost money so that appropriate changes could have been made.

Third, TI has made some changes to its operations since 2010, though it does not appear that the changes made will result in profitable operations. Exotics were introduced onto La Perla and Jalisco Ranches

[*103] on the advice of Dr. Hellickson, but there is no evidence that TI researched the exotics market beforehand, and the revenue generated from exotics hunting in years 2017–20 was low. While TI ceased regular waterfowl hunting around 2014, it still chose to enter expensive, long-term leases for waterfowl hunting rights beginning in January 2014 and did not attempt to get out of the leases afterward. On the other hand, use of deer breeding pens beginning in 2013 appears to have been successful in producing significantly more trophy-class bucks.

The fishing operations highlight how several changes made have been ineffective and that significant further changes are needed. The primary theory behind the fishing operations was that growing a state-record bass would result in an increase in gross income. However, this was a quixotic project at best. Dr. Schwarz's failure to make many changes suggested by Mr. Jones (or failure to follow his recommendations to begin with) stymied bass growth and almost certainly led to the fish kills. Dr. Schwarz's introduction of hybrid bass into La Perla Lake, against Mr. Jones's recommendation, led to the creation of a second large lake, with attendant increased costs. Trophy Lake was expanded and, as Blair Schwarz testified, "we had plans to develop it into another fishing lake, and we just never did." While the agreement with TPWD to grow ShareLunker Program bass in Jalisco Lake was inventive, TI also got lucky when the TPWD left the agreement well before the 15-year term had run.

Building the lakes and maintaining the lakes/fishing operations cost TI a great deal of money. Even in the unlikely event that TI eventually grows a bass that breaks the current state record, there is no guarantee that a larger bass will not be caught before then.

Finally, no entity said to be run in a businesslike manner would have entered into the problematic leases with GMCP and LSLP, then paid even more than the leases required. These leases essentially guaranteed that TI's ecotourism could not be profitable. The only reason that TI agreed to the leases is that LSLP and GMCP were ultimately owned by petitioners, who received a tax benefit from the overpriced and overpaid leases.

This factor favors respondent.

B.     *Expertise of Taxpayer or Advisers*

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those

**[*104]** who are expert therein, may indicate that a taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Treas. Reg. § 1.183-2(b)(2). Where a taxpayer has such preparation or procures such expert advice but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits. *Id.*

Petitioners pointed to Dr. Schwarz's decades-long history of ranching and growing deer, TI's hiring of knowledgeable employees, and the consultation with appropriate experts in support of their position.

Respondent made a variety of arguments, including that Dr. Schwarz has "applied [his] knowledge towards conservation efforts, rather than business planning." Respondent pointed out that Dr. Schwarz "did not always take the advice" given by experts such as Mr. Jones.

Dr. Schwarz recognized that there were times that he should have followed Mr. Jones's advice. It is also questionable whether TI gained business/economic knowledge sufficient to make a profit on its farming activity. In spite of these issues, it is clear that TI acquired a great deal of expertise regarding its farming activity in general.

This factor favors petitioners.

C. *Time and Effort Expended by Taxpayer in Carrying On the Activity*

The fact that a taxpayer devotes much of their personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. Treas. Reg. § 1.183-2(b)(3). A taxpayer's withdrawal from another occupation to devote most of their energies to the activity may also be evidence that the activity is engaged in for profit. *Id.* The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on the activity. *Id.*

Petitioners pointed out that they spent most weekends on La Perla and Jalisco Ranches, that Dr. Schwarz made all major decisions regarding TI, and that TI's employees ran day-to-day operations.

**[\*105]** Respondent argued that petitioners did not spend sufficient time on the ranches, that Dr. Schwarz worked full time as a dentist and oral surgeon, and that petitioners and their family derived personal and recreational benefits from La Perla, Jalisco, and other ranches owned by petitioners and Affiliated Entities.

Petitioners hired competent and qualified persons to carry on operations while they were not on ranches. Though there were personal and recreational elements associated with TI's farming activity (discussed *infra* OPINION Part IX.I), this factor favors petitioners.

D. *Expectation That Assets Used in Activity May Appreciate in Value*

Treasury Regulation § 1.183-2(b)(4) provides, in part:

The term *profit* encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of § 1.183-1 for definition of an activity in this connection.

We have already addressed Treasury Regulation § 1.183-1(d) and ruled that TI's farming activity and the real estate activities are separate activities. We will not consider appreciation of real properties.[116]

---

[116] Even if we agreed that most real estate activities and TI's farming activity are part of the same activity, there is no guarantee that this factor would strongly favor petitioners. The test set forth in Treasury Regulation § 1.183-1(d) clearly precludes consideration of the 1,736 acres purchased by LSLP for investment in 2005 and never sold. This is the most valuable acreage owned by petitioners or Affiliated Entities since 2005. Excluding this acreage, using taxable gains (when available) for sold properties instead of gross gains, and correcting other errors that Dr. Hakala made, it strongly appears that TI's Schedule F losses from 2005 to the end of 2020 outweigh realized and unrealized gains in real property (using Mr. Swanson's valuations). Considering the strong real estate market and petitioners' price-enhancing sales techniques, that is a *shockingly* bad outcome for petitioners.

**[*106]** Predictably, the parties focused on the values of the real properties when discussing this factor. There are certain assets that were severable from land that the parties did not address at length, namely the deer, exotics, and bass bought and raised by TI. No specific value was ever assigned to the exotics or the bass. It is unclear whether the bass had any value if removed from La Perla and Jalisco Lakes; Dr. Schwarz's testimony indicated that a state regulation prohibited the sale of bass, and petitioners made no attempt to place a specific value on the bass. We discussed the deer herd at length *supra* OPINION Part V.

Even if we assume that the deer, exotics, and bass have all increased in value and take any increase into account, such increases would be comparatively small. For example, after over a decade of TI's work on La Perla and Jalisco Ranches, Dr. Hellickson estimated that the deer herd on those ranches was worth $628,000.[117] This does not account for the value of deer on La Perla and Jalisco Ranches when TI began operating on those ranches.

Any increase in the value of the animals is negligible compared to TI's Schedule F losses of over $11 million for years 2010–20. Appreciation of animals from 2015 onward is also negligible when compared to TI's Schedule F losses of over $6 million for years 2015–20. *See Robison v. Commissioner*, T.C. Memo. 2018-88, at *20–21 (discussing how appreciation of assets and earnings should be sufficient to recoup losses between a given year and the time at which future profits are expected).

Petitioners made poorly developed arguments that the "Tecomate brand" had some value and has appreciated over time. No specific value was ever assigned, and we do not believe any benefit to be significant.

This factor is neutral.

---

We also note our caselaw holding that "[a]n unsuccessful farming operation cannot be carried on forever simply because the price of land in that general area is rising." *Boddy v. Commissioner*, T.C. Memo. 1984-156, 1984 Tax Ct. Memo LEXIS 514, at *22 n.6 (citing *Jasionowski*, 66 T.C. at 323), *aff'd*, 756 F.2d 884 (11th Cir. 1985) (unpublished table decision).

[117] As stated *supra* OPINION Part V, we do not agree with the $628,000 figure reached by Dr. Hellickson; we are using this figure only to illustrate a point.

**[\*107]** E.  *Success of Taxpayer in Carrying on Similar or Dissimilar Activities*

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that they are engaged in the present activity for profit, even though the activity is presently unprofitable. Treas. Reg. § 1.183-2(b)(5). In *Wondries v. Commissioner*, T.C. Memo. 2023-5, at \*11, we ruled that a taxpayer's success in turning unprofitable car dealerships into profitable ones indicated that the taxpayer and his spouse were engaged in a dissimilar ranch business for profit.

Dr. Schwarz profitably ran his dentistry business, VOMS, apparently from its inception. Petitioners had a history of success in ranch real estate activities. Dr. Schwarz was also a partner in Tecomate Seed Company/Tecomate Wildlife Systems for over two decades, though it is unclear whether he profited in this venture.

Petitioners (and later TI) ran the unprofitable Tecomate Ranch hunting operation from the 1990s to 2011. This activity is much more similar to ecotourism conducted by TI in the years at issue than to the activities discussed in the prior paragraph.

This factor is neutral.

F.  *Taxpayer's History of Income or Losses with Respect to the Activity*

A series of losses in the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. Treas. Reg. § 1.183-2(b)(6). Where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not engaged in for profit. *Id.* If losses are sustained because of unforeseen circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. *Id.* A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit. *Id.*

Respondent relied on TI's history of losses. Petitioners argued that there are many reasons for such losses, including (1) lease

**[\*108]** payments to LSLP and GMCP, (2) accelerated depreciation expenses, (3) fishing and other startup costs, and (4) unexpected setbacks discussed *supra* FoF Part XVII.B. Petitioners also made arguments about appreciation of ranch properties and value of animals which we have already discussed and will not rehash here.

While we are cognizant of the startup times that can be associated with developing a rundown ranch and growing large deer and bass, TI's Schedule F losses were still substantial.[118] In years 2005–20 TI's farming activity had total expenses over two times larger than total gross income. The same is true of years 2010–20.

Year after year TI's farming activity continued to lose money. This was true both during and after construction of the lakes. TI's ecotourism lost an enormous amount of money, continuing Dr. Schwarz's history of losing money with respect to hunting/ecotourism activities going back to the 1990s. TI's losses continued even though it fully booked available deer hunting packages and had a waiting list in the years at issue.

Petitioners' excuses are largely unavailing. The years at issue are outside the period in which startup costs are a good excuse. TI had more than sufficient time to build out its operation, grow deer and bass, and become profitable. However, there is no sign that TI will ever turn a profit. In fact, some financial metrics indicate things are getting worse. For example, hunting package gross income rose 42% from 2010 to 2020, but nonfishing wildlife operations expenses rose 316%.

Even if the problematic leases with LSLP and GMCP were corrected and lease payments were reduced, lease expenses would still be substantial. While this money went to entities ultimately owned by petitioners, those entities paid loan interest and other expenses associated with the properties that TI avoided by leasing properties instead of owning them itself.

Accelerated depreciation expenses may increase losses in the short term, but such expenses normalize over time. TI conducted its

---

[118] It appears that LSLP incurred most/many of the startup costs with respect to La Perla and Jalisco Ranches, while TI was conducting operations mostly in Starr County. LSLP reported Schedule F losses totaling over $2.7 million for years 2008–12 and its 2005–07 returns also claim deductions for items such as "hunt expense."

[*109] farming activity from 2005, operated mostly on La Perla and Jalisco Ranches from around 2010, and never had a profitable year.

Financial effects from setbacks are speculative and most alleged setbacks are not good excuses. We will quickly address the various setbacks petitioners point to.

Petitioners claimed that in 2012 an under-construction "barn burnt down, and petitioners' insurance did not completely cover the replacement, so much of the financial loss was born by the petitioners directly." LSLP's balance sheets indicate that it paid for the barn, and an LSLP document titled "Transactions by Account" shows various insurance payments received by LSLP relating to a barn fire in 2012. There is no indication that TI bore the cost of the barn fire, other than possibly being inconvenienced while the barn was rebuilt.

Petitioners claimed illegal immigration affected real property sales, which are not part of TI's farming activity.

Dr. Schwarz himself testified that droughts in South Texas are "not an act of God; that's where we live."

The fish kills were almost certainly caused by Dr. Schwarz's not following Mr. Jones's advice.

There is no evidence that Dr. Schwarz's bulldozer accident, while unfortunate, was a major setback to TI. TI had conducted farming operations for years when the accident occurred and had knowledgeable employees to run the operations while Dr. Schwarz recuperated.

The lawsuit that resulted in suspension of depredation permits to kill double-crested cormorants around 2016 was a setback for TI. Petitioners did not assign a cost to this setback, but vaguely described it as "crippling." We estimate this setback did not cost TI over $100,000 total over the years 2016–20. The fishing operations had significant other headwinds that we believe were more responsible for losses.

The Medicaid fraud charges against Dr. Schwarz pertained to his dental practice. He was acquitted after a trial in 2011. Petitioners alleged that TI sold equipment and cut back on feeding animals so that petitioners could pay legal expenses, which "would have an impact on the business for many years down the road." Petitioners' claims are speculative and do little to explain TI's long history of losses.

**[*110]**  This factor favors respondent.

### G.  *Amount of Occasional Profits, if Any*

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of a taxpayer's investment and the value of assets used in the activity, may demonstrate the taxpayer's intent. Treas. Reg. § 1.183-2(b)(7). An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. *Id.* However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. *Id.* Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are generated. *Id.*

TI's farming activity incurred losses each year 2005–20. The total net losses of $15,449,685 over this time exceed the total gross income of $14,338,568. TI's farming activity also had total expenses over two times larger than total gross income for years 2010–20. We have already discussed appreciation of relevant assets and found it to be insignificant.

There does not appear to be an opportunity to earn a "substantial ultimate profit in a highly speculative venture." While attempting to grow a state-record bass could be said to be highly speculative and might produce financial rewards for TI in the unlikely event one were caught, it is unlikely that such an event would make up for ecotourism losses related only to fishing, to say nothing of TI's other Schedule F losses.

This factor favors respondent.

### H.  *Financial Status of Taxpayer*

The fact that a taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Treas. Reg. § 1.183-2(b)(8). Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. *Id.*

[*111]  In the years at issue Dr. Schwarz made millions of dollars each year from VOMS. Petitioners have also made a substantial amount of money since 2005 from real estate activities. In the years at issue and other years TI's Schedule F losses were partially offset by tax deductions petitioners received as a result of those losses. TI's problematic leases with GMCP and LSLP generated passive income for GMCP and LSLP, which provided additional tax benefits to petitioners. There were also personal and recreational elements associated with TI's farming activity, discussed *infra* OPINION Part IX.I.

Though petitioners were worth almost $50 million in 2017, their liquidity was comparatively low. A substantial portion of petitioners' net worth was attributable to life insurance and ownership of Affiliated Entities that primarily held illiquid real property (including La Perla and Jalisco Ranches). A lack of liquidity likely explains why, when LSLP bought water rights for $560,450 in 2015, Dr. Schwarz funded the purchase by withdrawing funds from his section 401(k) plan at VOMS.

Petitioners argued that TI's Schedule F losses are large relative to Dr. Schwarz's income and unsustainable unless margins improve. In addition, Dr. Schwarz was at an age when many people contemplate retirement. We agree that it may be difficult for petitioners to continue operating TI should Dr. Schwarz retire and margins fail to improve.

This factor slightly favors respondent.

I.  *Elements of Personal Pleasure or Recreation*

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Treas. Reg. § 1.183-2(b)(9). On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. *Id.* However, an activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. *Id.* The fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors. *Id.*

Petitioners often did work when they were on La Perla and Jalisco Ranches, but there were also personal and recreational elements associated with TI's farming activity. Petitioners and their family spent a week around Christmas on the ranches, though there were usually

**[\*112]** hunters there at the same time. While there, petitioners benefited from improvements to the ranches. Petitioners and members of their family were hunters, though Dr. Schwarz and family members only shot trophy-class bucks on film for television shows. Petitioners' grandchildren were collectively allowed to shoot one management buck and one exotic each year. Dr. Schwarz was also an avid angler who enjoyed fishing. Petitioners' family members were also allowed to fish on the ranches, though not for large bass.

TI's work helped Dr. Schwarz continue his longtime hobby/dream of growing big deer. This and his more recent quest to grow large bass kept his name appearing in hunting- and fishing-focused magazines. The record also shows that Dr. Schwarz enjoyed owning and operating ranches, as prior generations of his family had.

This factor favors respondent.

J.     *Conclusion Regarding Section 183*

Most of the factors discussed above favor respondent. Of these, we believe that the factors pertaining to TI's history of losses and lack of profits are the most significant. Year after year, TI's farming activity continued to lose money, and there is no indication it will ever be profitable. We believe that Dr. Schwarz was following his longtime passion for deer and ranch development and pursued this independently of any desire to earn a profit. Petitioners had money to do this, especially when they knew that the real estate market was strong. Considering all the facts and circumstances, we find that petitioners did not have an actual and honest profit objective. We hold that TI's farming activity was not engaged in with the intent to make a profit.

X.     *Accuracy-Related Penalties*

Respondent determined that petitioners are liable for section 6662(a) accuracy-related penalties for the years at issue on the basis of negligence and/or substantial understatements of income tax. Respondent bears the burden of production with respect to section 6662(a) penalties and is required to present sufficient evidence showing that any penalty is appropriate. *See* § 7491(c); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001). This includes showing compliance with the procedural requirements of section 6751(b)(1). *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Respondent can meet his burden by presenting sufficient

**[*113]** evidence to show that it is appropriate to impose a penalty in the absence of available defenses. *See id.* (citing *Higbee*, 116 T.C. at 446).

Section 6662(a) and (b)(2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on a taxpayer's return that is attributable to a substantial understatement of income tax. An understatement of income tax is a "substantial understatement" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. § 6662(d)(1)(A). The deficiencies at issue and petitioners' returns for the years at issue show that respondent has met his burden of production with respect to penalties on the basis of substantial understatements of tax. Petitioners conceded that respondent complied with section 6751(b)(1) because his agent obtained proper written approval of the penalties at issue. We find that respondent has met his initial burden to show that penalties are appropriate.

Petitioners alleged that they have a reasonable cause defense against the penalties determined by respondent. A taxpayer may avoid a section 6662(a) penalty by showing that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. § 6664(c)(1). Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence. *United States v. Boyle*, 469 U.S. 241, 246 (1985). Whether a taxpayer acted with reasonable cause and in good faith within the meaning of section 6664(c)(1) is determined on a case-by-case basis, considering all relevant facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year. *Id.* Taxpayers bear the burden of proof to show that this defense applies. *Higbee*, 116 T.C. at 447–49.

Where a taxpayer claims reliance on professional advice, section 6664(c) will apply if the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Petitioners claimed that they relied in good faith on the advice of their longtime accountant, Mr. Guthrie. Respondent argued that "there is no evidence that petitioners' CPA, Mr. Guthrie, provided advice to

**[\*114]** petitioners during the years at issue." Respondent's argument is an overreach; it is clear that Mr. Guthrie provided advice to petitioners in the years at issue. We will proceed to consider the three-prong *Neonatology* test.

Regarding the first prong, respondent did not contest the fact that Mr. Guthrie was a competent professional who had sufficient expertise to justify reliance when returns were prepared for the years at issue. The first prong is satisfied.

Regarding the second prong, a taxpayer is not entitled to rely on advice if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item. Treas. Reg. § 1.6664-4(c)(1)(i). Respondent argued that petitioners fail this prong because they did not provide Mr. Guthrie with the leases between TI and GMCP/LSLP. Respondent claims that as a result, TI's returns were incorrectly prepared and losses flowing through to petitioners were overstated.[119]

A clause in each lease between TI and GMCP/LSLP provides that improvements made by TI "shall constitute additional rent and shall become the property of the landlord on expiration or termination of this lease" (additional rent clauses). While Mr. Guthrie was aware that the

---

[119] In his supplemental briefs respondent made no arguments regarding how the penalties at issue are affected by the problems with the leases and the resulting tax benefits to petitioners. Respondent barely addressed the penalties at all; he simply referred back to his opening and answering briefs in one sentence and cited in support all the proposed "Ultimate Findings of Facts" from his supplemental opening brief. Most of these proposed findings have nothing to do with penalties. One of the proposed findings states: "Petitioners cannot rely on any advice received from their certified public accountant as reasonable cause because they did not provide him with complete and accurate information." Respondent had already proposed this exact finding of fact in his opening brief.

When we ordered supplemental briefing, we directed the parties to address how the problems with the leases (and other issues) "impact the section 183 and section 6662 issues in this case." Respondent failed to comply with this straightforward directive with respect to the penalties at issue. When the Commissioner fails to address an issue on brief, we may deem that he waived that issue. *See Rinehart v. Commissioner*, T.C. Memo. 2002-71, 2002 Tax Ct. Memo LEXIS 75, at \*10 (citing *Levert v. Commissioner*, T.C. Memo. 1989-333, *aff'd*, 956 F.2d 264 (5th Cir. 1992) (unpublished table decision)). We deem respondent to have waived any argument relating to how the problems with the leases discussed in the supplemental briefing affect the penalties at issue.

[*115] leases existed, he was not aware of the additional rent clauses when he prepared returns for TI, LSLP, and GMCP.

When asked about the additional rent clauses at trial, Mr. Guthrie testified that the clauses mean that returns for TI, LSLP, and GMCP are not correct. He testified that there should have been additional rent expenses on TI's returns and additional rental income on returns for LSLP and GMCP. We believe Mr. Guthrie is mistaken. The written leases ran to the end of 2023. Each lease provides that improvements become property of the landlord only upon expiration or termination of the lease. Presumably, that is the time when the additional rent would be deemed to be paid. Because most leases were (apparently) still in effect at the time of trial, it appears no additional rent would have yet been paid with respect to those leases. The leases with respect to Tecomate 457 Ranch and Twin Lakes Ranch were terminated when those properties were sold in 2016 and 2019; but it was not established whether any improvements TI built on those properties were subject to the additional rent clauses. LSLP and GMCP may have paid TI to build all the improvements on those properties, causing those improvements to belong to LSLP and GMCP at all times and no additional rent to result from the termination of the leases.

Respondent claimed that "[b]ecause of the failure to provide Mr. Guthrie [the leases], petitioners', [TI's], GMCP's and LSLP's returns have been incorrectly prepared since the leases went into effect." However, respondent failed to develop facts that would support this contention; respondent relied on Mr. Guthrie's (likely erroneous) interpretation of the leases.

Even if respondent's claim happens to be correct, respondent failed to give petitioners any credit for (1) general ledgers, balance sheets, profit and loss statements, and other documents that were provided to Mr. Guthrie; (2) Mr. Guthrie's questions that petitioners and Mr. Yelland always answered; and (3) the facts that Mr. Guthrie was aware of the leases, did not request the leases, and was always provided with all information that he asked for.

Respondent stated in his opening brief that "a taxpayer is not entitled to reasonable cause if he fails to disclose a fact that he knows, or reasonably should know, to be relevant to the proper tax treatment of an item. Treas. Reg. § 1.6664-4(c)(1)(i)." Respondent then failed to argue that petitioners knew or reasonably should have known that failure to provide the leases to Mr. Guthrie was relevant to the proper tax

**[\*116]** treatment of TI's losses. Given the somewhat unclear additional rent clauses that respondent relied upon, we question whether petitioners should reasonably have known that the leases might have been relevant to the proper tax treatment of TI's expenses for the years at issue. In addition, this is a complex section 183 case in which well over 10,000 pages of documents have been admitted into evidence. It is also a case in which respondent made no adjustments regarding unreported income or specific expenses. While petitioners might not have provided Mr. Guthrie with every (potentially) relevant document, the evidence suggests that they made a reasonable attempt to do so. We find that the second prong of the *Neonatology* test was satisfied.

Regarding the third prong, respondent made only vague arguments that petitioners did not actually rely in good faith on Mr. Guthrie's judgment. Citing *Caylor Land & Development, Inc. v. Commissioner*, T.C. Memo. 2021-30, at \*53, respondent argued that petitioners did not reasonably rely on Mr. Guthrie because he allegedly simply copied information provided to him onto a return. This is incorrect; Mr. Guthrie clearly provided considered advice to petitioners.

A taxpayer's education, sophistication, and business experience are relevant in determining whether the taxpayer's reliance on tax advice was reasonable and in good faith. Treas. Reg. § 1.6664-4(c)(1). While petitioners were both educated and intelligent individuals, they had little knowledge with respect to taxes. Petitioners had experience in ranching and real estate activities, though they were not particularly knowledgeable when it came to paperwork and other "business-side" elements. Even with VOMS, Dr. Schwarz hired a manager to run the business so that he could focus on dental work.

The facts support petitioners' position that they relied in good faith on the judgment of Mr. Guthrie, an experienced CPA. We find that the third prong is satisfied.

Petitioners reasonably relied in good faith on Mr. Guthrie's advice. Accordingly, accuracy-related penalties do not apply for the years at issue.

XI.    *Conclusion*

We hold that TI's farming activity was not engaged in for profit in the years at issue, but that petitioners are not liable for accuracy-related penalties. We have considered all arguments made by the

**[\*117]** parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*